IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                               No. CR 24-1346 JB

PAUL JESSEN, JR.,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress, filed February 18, 2025 (Doc. 18)("Motion"). The Court held a hearing on May 9, 2025. See Clerk's Minutes at 1, filed May 9, 2025 (Doc. 36); Transcript of Hearing at 1, taken May 9, 2025 ("Tr.").[1] The primary issues are: (i) whether the supporting affidavit, the warrant, and the resulting search violate Jessen's Constitutional rights; (ii) whether the exclusionary rule applies to suppress the evidence obtained from the resulting search of Jessen's iPhone 13 on March 16, 2022; (iii) whether even if the warrant is invalid, the good-faith exception applies or the inevitable-discovery rule applies such that the Court does not suppress the evidence. The Court concludes that: (i) the supporting affidavit, the warrant, and the resulting search, are lawful; (ii) the exclusionary rule does not apply, because there is no evidence of a Constitutional violation; (iii) even if there is a Constitutional violation, the good-faith exception and the inevitable discovery exceptions apply because the police reasonably rely on the warrant when searching Jessen's iPhone 13 and law enforcement would have obtained a valid warrant to search the iPhone 13. The Court, therefore, denies Jessen's motion to suppress evidence obtained from Jessen's iPhone 13.

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other Federal Rules of Evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a)("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  Additionally, the United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States does not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[2]("[T]he

---

[2]United States v. Lopez-Carillo, 536 F. App'x 762 (10th Cir. 2013), is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value

Supreme Court [of the United States] has made it clear hearsay is admissible in suppression hearings . . . .   As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing <u>United States v. Matlock</u>, 415 U.S. 164, 172-77 (1974); <u>United States v. Sanchez</u>, 555 F.3d 910, 922 (10th Cir. 2009); and <u>United States v. Miramonted</u>, 365 F.3d 902, 904 (10th Cir. 2004)).   Here, the Court adopts findings of fact from Drug Enforcement Administration ("DEA") Special Agent Jason P. Jones' Affidavit, <u>see</u>, Affidavit In Support of An Application Under Rule 41 For A Warrant to Search and Seize (dated March 15, 2022), filed February 18, 2025 (Doc. 18-1)("Jones Aff."), which supports the search warrant at issue for Jessen's iPhone 13, <u>see</u> Application for a Warrant by Telephone or Other Reliable Electronic Means (dated March 15, 2022), filed February 18, 2025 (Doc. 18-1)("iPhone 13 Warrant").   The Court also adopts findings of fact from the May 9, 2025, hearing.   <u>See</u> Tr. at 1.

## <u>FINDINGS OF FACT</u>

1.       **<u>Linker's Obstruction of the DEA Investigation</u>.**

1.       In July 2021, Jessen and his fellow Bernalillo County Sheriff's Office Deputy, Kyle Linker, search R.W.'s residence, and locate a large quantity of methamphetamine.   <u>See</u> Jones Aff. ¶¶ 8-10, at 3-4.

2.       Linker offers R.W. a chance to not be charged for the methamphetamine, and

---

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).   The Court concludes that <u>United States v. Lopez-Carillo</u>, <u>United States v. Wilson</u>, 96 F. App'x 640, 643 (10th Cir. 2004), <u>United States v. Pina-Aboite</u>, 109 F. App'x 227, 239 (10th Cir. 2004), <u>Jones v. Manriquez</u>, 811 F. App'x 482, 486 (10th Cir. 2020), and <u>United States v. Portillo-Portillo</u>, 267 F. App'x 760, 762 (10th Cir. 2008), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

instead to work for the Bernalillo County Sheriff's Office Community Action Team as a cooperator. See Jones Aff. ¶ 11, at 4.

3.    R.W. agrees and reports to Linker. See Jones Aff. ¶ 11, at 4.

4.    According to R.W., Linker allows R.W. to continue trafficking drugs while operating as Linker's informant. See Jones Aff. ¶ 12, at 5.

5.    On November 15, 2021, DEA agents[3] conduct an operation where an intermediary, A.C., obtains drugs from R.W. that A.C. then provides to an undercover DEA officer. See Jones Aff. ¶¶ 13-15, at 5; Defendant Paul Jessen's Motion for Production of Alleged Co-Conspirator Statements and Pre-Trial Hearing on Their Admissibility Pursuant to Fed. R. Evid. 801(d)(2)(E) at 1, filed June 14, 2025 (Doc. 38)("Motion for Production").

6.    On November 17, 2021, A.C. conducts another drug transaction with the undercover DEA officer, but A.C. changes the location of the deal to the a nearby Sonic parking lot because A.C.'s "plug" was present to ensure the deal went well. Jones Aff. ¶16 at 6; ¶¶ 22-23, at 7-8.

7.    R.W. is in the Sonic drive-thru line next to the parking lot where the transaction was to occur. See Jones Aff. ¶ 24, at 8.

8.    On November 23, 2021, DEA agents try to set up another deal with A.C., but A.C. abruptly calls off the deal. See Jones Aff. ¶¶ 28-29, at 10.

9.    On the same day, DEA agents begin an investigation into why A.C. abruptly calls off the deal. See Motion for Production at 1.

10.    Agents examine A.C.'s telephone toll history, and identify a telephone number for

_____

[3]The record does not specify the DEA agents involved, so the Court refers to the actors generally as "DEA agents" or "agents."

R.W.  See Jones Aff. ¶ 29, at 10.

11.     Agents then examine R.W.'s telephone toll records[4] and note that he was in contact with a telephone belonging to Linker.  See Jones Aff. ¶ 30, at 10-11.

12.     The contact between R.W. and Linker occurs shortly after DEA agents contact Linker to "deconflict," which means to confirm that Linker is not conducting any law enforcement operations in the same area.  Jones Aff. ¶ 31, at 11.

> **2.      Jessen's Contacts With Linker.**

13.     On November 23, 2021, after Linker contacts R.W., Linker uses his personal telephone to call Jessen's personal telephone.  See Jones Aff. ¶ 42, at 14.

14.     On November 23, 2021, Jessen and Linker talk for two minutes and thirty-two seconds.  See Jones Aff. ¶ 32, at 11.

15.     In total, on November 23, 2021, Jessen uses his personal cellular telephone to exchange approximately forty-eight text messages with Linker.  See Jones Aff. ¶ 33, at 12.

> **3.      R.W. is Arrested and Cooperates with DEA Agents.**

16.     On December 16, 2021, DEA agents execute a search warrant at R.W.'s residence and R.W.'s vehicle and locate a large quantity of methamphetamine and a firearm.  See Jones Aff. ¶¶ 35-36, at 12-13.

17.     Federal agents[5] arrest R.W. the same day, and R.W. agrees to cooperate with the DEA.  See Jones Aff. ¶ 44, at 15.

---

[4]Telephone toll records are records that telephone carriers retain that provide information about telephone toll calls, including the name, address, and telephone number of the caller, telephone number called, date, time, and length of the call.  See 47 CFR § 42.6.

[5]The record does not indicate the specific federal agents involved, so the Court refers to the actors generally as "federal agents" or "agents."

18.     R.W. admits to working for Linker as a source.  See Jones Aff. ¶ 37, at 13.

19.     R.W. explains that R.W. helps Linker target a particular drug trafficker, "Jay," and Linker becomes upset after the DEA arrests "Jay" first.  Jones Aff. ¶¶ 38-39, at 13-14.

20.     R.W. admits that Linker warns him about the November 17, 2021, operation involving A.C.  See Jones Aff. ¶ 41, at 14.

21.     R.W. states that Linker tells R.W. that the deal may be a "DEA set up" and that R.W. should "trust his gut."  Jones Aff. ¶ 41, at 14.  Linker also tells R.W. that the November 23 deal is probably an undercover operation and that R.W. should call it off.  Jones Aff. ¶ 42, at 14.

**4.     At the Direction of DEA, R.W. Calls Linker, Who Then Calls Jessen.**

22.     On December 16, 2021, having just been arrested, R.W. makes several phone calls to Linker at the direction of DEA agents.  See Jones Aff. ¶ 44, at 15.

23.     In anticipation of those phone calls, agents place a ruse deconfliction call to Linker, stating that the agents are targeting R.W.  See Jones Aff. ¶ 44, at 15.

24.     Not knowing R.W. is with federal agents, Linker immediately calls R.W. and tells R.W. that he is "on DEA's radar."  Jones Aff. ¶ 44, at 15-16.

25.     Linker tells R.W. that he is trying to convince the agents to call off the deal, but R.W. should have someone else deliver the drugs.  See Jones Aff. ¶ 44, at 15-16.

26.     Immediately after this call to R.W., Linker uses his work telephone to call Jessen's personal telephone.  See Jones Aff. ¶ 45, at 16.

27.     A few minutes later, Linker uses his personal telephone to call Jessen's personal telephone, and they speak for just under eleven minutes.  See Jones Aff. ¶ 45, at 16.

28.     Jessen and Linker exchange several text messages over Jessen's personal telephone and engage in another five-minute voice call.  See Jones Aff. ¶ 45, at 16.

**5.**    **Linker Refers R.W. to Jessen Before Linker Is On Administrative Leave.**

29.    Roughly five hours later on the same day, Linker speaks to R.W. again using Jessen's work telephone.  See Jones Aff. ¶ 46, at 17-20.

30.    R.W. is still under custody and with agents.  See Jones Aff. ¶ 46, at 17.

31.    Linker warns R.W. that the DEA is going through with the operation targeting him. See Jones Aff. ¶ 46, at 17-20.

32.    Linker tells R.W. to "hit PJ's (Jessen's) number" and that Linker will distance himself, "so they (DEA) can't come back and be like oh I tipped you off . . . ." Jones Aff. ¶ 46, at 17-20.

33.    Linker also tells R.W. to "shut everything down.  Get rid of everything."  Jones Aff. ¶ 46, at 17-20.

34.    Linker reiterates that he does not want R.W.'s contacts on his telephone and that R.W. should "hit up PJ cuz they don't know his number."  Jones Aff. ¶ 46, at 17-20.  "PJ" are Paul Jessen's initials.

35.    Linker confirms to R.W. that Jessen has R.W.'s back because they (Linker and Jessen) are "both very pissed off."  Jones Aff. ¶ 46, at 17-20.

36.    Immediately after the call between R.W. and Linker, agents accidentally call Jessen's work telephone number using R.W.'s telephone.  See Jones Aff. ¶¶ 49-50, at 20-21.

37.    A male answers and gives the telephone to Linker, leading agents to believe that Jessen is present when Linker uses Jessen's work telephone to call R.W.  See Jones Aff. ¶ 50, at 21.

38.    The contacts and suspected contact between Linker and Jessen cause agents to believe that Linker and Jessen coordinate how to warn R.W. and advise R.W. regarding the DEA

operation.  <u>See</u> Jones Aff. ¶ 50, at 21.

39.     Linker is placed on administrative leave the evening of December 16, 2021.  <u>See</u>
Jones Aff. ¶ 54, at 24.

40.     Linker has numerous text messages and calls with Jessen's personal telephone on
the evening that Linker is placed on leave.  <u>See</u> Jones Aff. ¶ 54, at 24.

41.     On December 27, 2021, agents meet with R.W.  Jones Aff. ¶ 43, at 14.  R.W.
identifies a photograph of Jessen and confirms that he met Jessen in July, 2021.  Jones Aff. ¶ 43,
at 14-15.  Jessen also directed one of the controlled purchases that R.W. performed for Linker.
<u>See</u> Jones Aff. ¶ 43, at 14-15.

**6.      <u>Jessen's Contact With R.W.</u>**

42.     On January 4, 2022, R.W., while still in DEA custody and talking to Linker at the
direction and presence of agents, sends a message to Jessen on his work telephone that reads "Hey
what's going on I'm being threatened here man they got a hit on me and I don't know what the
f*** to do give me a call please."  Jones Aff. ¶¶ 55-57, at 24-25.

43.     Later that same day, R.W. sends another message to Jessen on his work telephone
conveying a similar message.  Jones Aff. ¶55, at 25.

44.     Jessen replies that he will call R.W. tomorrow morning.  Jones Aff. ¶56, at 25.

45.     On January 5, 2022, Jessen uses his work telephone to call R.W.  <u>See</u> Jones Aff. ¶
57, at 25.

46.     Jessen wants to meet with R.W. and explains that "there are some things on our end
. . . which is why I've been hesitant to uh . . . communicate with you about what's going on."  Jones
Aff. ¶ 58, at 26.

47.     Jessen and R.W. plan to meet in a bank parking lot the following day.  <u>See</u> Jones

Aff. ¶ 58, at 28.

48.     Agents surveil the meeting between Jessen and R.W. on January 6, 2022.  See Jones Aff. ¶ 62, at 29.

49.     When the pair meet, Jessen searches R.W.'s person and makes R.W. leave his cellular telephone in his vehicle.  See Jones Aff. ¶ 64, at 30.

50.     Jessen does not find the hidden recording device on R.W. that R.W and agents use to record the conversation.  See Jones Aff. ¶ 64, at 30.

51.     Jessen asks R.W. for details about the DEA's arrest operation, including the date and time that the DEA arrest R.W.  See Jones Aff. ¶ 65, at 30-33.

52.     Jessen wants to know if it is the same day "L" (Linker) called R.W. and if it is the same day that R.W. was supposed to do a drug deal.  See Jones Aff. ¶ 65, at 34.

53.     Jessen asks for additional details where the gun and drugs are found at R.W.'s residence and whether the DEA had a search warrant.  See Jones Aff. ¶ 65, at 34.

54.     Jessen asks: "When L called you, were there any DEA there?"  Jones Aff. ¶ 65, at 36.

55.     R.W. indicates in the negative, and Jessen states: "And you're not wearing a wire right now."  Jones Aff. ¶ 65, at 36.

56.     Jessen then states: "I'm gonna tell you this because I trust you and if I find out that you're like working up for the DEA and you're gonna try and rat me out, like I'm not gonna answer your telephone calls or anything like that."  Jones Aff. ¶ 65, at 36.

57.     Jessen explains that the DEA heard Linker's conversation where Linker warned R.W. about the December operation.  See Jones Aff. ¶ 65, at 36-37.

58.     After discussing R.W.'s new charges, Jessen assures R.W. that "we're (Linker and

Jessen) not doing anything with" R.W.'s July 2021 charges.  Jones Aff. ¶ 65, at 40.

59.    Jessen states however, that the DEA case is still a concern, as "there's nothing I could really do about a DEA case."  Jones Aff. ¶ 65, at 40.

60.    Jessen advises R.W. about talking to a lawyer or cooperating with the DEA and assisting them in investigations.  See Jones Aff. ¶ 65, at 40-41.

61.    R.W. tells Jessen about a conversation that R.W. has with Linker, in which Linker tells R.W. that Linker knows about and "he condoned" R.W.'s drug dealings.  Jones Aff. ¶ 65, at 42.

62.    Jessen replies: "I mean I don't know what L told you, I don't know like your guys' conversations like I said I wasn't there."  Jones Aff. ¶ 65, at 42.

63.    When R.W. asks Jessen if Jessen has contacts at the DEA that can help R.W., Jessen replies: "They're assholes bro.  They're fuckin dicks.  Were they dicks with you?"  Jones Aff. ¶ 65, at 42.

64.    Jessen then says: "I don't, I don't wanna associate with them, I don't work with them, they burn all our cases, they, they try to take all our sources.  They're they're you can't work with them bro.  Like they're probably the biggest dicks that -- ." Jones Aff. ¶ 65, at 43.

65.    Jessen advises R.W. that, "all I could say is just keep your nose clean bro, um, maybe try to work with the DEA and the AUSAs on something.  If you don't think you could -- like if you don't think you could beat the case then try and work something out bro, there's always a way."  Jones Aff. ¶ 65, at 43.

66.    Immediately after this statement, Jessen tells R.W. that, "[b]ut if you end up working for the DEA we won't, like L won't work with you anymore."  Jones Aff. ¶ 65, at 43.

67.    Jessen then returns to Linker's conversation with R.W. on December 16, 2021,

wondering, "I don't know if [the DEA] had had your telephone tapped, they were there when you made the call --" and R.W. states that the DEA were not there during the call.  Jones Aff. ¶ 65, at 44.

68.    On January 6, 2022, Jessen users his personal telephone to contact Linker's personal telephone.  See Jones Aff. ¶ 74, at 49.  A call lasts approximately thirteen minutes and forty-seven seconds.  See Jones Aff. ¶ 74, at 49.

69.    On January 19, 2022, Jessen uses his work telephone to text R.W. that "El said he can't talk with you, but wants to know what you wanted to talk about."  Jones Aff. ¶ 77, at 50.

70.    R.W. responds that he has an upcoming meeting with his lawyers and needs guidance about what to say about Linker tipping him off.  See Jones Aff. ¶ 77, at 50.

71.    Jessen responds that he again will attempt to reach out to Linker.  See Jones Aff. ¶ 77, at 50.

**7.    The Meeting Between Agents and Jessen.**

72.    FBI and DEA agents[6] meet with Jessen on January 20, 2022.  See Jones Aff. ¶ 78, at 51.

73.    Agents provide Jessen with a transcript of Linker's telephone call to R.W. on December 16, 2021, where Linker informs R.W. of DEA's operation and advises R.W. to get rid of the evidence.  See Jones Aff. ¶ 78, at 51.

74.    Agents also tell Jessen that additional communications between Jessen and Linker could place Jessen in jeopardy.  See Jones Aff. ¶ 78, at 51.

---

[6]The record does not indicate the specific FBI agents involved, so the Court has to refer to the actors generally as "FBI agents," or as "Agents."

**8.    Agents Identify Jessen's Work and Personal iPhones.**

75.    Agents note that Jessen had two cellular telephones during the interview: a work telephone and a personal telephone.  See Jones Aff. ¶ 78, at 51.

76.    One agent observes during the interview that Jessen's personal telephone is an iPhone 13, but it is actually an iPhone 11.  See Jones Aff. ¶ 78, at 51; Device Tracker at 1, filed February 18, 2025 (Doc. 18-2); Tr. at 16:13-15 (Meyers).

77.    Jessen's iPhone 11 has the assigned call number 505-379-9756 and IMEI 353424108655466.  See Jessen Cell Phone Provider Record at 1, filed February 18, 2025 (Doc. 1).

78.    "IMEI" stands for International Mobile Equipment Identity and is a unique fifteen-digit number that identifies each mobile phone.  Tr. at 41:21-42:15 (Swift, Meyers); What is IMEI Number?, IMEI.info, https://www.imei.info/faq-what-is-imei/ (last accessed July 24, 2025).

79.    Agents identify one as Jessen's work telephone and seize it pursuant to a federal search warrant, immediately after the interview.  See Jones Aff. ¶ 78, at 51.

**9.    After the Meeting With Federal Agents, Jessen and Linker Communicate.**

80.    Jessen uses his personal telephone to exchange approximately six text messages with Linker two hours after meeting with federal agents.  See Jones Aff. ¶ 78, at 52.

**10.    Jessen Replaces His Personal iPhone According to the Cell Phone Provider Record.**

81.    On January 23, 2022, Jessen upgrades his telephone from an iPhone 11 to an iPhone 13.  See Jessen Cell Phone Provider Record at 1; Tr. at 16:13-15 (Meyers).

82.    The Cell Phone Provider Record is a table that describes the devices associated with

Jessen's cellular telephone accounts.  See Tr. at 16:25-17:19 (Long).[7]

83.    The Cell Phone Provider Record records five cellular telephone accounts associated with Jessen, and each account lists columns for: "MTN_Status_Eff_Date," "MTN_Eff_Date," "IMEI" and "Name."  Cell Phone Provider Record at 1.

84.    "MTN" means "Mobile Telephone Number."    Glossary, Verizon https://www.verizon.com/support/glossary/?msockid=0d3fa93fa48b6c161a16bf2ba5736d5f (last accessed June 25, 2025).

85.    The "MTN_Status_Eff_Date" refers to the date that the cellular telephone account's active status takes effect.  Cell Phone Provider Record at 1.

86.    Jessen's cellular telephone account for an "iPhone 11 Pro Space Gray 64G VZ" has an MTN_Status_Eff_Date of "2020-10-04."  Cell Phone Provider Record at 1.

87.    Jessen's cellular telephone account for an "iPhone 13 128 Midnight" has an MTN_Status_Eff_Date of "2022-01-23."  Cell Phone Provider Record at 1.

88.    It is not clear what the "MTN_Eff_Date" date refers to.  Cell Phone Provider Record at 1.

89.    Both Jessen's cellular telephone account for "iPhone 11 Pro Space Gray 64G VZ" and "iPhone 13 128 Midnight" have an "MTN_Eff_Date" of "2015-03-02."  Cell Phone Provider Record at 1.

---

[7]At the hearing, Assistant United States Attorney Sean M. Long explains what the Cell Phone Provider Record is and speculates how the agents might have used it in writing the warrant application, but he does not know for sure.  Long states that he does not know "exactly when they had the records," and "I'm not aware if that's where they drew the information."  Hearing Tr. at 17:6-24 (Long).  He also states: "I do think the agents likely had access to this information. Whether they just skimmed over it or never laid eyes on it, I can't say for the Court."  Hearing Tr. at 17:1-18:3 (Long).  Because Jessen does not contest what the Cell Phone Provider Record is, or how or why an agent would use the Cell Phone Provider Record, the Court establishes Long's statements about the Cell Phone Provider Record as facts as findings of fact.

90.     The cellular service provider gives the Cell Phone Provider Record to agents.  <u>See</u> Tr. at 16:25-17:19 (Long).

91.     On March 3, 2022, agents possess the Jessen Cell Phone Provider Record which indicates Jessen's iPhone upgrade.  <u>See</u> Tr. at 17:24-18:1 (Long); Tr. at 82:1-84:24 (Sanchez-Knudsen, Meyers).

**11.     <u>The Search Warrant</u>.**

92.     On March 15, 2022, based on the Jones Aff., Jones applies for a search warrant for Jessen's personal telephone.  <u>See</u> iPhone 13 Warrant at 1.

93.     The warrant describes as the property to be searched: "iPhone 13 Cell Telephone Assigned Call Number 505-379-9756 with IMEI 350183980185078."  iPhone 13 Warrant at 1.

94.     Every telephone has its own IMEI number.  <u>See</u> Tr. at 42:8-10 (Swift, Meyers).

95.     The warrant states: "Based on the agent's familiarity and experience, the DEA agent believed the other cell phone device was an iPhone 13 (the same model of phone as the Device described in this affidavit)."  iPhone 13 Warrant at 51-52.

96.     It is not clear whether the agents pull the IMEI number from the Cell Phone Provider Record, or from a different location, such as a summary email.  <u>See</u> Tr. at 17:20-24 (Long).

97.     At the point in time the warrant describes that the DEA agent observes and believes "the other cell phone device was an iPhone 13," iPhone 13 Warrant at 51-52, Jessen does not possess an iPhone 13 with IMEI 350183980185078, <u>see</u> Jessen Cell Phone Provider Record at 1.

98.     Jones believes Jessen's personal telephone contains information about the nature of the relationships between Jessen, Linker, and R.W.  <u>See</u> Jones Aff. ¶ 79, at 52.

99.     Jones asserts that this information includes telephone call and text message records

that might discuss R.W.'s illicit activities, and also whether Jessen and Linker provided sensitive information to others.  See Jones Aff. ¶ 79, at 52.

100.    Jones notes that Jessen's personal telephone exchanges numerous telephone calls and texts with Linker's personal telephone during time periods relevant to the investigation.  See Jones Aff. ¶ 79, at 52-53.

101.    Jones believes that such information could constitute evidence of numerous federal offenses, including (among others) 18 U.S.C. § 1512 (obstruction of justice), and 21 U.S.C. §§ 841 and 846 (distribution and possession with intent to distribute controlled substances and conspiracy to commit the same).  See Jones Aff. ¶ 80, at 53.

102.    On March 15, 2022, the Honorable John F. Robbenhaar, United States Magistrate Judge for the United States District Court for the District of New Mexico, issues a warrant to search Jessen's iPhone 13.  See iPhone 13 Warrant at 1.

103.    On March 16, 2022, federal agents approach Jessen at his residence and seize his iPhone 13 pursuant to the iPhone 13 Warrant.  See Tr. at 83:25 (Sanchez-Knudsen); Government's Response to Defendant's Motion to Suppress at 1, filed March 4, 2025 (Doc. 22)("Response").

12.    **The Records and Information from the Search.**

104.    According to the Jones Aff., agents seek to obtain the following information from the search:

    a.    Data and information identifying co-conspirators, customers, and suppliers;

    b.    Communications between co-conspirators, customers, and suppliers;

    c.    Data and information regarding the drugs, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    d.    Data and information related to sources of drugs (including names, addresses, telephone numbers, or any other identifying information);

    e.    Photographs and/or videos;

    f.    Financial records or other information regarding the expenditure or disposition of proceeds from the distribution of controlled substances including all bank records, checks, credit card bills, account information, and other financial records; and

    g.    Records of travel.

    h.    Evidence of user attribution showing who uses or owns the iPhone 13 at the time the things described in this warrant were created, edited, or deleted, such as logs, telephonebooks, saved usernames and passwords, documents, and browsing history.

Jones Aff. at 64.

13.    **Total Number of Communications Between Jessen and Linker.**

105.    In total, from August 30, 2021, to February 7, 2022, Jessen and Linker exchange

1,585 total calls and texts.  See Jones Aff. ¶ 34, at 12.[8]

## PROCEDURAL BACKGROUND

First, the Court summarizes the Motion.  Then, the Court summarizes the United States response, and Jessen's reply.  Finally, the Court summarizes the hearing.

### 1.    **The Motion.**

Jessen moves to suppress all evidence that the United States seizes from Jessen's iPhone 13 on March 16, 2022.  See Motion at 1.  Jessen argues that the iPhone 13 Warrant lacks particularity because it describes an iPhone 13 that the agents assert is in Jessen's possession on January 20, 2022, but Jessen does not possess an iPhone 13 until three days later, on January 23, 2022.  See Motion at 5-6.  Further, the Jones Aff. does not establish a nexus between the iPhone 13 and the alleged criminal conduct, i.e., the communications among Jessen and Linker, because Jessen uses his iPhone 11 to communicate with Linker.  See Motion at 6.  As Jessen argues, "[p]ut another way, there is not one reference, other than the caption and the description of the Device, to the iPhone 13 which was acquired after the January 20, 2022 interaction between agents and

---

[8]Jessen disputes this number and alleges that there are 1,090 calls/texts between Jessen and Linker from August, 2021, to February, 7, 2022.  See Reply at 4.  However, Jessen does not provide contravening evidence.  The Court, therefore, adopts the 1,585 calls/texts in the Jones Aff. as true.

The parties also dispute the number of calls/texts after January 23, 2022, when Jessen acquires the iPhone 13.  The United States calculates a daily rate of 9.84 communications per day based on a total of 1,585 total communications between August, 2021 and February, 7, 2022, and then multiplies 9.84 communications per day by the number of days between January, 23, 2022, and March 15, 2022, which is when the search warrant is issued.  See Response at 18.  The United States, therefore, estimates 148 calls/texts between Jessen and Linker between January 23, 2022, and March 15, 2022.  See Response at 18.  On the other hand, Jessen contends that there are only 8 calls/texts, with 3 being missed calls, between January 23, 2022 and March 15, 2022.  See Reply at 4-5.  No evidence supports either parties' alleged number of communications.  As for the United States, extrapolating an average daily communication rate to a specific time period is not evidence of the number of communications that occur during that period, and as for Jessen, Jessen does not provide evidence of those alleged 8 calls/texts.  The Court, therefore, does not make a finding of fact on the number of calls/texts between Jessen and Linker from August, 2021 to February, 7, 2022.

Mr. Jessen."  Motion at 7.  Finally, Jessen argues that, because the iPhone 13 Warrant lacks particularity, it is an unlawful "general warrant" in violation of the Fourth Amendment.  Motion at 8.

       2.      **<u>The Response</u>.**

The United States opposes the Motion.  <u>See</u> Government's Response to Defendant's Motion to Suppress at 1, filed March 4, 2025 (Doc. 22)("Response").  The United States argues that the iPhone 13 Warrant is not an unlawful general warrant, because it is sufficiently particular. <u>See</u> Response at 7-9.  First, the iPhone 13 Warrant specifically describes the item to be searched as an "iPhone Cell Phone Assigned call number [ending x9756] with IMEI [ending x5078]." iPhone 13 Warrant at 1.  The iPhone 13 Warrant also restricts the scope of the search to evidence of specific federal crimes and specific types of material, such as: information identifying co-conspirators, communications between co-conspirators, various information related to drug trafficking, and evidence of user attribution.  Response at 9.  The iPhone 13 Warrant, the United States argues, does not give agents "unbridled discretion" to search Jessen's belongings.  <u>See</u> Response at 9.  Next, the United States argues that, even if the iPhone 13 Warrant lacks particularity, the good-faith exception applies to admit the evidence.  <u>See</u> Response at 10.  The United States argues that the agents act in good faith, because they complied with the law in preparing the affidavit and the warrant application, and in executing the search pursuant to the warrant that Judge Robbenhaar signs.  <u>See</u> Response at 12.

The United States also argues that the iPhone 13 Warrant establishes a nexus between the Jessen's allegedly unlawful communications with Linker and the iPhone 13 to be searched.  <u>See</u> Response at 12-13.  The iPhone 13 Warrant denotes several dates where Jessen uses his personal telephone to communicate with Linker: November 23, 2021, December 16, 2021, January 6, 2022,

and January 20, 2022.  See Response at 13-14.  Additionally, on January 19, 2022, Jessen tells R.W. that Jessen will reach out to Linker.  See Response at 14.

The United States argues that, even if the iPhone 13 Warrant references a different telephone than the one that agents search, the iPhone 13 Warrant still has sufficient probable cause. See Response at 14-15.  First, even if the iPhone 13 Warrant incorrectly states that agents observe an iPhone 13 in Jessen's possession, agents were mistaken, but did not recklessly or knowingly misidentify the iPhone 11.  See Response at 15-16.  Second, the iPhone 13 Warrant has sufficient probable cause about Jessen's personal telephone communications with Linker to search Jessen's iPhone 13 based on the Jones Aff. and telephone toll records.  See Response at 17.  Finally, even if the iPhone 13 Warrant does not have probable cause, the United States argues the good-faith exception applies, because there is no evidence that agents recklessly disregarded the fact that Jessen changed his telephone from an iPhone 11 to an iPhone 13.  See Response at 22.

### 3.    The Reply.

Jessen replies to the United States' Response.  See Reply at 1.  In the Reply, Jessen argues that the iPhone 13 Warrant is not sufficiently particular, because it specifically describes an iPhone 13 with IMEI 350183980185078, but, in reality, the iPhone that the agents observe which forms the basis for the warrant is an iPhone 11 with IMEI 353242108655466.  See Reply at 2.  The United States, therefore, incorrectly identifies Jessen's telephone model, IMEI, and the date that Jessen possesses the telephone.  See Reply at 3.  Jessen argues that, as a result of this misidentification, the iPhone 13 Warrant fails the particularity requirement and constitutes an unlawful general search.  See Reply at 3.

Jessen next argues that there is no nexus between Jessen's alleged criminal communications on his iPhone 11 and the iPhone 13 that was searched.  See Reply at 4.

Specifically, Jessen contends that the iPhone 13 Warrant describes Jessen's alleged criminal communications which take place on between November, 2021, and January 20, 2022.  <u>See</u> Reply at 4.  Jessen contends that the iPhone 13 that agents search does not exist until January 23, 2022. <u>See</u> Reply at 4.  Jessen also clarifies that, after he obtains the iPhone 13, communications between Jessen and Linker "dramatically decreased" to less than 0.5 per day, Reply at 5, in contrast to the United States' calculation of 9.84 per day, <u>see</u> Response at 17-18.  Similarly, Jessen disputes the United States' report of the quantity of communications between Jessen and Linker before Jessen upgrades his telephone to an iPhone 13.  <u>See</u> Reply at 4 (alleging that there are 1,090 total calls/texts between Jessen and Linker between August, 2021-February, 7, 2022, not 1,585); <u>id</u>. (alleging that there are twenty-one calls/texts between Jessen and Linker on November 23, 2021, not forty-eight).  Last, Jessen argues that the good-faith exception does not apply, because Jones engaged in "reckless, if not deliberate, actions" in the warrant application process.  Reply at 6. Specifically, Jessen argues that the agents had access to Verizon records showing when Jessen upgrades his telephone, and "their failure to accurately identify the correct device despite having this information demonstrates, at minimum, reckless disregard for the truth" disqualifying Jones from the good-faith exception.  Reply at 6.  Furthermore, according to Jessen, agents had "ample time and resources" to verify and correct any mistakes in the Jones Aff.  Reply at 7.  According to Jessen, the misrepresentations about the quantity of communications between Jessen and Linker further "lead astray" Magistrate Judge Robbenhaar.  Reply at 7.

4.     **The Hearing**.

At the hearing, Jessen and the United States present the arguments in the briefing.  <u>See</u> Tr. at 1.  Jessen argues that the iPhone 13 that the agents search is different from the iPhone that the Jones Aff. describes, because "[i]t's a critical question whether or not the new phone is somehow

going to have that same data as the old phone. That's not necessarily true." Tr. at 8:1-4 (Meyers). Jessen analogizes to how probable cause for a search of a file cabinet does not automatically transfer over to a new file cabinet, because "it's still a different location to be searched." Tr. at 12:8-16 (Meyers). The iPhone 13 Warrant has probable cause only for Jessen's iPhone 11, because the iPhone 13 is "not even in existence, not born yet, so to speak" when the events described -- namely, Jessen's interview -- in the Jones Aff. happen. Tr. at 13:23-24 (Meyers). The Court questions Jessen whether the focus of the Fourth Amendment analysis should be on the device or on the data. See Tr. at 10:20-23 (Court). The Court raises the hypothetical scenario to Jessen of a DEA agent who sees a man get onto an Amtrak train with a bag, but then later throws the contents into another bag. See Tr. at 12:17-13:3 (Court). The Court asks Jessen whether the search warrant for the first bag would be invalid. See Tr. at 13:3 (Court). Jessen argues that the warrant needs to describe the new bag, or at least the nexus between the probable cause for the original bag and the new bag. See Tr. at 13:11-16 (Meyers).

The United States argues that the Jones Aff. represents, to the best of Jones' belief, that Jessen's iPhone 11 appears to be an iPhone 13, and not that Jessen's iPhone 11 is certainly an iPhone 13. See Tr. at 20:12-19 (Long). The United States argues that the agents did not make a "deliberate misstatement" to the Court. Tr. at 20:24-25 (Long). According to the United States, had the agents known that Jessen upgraded his iPhone 11 to an iPhone 13, the agents likely would have spent more time describing reasonable inferences about data transfers between an old cellular telephone and a new cellular telephone. See Tr. at 21:15-17 (Long). Furthermore, the United States argues, that the good-faith exception applies, because Jones did not mislead intentionally Magistrate Judge Robbenhaar when he writes that he believes Jessen possesses an iPhone 13. See Tr. at 30:1-15 (Long).

Jessen calls Wade Swift, a digital forensics expert who testifies about transferring data between iPhones.  See Tr. at 37:14 (Swift); id. at 45:16-17 (Swift).  Swift testifies about two possible methods to transfer data.  The first is the "quick transfer" in which the user places both iPhones in close proximity and the telephone transfers as much data as the new telephone's settings are set to store.  See Tr. at 46:11-47:16 (Swift).  The next method is the iCloud transfer in which the user logs into his or her iCloud account, and stores and transfers data onto a new iPhone through the iCloud.  See Tr. at 50:14-21 (Swift).  Swift testifies that there is "no way to ensure" that the items sought by the warrant are on the new iPhone 13.  Tr. at 63:21-25 (Meyers, Swift).

Jessen next calls Paula Sanchez-Knudsen, a private investigator.  See Tr. at 79:14-11 (Meyers, Court, Sanchez-Knudsen).  Sanchez-Knudsen testifies that the Cell Phone Provider Record indicates that Jessen's iPhone 13 was activated on January 23, 2022, and that the United States provides the Cell Phone Provider Record to Jessen by March 3, 2022.  See Tr. at 82:14-83:7 (Meyers, Sanchez-Knudsen)(testifying that the Cell Phone Provider Record is in "the discovery provided by the Government" in the format of "an Excel spreadsheet in one of the toll downloads").

The Court expresses its thoughts on the suppression motion.  See Tr. at 86:11-87:20 (Court).  The Court states that suppression for Fourth Amendment purposes intends to "try to get officers to do something different next time" and that suppression here may be "just punishing the officers here without really promoting any Fourth Amendment values."  Tr. at 86:11-87:20 (Court).  Jessen contends that, based on the Cell Phone Provider Record evidence, the Court can "extrapolate" that the United States knows about the new iPhone 13 upgrade before obtaining the warrant.  Tr. at 88:8-23; id. at 90:15-22 (Meyers).  The United States argues that Jessen does not meet his burden to show that Jones or other agents included the description of Jessen's iPhone 13

in his affidavit "knowingly or with reckless disregard to the fact that it was false" as <u>Franks v.</u>

<u>Delaware</u>, 438 U.S. 154, 154 (1978), requires to invalidate a warrant.  Tr. at 96:23-97:4 (Long).

**<u>LAW REGARDING FOURTH AMENDMENT SEARCHES</u>**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be

seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has

occurred, courts must "assur[e] preservation of that degree of privacy against government that

existed when the Fourth Amendment was adopted."  <u>United States v. Jones</u>, 565 U.S. 400, 406

(2012)(Scalia, J.)(quoting <u>Kyllo v. United States</u>, 533 U.S. 27, 31 (2001)(Scalia, J.))(brackets in

<u>United States v. Jones</u>, but not in <u>Kyllo v. United States</u>).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is

reasonableness."  <u>United States v. Harmon</u>, 785 F. Supp. 2d 1146, 1157 (D.N.M.

2011)(Browning, J.).  <u>See</u> <u>United States v. McHugh</u>, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he

ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting <u>Brigham City, Utah</u>

<u>v. Stuart</u>, 547 U.S. 398, 403 (2006))).  "In the criminal context, reasonableness usually requires a

showing of probable cause."  <u>Herrera v. Santa Fe Pub. Sch.</u>, 792 F. Supp. 2d 1174, 1184 (D.N.M.

2011)(Browning, J.)(quoting <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v.</u>

<u>Earls</u>, 536 U.S. 822, 828 (2002)).  The Supreme Court of the United States holds that, in the law

enforcement context, "searches conducted outside the judicial process, without prior approval by

judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few

specifically established and well-delineated exceptions."  <u>Katz v. United States</u>, 389 U.S. 347, 357

- 23 -

(1967)(footnotes omitted).  See United States v. Knapp, 917 F.3d 1161, 1165 (10th Cir. 2019)("The warrantless search rule, however, is subject to several exceptions.").

1.      **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. at 403.  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." (quoting United States v. Knights, 534 U.S. 112, 118 (2001))).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121.  The Supreme Court justifies this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the

degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he clearly was notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "'[w]hat is "reasonable" under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population'")(quoting Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004)(Easterbrook, J.,

concurring))(internal quotations have no citation); <u>Boling v. Romer</u>, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .").

As the Honorable Elena Kagan, Associate Justice of the Supreme Court, notes, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." <u>Florida v. Jardines</u>, 569 U.S. 1, 13 (2013)("<u>Jardines</u>")(Kagan, J., concurring)(quoting <u>Georgia v. Randolph</u>, 547 U.S. 103, 111 (2006))(alteration in <u>Jardines</u>, but not in <u>Georgia v. Randolph</u>). Similarly, in <u>Vernonia Sch. Dist. 47J v. Acton</u>, Justice Scalia, writing for the majority, notes: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (citing <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 337 (1985)).

## 2.    Florida v. Jardines.

In <u>Florida v. Jardines</u>, Justice Scalia holds that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search. 569 U.S. at 11. Justices Thomas, Ginsburg, Sotomayor, and Kagan join Justice Scalia's majority opinion in <u>Florida v. Jardines</u>. Justice Kagan files a separate concurring opinion, in which Justices Ginsburg and Sotomayor join, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 569 U.S. at 16 (Kagan, J., concurring). Justice Alito dissents, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer join his opinion.

In Florida v. Jardines, the Miami-Dade, Florida, police department and the Drug Enforcement Administration receive a tip that the defendant Jardines is growing marijuana in his home, and then send a surveillance team to Jardines' home. See 569 U.S. at 3. Observing nothing of note in the first fifteen minutes watching the home, two detectives approach the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes. See Jardines, 569 U.S. at 3. As the dog approaches Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 569 U.S. at 3. The dog's handler then immediately leaves the porch, and tells the other agents and officers at the scene that there is a positive alert for drugs, at which time the officers apply for and receive a search warrant for the residence, the execution of which reveals marijuana plants. See 569 U.S. at 3. Jardines is arrested for trafficking in marijuana and moves to suppress the evidence based on an illegal search. See 569 U.S. at 3. Justice Scalia holds that the use of a drug-sniffing dog is a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

569 U.S. at 5. Justice Scalia notes that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. at 176). Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz)

gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text."  569 U.S. at 6.

Justice Scalia holds that "the officers' investigation took place in a constitutionally protected area," the home, because the front porch is the home's curtilage.  Jardines, 569 U.S. at 7.  Justice Scalia then "turn[s] to the question of whether it was accomplished through an unlicensed physical intrusion," 569 U.S. at 5, and reasons:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. ]Ciraolo, 476 U.S. [207,] 213 [(1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id.  Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

Jardines, 569 U.S. at 7-8.  Justice Scalia notes that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concludes that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else.  There is no customary invitation to do that."  Jardines, 569 U.S. at 9 (emphasis in original).  Justice Scalia explains:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the

police. The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

Jardines, 569 U.S. at 3.

Justice Scalia further notes that, in United States v. Jones, the Supreme Court concludes that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under Katz v. United States] when the government gains evidence by physically intruding on constitutionally protected areas." Jardines, 569 U.S. at 11 (quoting United States v. Jones, 565 U.S. at 409). Because the Supreme Court concludes that the conduct is a Fourth Amendment search under the trespass-based analysis, therefore, it holds that it is unnecessary to consider whether the conduct amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

Jardines, 569 U.S. at 11.

### 3.    Vehicle Searches.

One exception to the Fourth Amendment search-warrant requirement is the automobile exception, which allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. See Collins v. Virginia, 584 U.S. 586, 591-92 (2018). While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107

F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  Under the automobile-exception to the warrant requirement, however, a warrant generally is not required.  See Carroll v. United States, 267 U.S. 132, 153 (1925)(establishing the automobile exception for vehicles, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought" unlike "a store, dwelling house, or other structure").  The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Collins v. Virginia, 584 U.S. at 596 (declining to apply the automobile exception to a motorcycle parked in the curtilage of a house, because such a search "would unmoor the exception from its justification" that a vehicle poses a risk of immediate mobility); Maryland v. Dyson, 527 U.S. 465, 467 (1999)("[W]here there [is] probable cause to search a vehicle[,] 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'")(quoting United States v. Ross, 456 U.S. at 809)(emphasis added in Maryland v. Dyson); California v. Carney, 471 U.S. 386, 393 (1985)(applying the automobile exception to the defendant's mobile home, because it was "readily mobile" and "could readily have been moved beyond the reach of the police").

Thus, if the vehicle is readily mobile, "'probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.'"  United States v. Phillips, 71 F.4th 817, 823 (10th Cir. 2023)(quoting United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001)).  The search's object and the places in

which there is probable cause to believe that the object may be found define the scope of a warrantless vehicle search.  See United States v. Ross, 456 U.S. 798, 824 (1982).  Accordingly, if probable cause justifies a vehicle search, it justifies the search of every part of the vehicle in which the evidence might be found, including closed compartments, containers, packages, and trunks, and any contents or containers that may conceal the object of the search.  See California v. Acevedo, 500 U.S. 565, 574 (1991); Wyoming v. Houghton, 526 U.S. 295, 304-07 (1999); United States v. Rosborough, 366 F.3d 1145, 1152-53 (10th Cir. 2004).

**4.     Searches Incident to Arrest.**

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest." Arizona v. Gant, 556 U.S. 332, 338 (2009)("Gant").  The exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."  Gant, 556 U.S. at 338.   The search-incident-to-lawful-arrest exception enables the search "of the arrestee's person" in addition to "the area within the arrestee's 'immediate control.'"  United States v. Knapp, 917 F.3d at 1165 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).   The Supreme Court defines the area within the arrestee's "immediate control" as "the area from within which he might gain possession of a weapon or destructible evidence," Chimel v. California, 395 U.S. at 763, a limitation that "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy," Gant, 556 U.S. at 339.

The search-incident-to-lawful-arrest exception also may enable a search of an automobile where a recent occupant is placed under arrest.  See New York v. Belton, 453 U.S. 454, 459-60 (1981).  An automobile search incident to a recent occupant's arrest is Constitutional if: (i) "the arrestee is within reaching distance of the vehicle during the search"; or (ii) "if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'"  Davis v.

United States, 564 U.S. 229, 235 (2011)(quoting Gant, 556 U.S. at 343).  See United States v. Knapp, 917 F.3d at 1168 (explaining that automobile searches incident to a lawful arrest under Gant "are justified either by the 'twin rationales of Chimel' or by an arresting officer's reasonable belief that the vehicle contains evidence of the crime precipitating the arrest" (quoting Gant, 556 U.S. at 342-43)).  Although a search incident to arrest must be a "contemporaneous incident of [a lawful] arrest," New York v. Belton, 453 U.S. at 460, it is of no moment that a search precedes an arrest, so long as "probable cause for the arrest precede[s] the search," United States v. Smith, 389 F.3d 944, 952-53 (9th Cir. 2004).

**5.      Fourth Amendment Standing.**

The Tenth Circuit refers to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."  United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").  Accordingly, the Court, tracing the Tenth Circuit's language, refers to this test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme

Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test now expressly has been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproves of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label, the Supreme Court notes:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing

because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

Rakas v. Illinois, 439 U.S. at 138-39.  The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within the purview of substantive Fourth Amendment law than within that of standing.

Rakas v. Illinois, 439 U.S. at 139-40.  In Minnesota v. Carter, the Supreme Court recognizes that

Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the

substantive Fourth Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  Id., at 140 . . . .

Minnesota v. Carter, 525 U.S. at 87-88.  The Supreme Court notes that the analysis under either

approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures

are personal versus the separate notion of "standin g" -- is the same and that Katz v. United States'

reasonable-expectation-of-privacy analysis now is a substantive Fourth Amendment test, as

opposed to a standing test.  See Rakas v. Illinois, 439 U.S. at 139.

6.    **Probation Searches**.

Although law enforcement officers typically must obtain a search warrant which probable

cause supports before conducting a search, there are exceptions to this requirement where "'special

needs, beyond the normal need for law enforcement, make the warrant and probable-cause

requirement impracticable.'"    United States v. Carter, 511 F.3d 1264, 1267 (10th Cir.

2008)(quoting <u>Griffin v. Wisconsin</u>. 483 U.S. 868, 873 (1987)).  The Supreme Court concludes that, in the State probation context, special needs negate the requirement that an officer obtain a warrant supported by probable cause.  See <u>United States v. Carter</u>, 511 F.3d at 1268 (citing <u>Griffin v. Wisconsin</u>, 483 U.S. at 875).  <u>See</u>, <u>e.g.</u>, <u>United States v. Romo</u>, No. CR 14-2352, 2015 WL 13651108, at *4 (D.N.M. December 2, 2015)(Armijo, C.J.)(unpublished)(stating that New Mexico's State probation system presents a "special need" under <u>Griffin v. Wisconsin</u>).  For a probation search to meet the Fourth Amendment's requirements, it must be "'carried . . . out pursuant to state law which itself satisfies the Fourth Amendment's reasonableness requirement.'" <u>United States v. Carter</u>, 511 F.3d at 1268 (quoting <u>United States v. Lewis</u>, 71 F.3d 358, 361 (10th Cir. 1995)).

In <u>United States v. Knights</u>, 534 U.S. 112 (2001), the Supreme Court concludes that a probationer who signs a probation agreement that "clearly expressed the search condition" has a "significantly diminished . . . reasonable expectation of privacy."  534 U.S. at 119-20.  See <u>United States v. Blake</u>, 284 F. App'x 530, 535-536 (10th Cir. 2008)("The Supreme Court has concluded that 'probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment.'" (citing <u>United States v. Trujillo</u>, 404 F.3d 128, 1241-42 (10th Cir. 2005)(discussing <u>Griffin v. Wisconsin</u>, 483 U.S. 868 (1987), and <u>United States v. Knights</u>, 534 U.S. 112 (2001))). In so concluding, the Supreme Court states that, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."  <u>United States v. Knights</u>, 534 U.S. at 119.  The Tenth Circuit "has interpreted *Knights* to mean that 'a probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search.'"  <u>United States v. Freeman</u>, 479 F.3d 743, 747 (10th Cir. 2007)(quoting

United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002)(alteration in United States v. Freeman, but not United States v. Tucker)).

Reasonable suspicion is "['] merely a particularized and objective basis for suspecting criminal activity.'" United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200). While reasonable suspicion requires "'some minimal level of objective justification,'" it requires less justification than is required to show probable cause. United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. 210, 217 (1984), and citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). In assessing whether reasonable suspicion exists for a search, courts "consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances." United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).

In a number of instances and in a variety of contexts, the Tenth Circuit has upheld probation searches when the officer conducting the search has reasonable suspicion to conduct the search pursuant to a probation agreement's terms. In United States v. Blake, the Tenth Circuit refuses to suppress evidence found during a search pursuant to the defendant's wife's probation agreement of a residence that the defendant shared with his wife. See 284 F. App'x at 535-37. In United States v. Stewart, 273 F. App'x 768 (10th Cir. 2008), the Tenth Circuit declines to suppress evidence found during the search of a defendant's residence, pursuant to the defendant's probation agreement, that police and probation agents conduct while attempting to execute an arrest warrant. See 273 F. App'x at 769-71. In United States v. Carter, the Tenth Circuit declined to suppress evidence found during the search of a defendant's residence on the basis of a tip which a social worker relayed to the defendant's probation officer that the defendant was in breach of his

probation agreement, and also declined to suppress evidence found during a subsequent consensual search.  See 511 F.3d 1266-69.

7.    **Probable Cause for Search Warrants.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant."  United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. 213, 239 (1983)), aff'd, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. at 238 (internal quotations have no citation).  See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).  In making his or her determination, the magistrate judge "may draw

reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause . . . ." United States v. Reed, 195 F. App'x at 822. The Court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. at 238-39 (quoting Jones v. United States, 362 U.S. at 271)(ellipses and brackets in Illinois v. Gates, but not in Jones v. United States). This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213. Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. 102, 106 (1965).

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d 1201, 1253-54 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished). "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006). Specifically, the Court should not defer to a magistrate judge's

"probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

**8.    Specificity Required in Warrants.**

        In several opinions, the Tenth Circuit has clearly established that items to be seized must be described within the search warrant for seizure of those items to be reasonable.  The Fourth Amendment requires search warrants to particularly describe the place to be searched, and the persons or things to be seized.  See United States v. Angelos, 433 F.3d 738, 744 (10th Cir. 2006).  Furthermore, the Tenth Circuit has held that "[t]he Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." United States v.. Campos, 221 F.3d 1143, 1147 (10th Cir. 2000)(quoting United States v. Carey, 172 F.3d 1268, 1271 (10th Cir. 1999).  "A warrant's description of things to be seized is sufficiently particular if it allows the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997).  "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Davis v. Gracey, 111 F.3d 1472, 1478 (10th Cir. 1997)(quoting Marron v. United States, 175 U.S. 192, 196 (1927)).  "The test applied to the description of the items to be seized is a practical one . . . and the language in warrants is to be read in a common sense fashion . . . As an irreducible minimum, a proper warrant must allow the executing officers to distinguish between items that may and may not be seized." Davis v. Gracey,

111 F.3d at 1478.  See Copar Pumice Co. v. Morris, No. CIV 07-79 JB/ACT, 2008 WL 2323488, at *11-12 (D.N.M. Mar. 21, 2008)(Browning, J.)

## LAW REGARDING FOURTH AMENDMENT SEIZURES

The Fourth Amendment protects individuals from unreasonable seizures.  See U.S. Const. amend. IV.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement."  Brendlin v. California, 551 U.S. 249, 254 (2007)(quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)).  See United States v. Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017).  "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'"  United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).  "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'"  United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628).  "'If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.'"  United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)).  See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))).  The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at

minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).  For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See United States v. Samilton, 56 F.4th 820 (10th Cir. 2022); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

### 1. Consensual Encounters.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business."  1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 769 (6th ed. 2020)("LaFave").

### 2. Investigative Stops.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit notes: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at 1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968), and then quoting Terry v. Ohio, 392 U.S. at 27).  The Tenth Circuit recognizes that, in Terry v. Ohio, the Supreme Court identifies two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk."  United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Adams v. Williams,

407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explains:

> Terry has come to stand for two distinct propositions -- an investigative detention
>
> ("stop") in which a police officer, for the purpose of investigation, may briefly
>
> detain a person on less than probable cause,  . . .  and a protective search ("frisk")
>
> which permits an officer, in the course of an investigative detention, to conduct a
>
> limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks

whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96

F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

**3.    Investigative Detentions and Reasonable Suspicion.**

A police-citizen encounter that is not consensual may be a Constitutional investigative detention.

See Dorato v. Smith, 108 F. Supp. 3d at 1118.  An investigative detention occurs when an officer

stops and briefly detains a person "'in order to determine his identity or to maintain the status quo

momentarily while obtaining more information.'"  Oliver v. Woods, 209 F.3d at 1186 (quoting

Adams v. Williams, 407 U.S. at 146).  Such brief investigative detentions must meet two distinct

requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108 F. Supp. 3d

at 1118.  First, the officer "'must have a particularized and objective basis for suspecting the

particular person stopped of criminal activity.'"  Oliver v. Woods, 209 F.3d at 1186 (quoting United

States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows

the stop must be "reasonably related in scope to the circumstances" which justifies the stop in the

first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on

both the length of the detention and the manner in which it is carried out," United States v. Holt,

264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).    Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)("'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.").

**4.    Frisks.**

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)).  An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  A frisk "must  . . .  be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, a court should consider the totality of

the circumstances.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

5.    **Traffic Stops.**

"'A traffic stop is a seizure within the meaning of the Fourth Amendment  . . . .'"  United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)).  "'For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'"  United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's."  United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).  "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop."  United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131, and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart."  United States v. Erwin, 875 F.2d at 270.

       The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. at 403), courts

       assess the reasonableness of a routine traffic stop under the principles laid out for
       investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether

the officer's action was justified at its inception, and whether it was reasonably
related in scope to the circumstances which justified the interference in the first
place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220).  A

court must examine "both the length of the detention and the manner in which it is carried out,"

United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration

and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting

United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based

on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary,

lasting no longer than necessary to effectuate the purpose of the [further] detention, and the scope

of the [further] detention must be carefully tailored to its underlying justification.'"  United States

v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir.

1997))(brackets in United States v. Wilson, but not in United States v. Wood).  "A traffic stop is

justified at its inception if an officer has . . . reasonable articulable suspicion that a particular

motorist has violated any of the traffic . . . regulations of the jurisdiction."  United States v. Winder,

557 F.3d at 1134.  See United States v. Martinez, No. CR 24-0707 JB, 2024 U.S. Dist. LEXIS

214431, at *94 (D.N.M. November 25, 2024)(Browning, J.)(concluding that the police officer

initiates Constitutionally the traffic stop of a car, because there is probable cause to believe that at

least some of the car's passengers do not have their seatbelts fastened).

**6.   Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention,"

Oliver v. Woods, 209 F.3d at 1186, that is "reasonable only if supported by probable cause," United

States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018).  A police-citizen encounter that goes

beyond the limits of a stop under <u>Terry v. Ohio</u> is an arrest.  <u>See</u> <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent.").  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[9]  <u>United States v. Melendez-Garcia</u>, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  <u>United States v. Rodriguez</u>, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).     <u>See</u>  <u>Wilson  v.  Jara</u>,  866  F. Supp. 2d  1270,  1292  (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy  search  or  detention.'"  (quoting  <u>Oliver v. Woods</u>,  209  F.3d  at  1185)),  <u>aff'd</u>,  512 F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  <u>United States v. Valenzuela</u>, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting <u>United States v. Edwards</u>, 242 F.3d 928, 934 (10th Cir. 2001)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require 'more

---

[9]The use of handcuffs, however, does not always elevate a detention into an arrest. <u>See</u> <u>United States v. Albert</u>, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a <u>Terry</u> stop."); <u>Pierre-Louis v. Schake</u>, No. CIV 12-0527, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); <u>United States v. Reyes-Vencomo</u>, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs  . . .  does not always elevate a detention into an arrest.").

than mere suspicion.'" United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting

United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has

made the following distinction between reasonable suspicion, which is sufficient for an

investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can

be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in
> the sense that reasonable suspicion can be established with information that is
> different in quantity or content than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89,

96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing

Florida v. Royer, 460 U.S. at 507, and United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir.

2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that

probable cause existed to arrest the defendant based on the 'information possessed by the

[arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting

Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995))(alterations in Olsen v. Layton Hills Mall,

but not in Romero v. Fay).

**7.    When a Detention Becomes an Arrest.**

The Tenth Circuit holds that a police-citizen encounter which goes beyond an investigative

stop's limits is an arrest that probable cause or consent must support to be valid.  See United States

v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the

limits of a Terry stop, however, may be constitutionally justified only by probable cause or

consent."). "<u>Terry</u> stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." <u>United States v. Perdue</u>, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" <u>United States v. Perdue</u>, 8 F.3d at 1462 (quoting <u>Florida v. Royer</u>, 460 U.S. at 500).

The Court also engages in the balancing act of deciding when a detention becomes an arrest. In <u>United States v. Perea</u>, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), <u>aff'd sub nom.</u> <u>United States v. Burciaga-Burciaga</u>, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court determines whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. <u>See</u> <u>United States v. Perea</u>, 374 F. Supp. 2d at 976. In that case, the Court determines that such measures are appropriate and do not elevate the investigative detention to the level of an arrest. <u>See</u> 374 F. Supp. 2d at 976. The Court recognizes that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a <u>Terry</u> stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974 (quoting <u>United States v. Perdue</u>, 8 F.3d at 1463). <u>See</u> <u>United States v. Gama-Bastidas</u>, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'")(quoting <u>United States v. Perdue</u>, 8 F.3d at 1462); <u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730 (affirming the Court's determination in <u>United States v. Perea</u> that the officers have reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not

transforming the vehicle stop into a formal arrest requiring probable cause).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1462). See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of a stop when officers detain the defendant at gunpoint and place him in handcuffs, where suspect threatens to kill someone and is pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" is not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers do not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspect that the defendant has "just completed a narcotics purchase," there are a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards"). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents."). United States v. Perea is one of those unique cases, because the police have reasonable cause to believe that the person whom they are detaining is the suspect whom they seek to arrest -- a man wanted for murder who, it is believed, might be armed and dangerous. See 374 F. Supp. 2d at 976. The

Tenth Circuit affirms the Court's determination that the stop is not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a <u>Terry</u> stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety.  <u>United States v. King</u>, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 20 . . . (1968)).  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.    The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

<u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730.

## 8. <u>Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest</u>.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." <u>Romero v. Fay</u>, 45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." <u>Baptiste v. J.C. Penney Co.</u>, 147 F.3d 1252, 1259 (10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." <u>Garcia v. Casuas</u>, No. CIV 11-0011, 2011 WL 7444745, at *49 (D.N.M. December 8, 2011)(Browning, J.)(citing <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

## <u>LAW REGARDING THE EXCLUSIONARY RULE</u>

"When the government obtains evidence though an unconstitutional search, the evidence is inadmissible under the exclusionary rule unless an exception applies." <u>United States v. Neugin</u>, 958 F.3d 924, 931 (10th Cir. 2020).  <u>See</u> <u>Sanchez-Llamas v. Oregon</u>, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth

Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process."); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  "In addition, a defendant also may suppress any other evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence." United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).  The exclusionary rule applies if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence he or she seeks to excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999; United States v. Ringleb, No. CR 22-0190 JB, 2025 2025 U.S. Dist. LEXIS 75030, at *1-3 (D.N.M. April 18, 2025)(Browning, J.)(holding that police officers violate the Fourth Amendment when they enter a backyard unlawfully, there is sufficient factual nexus between the unlawful search and the challenged evidence, and no exclusionary rule exception applies).  The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015).

### 1.    **Attenuation Doctrine.**

One exception to the exclusionary rule is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the

constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. at 238 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." Utah v. Strieff, 579 U.S. at 238. To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulates in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court concludes that a time span of "less than two hours" between the unconstitutional arrest and the confession is too short an interval, and, therefore, counsels in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court concludes that there are sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applies the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents have probable cause to believe that apartment occupants are dealing cocaine. See 468 U.S. at 799-800. They seek a warrant. See 468 U.S. at 799-800. In the meantime, they enter the apartment, arrest the occupant, and discover evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtain a search warrant. See 468 U.S. at 800-01. The Supreme

Court deems the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant is "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggests that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, 579 U.S. at 240 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, 579 U.S. at 239 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 579 U.S. at 241. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 579 U.S. at 241. See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

## 2.    **Good-Faith Exception.**

Recognizing that the exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations," the Supreme Court holds that evidence is admissible where the officer who obtains the evidence through an unlawful search or seizure acts in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court explains "that the deterrence benefits of

exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 143 (2009))(brackets in United States v. Davis, but not in Herring v. United States). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot 'pay its way.'" United States v. Davis, 564 U.S. at 238 (internal quotation marks have no citation). "In those situations, officers act with an 'objectively reasonable good-faith belief that their conduct is lawful,' . . . precluding the application of the exclusionary remedy." United States v. Pemberton, 94 F.4th 1130, 1137 (10th Cir. 2024)(quoting United States v. Davis, 564 U.S. at 257).

The good-faith exception most commonly arises in the context of warrant-based searches to allow entry of evidence obtained by officers acting "in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid." Massachusetts v. Sheppard, 468 U.S. 981, 987-88 (1984). "When a search is conducted pursuant to a warrant that is based on illegally obtained information," however, "a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the warrant affidavit's remaining content establishes probable cause, the search pursuant to that warrant is appropriate, and the evidence is admissible:

When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. [United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)]. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005). See United States v. Bullcoming, 22 F.4th 883, 890-92 (10th Cir.), cert. denied, 142 S.Ct. 2805 (2022). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

In United States v. Leon, the Supreme Court concludes that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police are acting in good-faith reliance on that warrant. See 468 U.S. at 922-23; id. at 468 U.S. at 905. The Supreme Court notes that excluding this evidence will not deter police misconduct, as the officer took all of the necessary steps to comply with the Fourth Amendment and reasonably thinks his warrant, and, thus, his search, is valid. See United States v. Leon, 468 U.S. at 918-19. The Supreme Court explains that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence will not have a significantly deterrent effect on judicial conduct. See 468 U.S. at 916-17. "The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M.

2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United

States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be
> ordered . . . only in those unusual cases in which exclusion will further the purposes
> of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . . "Where an
> officer acting with objective good faith obtains a search warrant from a detached
> and neutral magistrate and the executing officers act within its scope, there is
> nothing to deter." United States v. Nolan, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.

Furthermore, the Tenth Circuit has explained that, "[u]nder Leon, we presume good-faith

when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]." United States

v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known was false if not for his "reckless disregard of the truth." [United States v.
> Leon, 468 U.S.] at 923 . . . . Second, the exception does not apply when the
> "issuing magistrate wholly abandon[s her] judicial role." Id. Third, the good-faith
> exception does not apply when the affidavit in support of the warrant is "so lacking
> in indicia of probable cause as to render official belief in its existence entirely
> unreasonable." Id. (quotation omitted). Fourth, the exception does not apply when
> a warrant is so facially deficient that the executing officer could not reasonably
> believe it was valid. See id.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d at 1316.

In Herring v. United States, the Supreme Court clarifies that, "[t]o trigger the exclusionary

rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and

sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S.

at 144. Officers arrest Herring pursuant to an arrest warrant listed in the Dale County, Alabama,

warrant database, and discover drugs and a gun on Herring's person during a search incident to arrest. See 555 U.S. at 137. Herring is then indicted on federal gun- and drug-possession charges. See 555 U.S. at 138. It turns out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. See 555 U.S. at 138. Asserting that the evidence found during the search is fruit of an unlawful arrest, Herring seeks to suppress it. See 555 U.S. at 138.

The Supreme Court concludes that, although the police's failure to update the warrant database to reflect that Herring's warrant is withdrawn was negligent, the police's omission is not reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterates its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922). The Supreme Court further explains that "'evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional.'" Herring v. United States, 555 U.S. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

In Davis v. United States, the Supreme Court confronts the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court

had not yet decided <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  <u>See</u> <u>Arizona v. Gant</u>, 556 U.S. at 341-48.  The United States Court of Appeals for the Eleventh Circuit had interpreted the Supreme Court's decision in <u>New York v. Belton</u>, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  <u>See</u> <u>United States v. Gonzalez</u>, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under <u>Arizona v. Gant</u>.  <u>United States v. Davis</u>, 564 U.S. at 239-40.

The Supreme Court determines that the "acknowledged absence of police culpability dooms [the defendant's] claim."  <u>United States v. Davis</u>, 564 U.S. at 240.  The Supreme Court explains that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  <u>United States v. Davis</u>, 564 U.S. at 240 (quoting <u>Herring v. United States</u>, 555 U.S. at 144).  The Supreme Court states: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  <u>United States v. Davis</u>, 564 U.S. at 240 (quoting and citing <u>Herring v. United States</u>, 555 U.S. at 144).  The Supreme Court concludes that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  <u>United States v. Davis</u>, 564 U.S. at 240.

3.    <u>**Inevitable-Discovery Exception**</u>.

Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means." <u>United States v. Braxton</u>, 61 F.4th 830, 833 (10th Cir. 2023)(quoting <u>United States v. Neugin</u>, 958 F.3d at 931).  <u>See United States v. Christy</u>, 739 F.3d 534, 540 (10th Cir. 2014).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." <u>United States v. Cunningham</u>, 413 F.3d 1199, 1203 (10th Cir. 2005).  For the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  <u>United States v. Owens</u>, 782 F.2d 146, 152 (10th Cir. 1986). The Tenth Circuit clarifies, however, that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question, so long as "the lawful means of discovery are 'independent of the constitutional violation.'"  <u>United States v. Christy</u>, 739 F.3d at 540-41 (quoting <u>United States v. Larsen</u>, 127 F.3d 984, 987 (10th Cir. 1997)). The Tenth Circuit has urged courts to consider the "'danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway.'"  <u>United States v. Owens</u>, 782 F.2d at 152-53 (quoting <u>United States v. Romero</u>, 692 F.2d 699, 704 (10th Cir. 1982)).  Accordingly, "courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."  <u>United States v. Martinez</u>, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

The Tenth Circuit further explains that, "[w]hile the inevitable discovery exception does not apply in situations where the government's only argument is that it had probable cause for the

search, the doctrine may apply where, in addition to the existence of probable cause, the police had taken steps in an attempt to obtain a search warrant." United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000). The Tenth Circuit states that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. In United States v. Souza, 223 F.3d 1197, the Tenth Circuit adopts four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

223 F.3d at 1204 (quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)). See United States v. Cunningham, 413 F.3d at 1204-05 (applying the four factors that United States v. Souza outlines). In United States v. Christy, the Court applies the four United States v. Souza factors and determines that the inevitable-discovery exception applies. See United States v. Christy, 810 F. Supp. 2d 1219, 1275-79 (D.N.M. 2011), aff'd, 739 F.3d 534 (10th Cir. 2014)

**LAW REGARDING EVIDENTIARY HEARINGS UNDER FRANKS V. DELAWARE**

A defendant may challenge a facially sufficient warrant affidavit only through a Franks v. Delaware evidentiary hearing. See Franks v. Delaware, 438 U.S. at 171-72. The Franks v. Delaware rule is, however, "limited [in] scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." Franks v. Delaware, 438 U.S. at 167. A court may conduct a Franks v. Delaware evidentiary hearing only after the defendant makes "a substantial preliminary showing that (i) the warrant

affidavit includes a false statement or material omission; (ii) the statement was made knowingly and intentionally or with reckless disregard for the truth; and (iii) the allegedly false statement is necessary to a finding of probable cause." United States v. McKenzie, CR 08-1669 JB, 2011 WL 831218, at *8 (D.N.M. Feb. 10, 2011)(Browning, J.)(citing United States v. Tisdale, 248 F.3d 964, 973 (10th Cir. 2001)).

In obtaining a hearing under Franks v. Delaware, "[t]he defendant bears the burden to demonstrate the affidavit's falsity or reckless disregard for the truth by a preponderance of the evidence." United States v. Morales-Ortiz, 376 F. Supp. 2d 1131, 1140 (D.N.M. 2004)(Browning, J.)(quoting United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997)). Regarding the affiant's mental state in making a false statement, "the Franks standard is a high one." United States v. McKenzie, 2011 WL 831218, at *8. "Allegations of negligence or innocent mistake are insufficient." Franks v. Delaware, 438 U.S. at 171. "Franks does not require that all statements in an affidavit be true; it requires only that the statements be believed or appropriately accepted by the affiant as true." United States v. McKenzie, 2011 WL 831218, at *9. Additionally, the same standards that apply to false statements govern material omissions from an affidavit. See United States v. Basham, 268 F.3d 1199, 1204 (10th Cir. 2001).

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Franks v. Delaware, 438 U.S. at 171. A defendant must instead make an offering of proof:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explain.

Franks v. Delaware, 438 U.S. at 171.  See United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004)("Affidavits of witnesses should be provided to the court or their absence satisfactorily explain.").  "If these requirements are met, then the defendant must show that the remaining content of the warrant affidavit is insufficient to support a finding of probable cause."  United States v. McKenzie, 2011 WL 831218, at *9 (quoting United States v. Artez, 389 F.3d at 1116). See also United States v. Roybal, 46 F. Supp 3d 1127, 1161-62 (D.N.M. 2014)(Browning, J.)(denying the defendant's request for discovery, because the defendant makes no showing that there is a material omission or misrepresentation in wiretap applications).

## ANALYSIS

The Court first concludes that each step of the search, including the Jones Aff., the iPhone 13 Warrant, and the warrant's execution, is lawful.  Next, the Court concludes that the exclusionary rule does not apply, because there is no evidence of a Constitutional violation.  Even if the exclusionary rule applies, then: third, the good-faith exception applies, because the police reasonably rely on the warrant when searching Jessen's iPhone 13; fourth, law enforcement would have obtained a valid warrant to search the iPhone 13.  The Court, therefore, denies Jessen's motion to suppress evidence obtained from Jessen's iPhone 13.

## I.    THE JONES AFFIDAVIT, THE IPHONE 13 WARRANT, AND THE RESULTING SEARCH ARE LAWFUL.

The Court analyzes the search's three stages: (i) the Jones Aff.; (ii) the iPhone 13 Warrant; and (iii) the resulting iPhone 13 search.  First, the Court concludes that the Jones Aff. sets forth probable cause to search Jessen's personal telephones, which include both the iPhone 11 and the iPhone 13.  Second, the Court concludes that the iPhone 13 Warrant is valid for two reasons: it is sufficiently particular, and the probable cause in the Jones Aff. supports searching the iPhone 13

that the warrant describes.  Third, the resulting search of the iPhone 13 is lawful, because agents search the item that the iPhone 13 Warrant describes.

A.    **THE JONES AFF. CONTAINS PROBABLE CAUSE TO SEARCH ALL OF JESSEN'S PERSONAL TELEPHONES, INCLUDING THE IPHONE 11 AND THE IPHONE 13.**

Jessen argues that the Jones Aff. lacks probable cause to provide a sufficient basis for the iPhone 13 Warrant, because law enforcement observes that Jessen possesses an iPhone 11, but then writes up a warrant to search an iPhone 13.  See Motion at 5.  The Court disagrees with Jessen's argument.  The Jones Aff.'s probable cause explanation is not tied to the iPhone 11.  The Jones Aff. describes how law enforcement observes that Jessen possesses an iPhone that "[b]ased on the agent's familiarity and experience," is "believed" to be an iPhone 13.  Jones Aff. ¶ 78, at 51.  Law enforcement does not know with certainty whether the cellular telephone is an iPhone 13, or an "iPhone 13 Cell Phone Assigned Call Number 505-379-9756 WITH IMEI 350183980185078."  iPhone 13 Warrant at 1.  Thus, the Jones Aff. does not make any mistake in identifying what device Jessen possesses, because it couches law enforcement's observation with a little uncertainty as to what the iPhone model is.  This uncertainty is reasonable; Swift testifies at the hearing that he would "never" be able to identify a particular model of iPhone merely by looking at it, because they are so similar in appearance, and "there is nothing distinguishing about the surface of the phone that tells you what it is," whether it is placed face up or face down.  Tr. at 78:1-15 (Meyers, Swift).  Instead, the Jones Aff. establishes sufficient probable cause that Jessen possesses a personal iPhone -- regardless whether it is an iPhone 11 or an iPhone 13 -- which he uses to contact Linker.  See Jones Aff. ¶ 78, at 51.

During the interview, the DEA agent "observed that Detective Jessen was in possession of two cell phone devices, one of which was identified as Detective Jessen's work phone and the

other was the phone that Detective Jessen used to contact Detective Linker." Jones Aff. ¶ 78, at

51. The Jones Aff. explains the probable cause that supports searching Jessen's personal

telephone:

> I believe that the digital information contained on the Device will provide additional information about the nature of the relationship between Detectives Jessen and Linker, and R.W. This information will include, but is not limited to: communication records, like phone logs and text messages between Detectives Jessen and Linker, and R.W., discussing R.W.'s illegal activities; records of payments exchanged between Detectives Jessen and Linker and R.W. relating to R.W.'s drug distribution; photographs or videos showing evidence of R.W.'s illegal activities and the role Detectives Jessen and Linker played in those illegal activities; evidence of locations where R.W. conducted illegal activity and his travel to this locations that may lead to further evidence; and evidence of other people like R.W.'s sources of supply, coconspirators, or customers, or people that Detectives Jessen and Linker were communicating with in a similar manner to R.W., who could be interviewed by agents to determine if Detectives Jessen and Linker provided information of law enforcement operations to them.

Jones Aff. ¶ 79, at 52-53. According to the Jones Aff., the digital information that can reveal the

nature of the relationship among Jessen, Linker, and R.W. exists on Jessen's personal telephone,

whether that is the original iPhone 11 or the upgraded iPhone 13. See Jones Aff. ¶ 79, at 52-53.

The Jones Aff.'s probable cause explanation, therefore, does not attach to any specific physical

iPhone device. The explanation, rather, supports a search of a personal telephone device that:

(i) Jessen possesses; (ii) resembles an iPhone 13; and (iii) likely contains the digital information

that the Jones Aff. describes, i.e., communications among Jessen, Linker, and R.W.

The iPhone 13 that agents ultimately search meets all of those requirements: (i) Jessen

possesses the iPhone 13 as a personal telephone; (ii) it is an iPhone 13; and (iii) it likely contains

the digital information that the Jones Aff. describes, for two reasons. First, it is reasonable to

believe that Jessen transfers the relevant digital information from the iPhone 11 to the iPhone 13

when he upgrades. It is "reasonably common for individuals to transfer data between an old and

new phone when they upgrade," United States v. Gonzalez-Arocho, No. CR 22-418 (PAD), 2024 WL 277507, at *2 (D.P.R. Jan. 25, 2024)(Lopez, M.J.). Other district courts conclude similarly. See Coyne v. Los Alamos Nat'l Sec., LLC, No. CIV 15-0054 SCY/KBM, 2017 WL 3225466, at *9 (D.N.M. May 1, 2017)(Yarborough, M.J.)("[T]he Court agrees with Defendants that it is common for a person to transfer data from an old phone onto a new phone."). See also Lamb v. Liberty Univ., No. 6:21-CV-00055, 2022 WL 3692670, at *5 (W.D. Va. August 25, 2022)(Moon, J.)("It is also unusual for a person to exchange phones without transferring data from the old phone onto the new.").

Jessen contends that, because a data transfer from the iPhone 11 to the iPhone 13 "may or may not" occur, the probable cause for the iPhone 11 "does not automatically transfer" to the iPhone 13. Tr. at 12:8-12 (Meyers). The two iPhones are not only different physical objects, but they also may or may not contain different information. See Motion at 6; Tr. at 12:8-12 (Meyers). At the hearing, Jessen examines digital forensics expert Swift, who testifies that a data transfer is not automatic, and a user must "perform an action" to initiate a transfer. Tr. at 47:20-48:4 (Meyers, Swift). In the "quick transfer" method, where the user places the old telephone and the new telephone next to each other, the user must launch the transfer command on both telephones, Tr. at 48:2-3 (Swift), and in the iCloud transfer, the user must log-in to the new device and initiate the transfer, Tr. at 50:14-24 (Meyers, Swift). Swift testifies that, regardless of the method of data transfer, there is "no way to ensure" that the items sought by the warrant are transferred to the new iPhone 13. Tr. at 63:21-25 (Meyers, Swift).

As the Court explains, however, data transfers are extremely common. Even though Jessen is correct that a data transfer "may or may not occur," Tr. at 12:8-12 (Meyers), the high likelihood of a data transfer occurring is indisputable, so as to establish probable cause. Probable cause exists

when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched." United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995)(quoting United States v. Bieri, 21 F.3d 811, 815 (8th Cir. 1994)).  A prudent person would believe that, when an iPhone user upgrades their iPhone, they will transfer their data to the new iPhone.  See Tr. at 65 (Swift)(testifying that seeing the same image on an old telephone and upgraded telephone may indicate a data transfer).  There is probable cause to believe, therefore, that the digital information regarding Jessen, Linker, and R.W.'s relationship that the Jones Aff. describes, exists on Jessen's upgraded iPhone 13.

The second reason that the iPhone 13 likely contains the digital information that the Jones Aff. describes is because it is reasonable to believe that Jessen communicates with Linker on the upgraded iPhone 13.  Jessen communicates with Linker on his personal telephone throughout the investigation.  See Jones Aff. ¶ 78, at 52 (stating that Jessen's personal iPhone exchanges approximately six text messages with Linker's personal telephone, even after the FBI agent advises against communicating with Linker during the interview).  Probable cause that Jessen uses his iPhone 13 to communicate with Linker therefore exists independent of the earlier iPhone-11 activities.  Accordingly, the Court, concludes that the Jones Aff. establishes probable cause to search Jessen's personal telephone device or devices  The probable cause is not limited to just Jessen's iPhone 11; the probable cause includes any iPhone in Jessen's possession that looks like an iPhone 13, and is likely to have evidence of communications among Jessen, Linker, and R.W.

### B.   THE IPHONE 13 WARRANT IS VALID, BECAUSE IT IS SUFFICIENTLY PARTICULAR, AND BECAUSE THE JONES AFF. PROVIDES THE NECESSARY PROBABLE CAUSE.

Jessen makes two challenges to the iPhone 13 Warrant's validity.  First, Jessen argues that the iPhone 13 Warrant lacks probable cause, because the Jones Aff. only supports a search of the

iPhone 11.  See Motion at 6-7.  The Court's conclusion above resolves Jessen's first challenge; the Jones Aff. establishes probable cause to search both the iPhone 13 and the iPhone 11.  Accordingly, probable cause supports the iPhone 13 Warrant, which explicitly issues a search of the iPhone 13. The iPhone 13 Warrant is thus valid.

Second, Jessen invokes the particularity requirement to argue that the warrant is an invalid general warrant, because it issues a search of a misidentified item.  See Motion at 5-6.  Search warrants must describe the items to be searched with sufficient particularity.  See United States v. Russian, 848 F.3d 1239, 1244 (10th Cir. 2017)(citing U.S. Const. amend. IV).  The particularity requirement's purpose is "to prevent a general exploratory rummaging in a person's belongings." United States v. Campos, 221 F.3d 1143, 1147 (10th Cir. 2000)(quoting United States v. Carey, 172 F.3d 1268, 1271 (10th Cir. 1999)).  "A warrant's description of things to be seized is sufficiently particular if it allows the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997).  "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Davis v. Gracey, 111 F.3d 1472, 1478 (10th Cir. 1997)(quoting Marron v. United States, 175 U.S. 192, 196 (1927)).

Here, the iPhone 13 Warrant's identification of Jessen's cellular telephone does not give way to the "general exploratory rummaging in a person's belongings" that the particularity requirement prohibits.  United States v. Campos, 221 F.3d at 1147.  The iPhone 13 Warrant describes specifically an "iPhone 13 Cell Phone Assigned Call Number 505-379-9756 WITH IMEI 350183980185078."  iPhone 13 Warrant at 1.  Furthermore, the iPhone 13 Warrant restricts

the search's scope to evidence of specific federal crimes and specific material: information identifying co-conspirators; communications between co-conspirators; information related to drug trafficking; and evidence of user attribution.  See iPhone 13 Warrant at 64.  Then, the iPhone 13 Warrant requires that the targeted information must relate to the specific federal crimes of 18 U.S.C. § 1512, 21 U.S.C. §§ 841 and 846, and 18 U.S.C. §§ 2-3.  See iPhone 13 Warrant at 64. Although the Tenth Circuit invalidates warrants of electronic searches "where we could discern no limiting principle: where, for example, the warrant permitted a search of 'any and all' information, data, devices, programs, and other materials," United States v. Christie, 717 F.3d 1156, 1164-65 (10th Cir. 2013)(quoting United States v. Otero, 563 F.3d 1127, 1132-33 (10th Cir. 2009)), that situation is not the case here.  To the contrary, several levels of clear limiting principles limit not only what device will be searched, but also what information on the device can be obtained.  See iPhone 13 Warrant at 64.  The Court, therefore, concludes that the iPhone 13 Warrant's specific description of the iPhone to be searched meets the particularity requirement, especially considering the particularity requirement's purpose and intent.

### C.    THE RESULTING SEARCH IS LAWFUL BECAUSE AGENTS SEARCH THE EXACT ITEM THAT THE WARRANT DESCRIBES.

To finish the search analysis, the Court concludes that the warrant execution is lawful.  The agents search the exact item that the warrant describes: an "iPhone 13 Cell Phone Assigned Call Number 505-379-9756 WITH IMEI 350183980185078." iPhone 13 Warrant at 1.  Summarizing the Court's complete line of reasoning, the Court concludes that the warrant execution is lawful, because the warrant itself is sufficiently particular and the Jones Aff. provides probable cause to support the warrant.

II.    **THE MISIDENTIFICATION OF THE ITEM TO BE SEARCHED IN THE WARRANT DOES NOT TRIGGER THE EXCLUSIONARY RULE UNDER FRANKS V. DELAWARE, 438 U.S. 154 (1978).**

Jessen contends that the Jones Aff.'s misidentification of the iPhone to be searched is "reckless, if not deliberate, action[]."  Reply at 5.  Although Jessen does not invoke Franks v. Delaware, a defendant must challenge a facially sufficient affidavit through a Franks v. Delaware evidentiary hearing.  See Franks v. Delaware, 438 U.S. at 171-72.  The Court, therefore, analyzes Jessen's challenge under the Franks v. Delaware framework.  A court may conduct a Franks evidentiary hearing only after the defendant makes "a substantial preliminary showing that (i) the warrant affidavit includes a false statement or material omission; (ii) the statement was made knowingly and intentionally or with reckless disregard for the truth; and (iii) the allegedly false statement is necessary to a finding of probable cause."  United States v. McKenzie, CR 08-1669 JB, 2011 WL 831218, at *8 (D.N.M. Feb. 10, 2011)(Browning, J.)(citing United States v. Tisdale, 248 F.3d 964, 973 (10th Cir. 2001)).

Even if the Jones Aff. lacks probable cause to search the iPhone 13 and the iPhone 13 Warrant is invalid, the Court does not permit a Franks v. Delaware evidentiary hearing, because no police misconduct occurs.  "False statements in warrant applications are serious business." Taylor v. Hughes, 26 F.4th 419, 426 (7th Cir. 2022).  In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court holds that a warrant is invalid if the police make a false statement in the warrant affidavit "knowingly and intentionally, or with reckless disregard for the truth," and that statement "is necessary to the finding of probable cause."  438 U.S. at 155.  Courts must exclude resulting evidence "to the same extent as if probable cause was lacking on the face of the affidavit."  Franks v. Delaware, 438 U.S. at 156.  See also United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006)("The ordinary remedy in a criminal case for violation of the Fourth Amendment

is suppression of any evidence obtained during the illegal police conduct."). The "<u>sole</u> purpose of the exclusionary rule is to deter police misconduct by law enforcement." <u>Davis v. United States</u>, 564 U.S. 229, 245 (2011)(emphasis in <u>Davis</u>). To exclude evidence, the deterrent value must outweigh these costs. <u>See</u> <u>Herring</u>, 55 U.S. at 147. In balancing the deterrent benefits against the costs, government agents' culpability is relevant. <u>See</u> <u>Herring</u>, 55 U.S. at 137. The Supreme Court explains:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

<u>Herring</u>, 55 U.S. at 144.

Importantly, the defendant has the burden to show that the affidavit supporting an allegedly invalid search warrant includes affirmatively false statements. <u>See</u> <u>United States v. Kennedy</u>, 131 F.3d 1371, 1377 (10th Cir. 1997). In <u>Herring</u>, the police act on a warrant which was subsequently recalled, but, for some unknown reason, the recall information does not appear in the police database. <u>See</u> 55 U.S. at 138. The Supreme Court concludes that, while a Fourth Amendment violation occurs because the police conduct an unreasonable search because they rely on a recalled warrant, the police error in this case does not rise to the level of "deliberate, reckless, or grossly negligent conduct" that the exclusionary rule serves to deter. <u>Herring</u>, 55 U.S. at 144. The Supreme Court further explains that the "pertinent analysis of deterrence and culpability is objective, not an 'inquiry into the subjective awareness of arresting officers.'" 55 U.S. at 145 (quoting the Petitioner's Reply Brief). While not all recordkeeping errors by the police are immune from the exclusionary rule, the conduct at issue in <u>Herring</u> is "not so objectively culpable as to require exclusion." <u>Herring</u>, 155 U.S. at 146. The Supreme Court hypothesizes that, had the police

been "reckless in maintaining a warrant system" or "knowingly made false entries to lay the groundwork for future false arrests," such misconduct would be a Fourth Amendment violation. Herring, 55 U.S. at 146.

Applying the Supreme Court's reasoning in Herring here, the Court concludes that, based on Jessen's proffered evidence, Jones' description of Jessen's cellular telephone to be searched as an iPhone 13 is not so objectively culpable to justify exclusion. Jessen's sole evidence is the Cell Phone Provider Record, which indicates that Jessen activates an iPhone 13 after the date of police questioning. See Cell Phone Provider Record at 1. Jessen does not show, however, that Jones relies on the Cell Phone Provider Record when writing the warrant application. There is no evidence regarding what documents or data Jones uses to identify the "iPhone 13 Cell Phone Assigned Call Number 505-379-9756 WITH IMEI 350183980185078" in the warrant application. iPhone 13 Warrant at 1. Jessen does not call on Jones to testify at the hearing, and the United States also does not call Jones, because it holds Jessen to meet his preponderance of the evidence burden. See Tr. at 97:18-25 (Long). Swift's testimony that he cannot tell the difference between an iPhone 11 and an iPhone 13 from afar debunks Jessen's theory that Jones lists an iPhone 13 as the item to be searched despite observing an iPhone 11 in Jessen's possession during the meeting between Jessen and agents. See Tr. at 78:1-15 (Meyers, Swift). Swift testifies that he would "never" be able to identify a particular model of iPhone merely by looking at it, because they are so similar in appearance and "there is nothing distinguishing about the surface of the phone that tells you what it is," whether it is placed face up or face down. Tr. at 78:1-15 (Meyers, Swift).

Moreover, the evidence on which Jessen relies in the Cell Phone Provider Record is very difficult to discern from the data; the Court would not know where to look had Jessen not pointed to it at the hearing. See Tr. at 89:8-9 (Court)("Well, I told you that me looking at that sheet, I

didn't get much information out of it."). On the data sheet, both Jessen's iPhone 11 and the iPhone 13 entries have an "MTN_Effective_Date" of "2015-03-02," which could suggest that Jessen possesses the iPhone 13 well before the police interview, and, even more noteworthy, the iPhone 13 entry also has a "MTN_Status_Eff_Date" of "01-23-2020," which is after the police interview. Cell Phone Provider Record at 1. The Cell Phone Provider Record data sheet does not explain the difference between an "MTN_Effective_Date" and an "MTN_Status_Eff_Date." Cell Phone Provider Record at 1. Jessen does not show that Jones knows or should have known how to interpret the Cell Phone Provider Record, or that Jones uses the Cell Phone Provider Record when writing the affidavit or the warrant application. Jessen does not meet his burden to show that Jones' observation that Jessen has an iPhone 13 at the time of police questioning, when he had an iPhone 11, is "reckless" or "knowingly" a false statement. Herring, 55 U.S. at 146. Misidentifying the iPhone agents observe as an iPhone 13 is not deliberate or reckless. Coupled with the ambiguity of the Cell Phone Provider Record data, the Court concludes that, under Herring, the exclusionary rule does not apply. The Court, therefore, concludes that Jessen is not entitled to a Franks v. Delaware evidentiary hearing on the alleged misidentification of the iPhone agents observe in the Jones Aff.

## III.    EVEN IF THE WARRANT IS INVALID, THE GOOD-FAITH EXCEPTION APPLIES.

Even if the Jones Aff. lacks probable cause to search the iPhone 13 and the iPhone 13 Warrant is invalid, the Court admits the evidence, because the searching officers reasonably rely on a facially valid warrant. See United States v. Burgess, 576 F.3d 1078, 2095 (10th Cir. 2009)(citing United States v. Leon's good-faith doctrine). "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing

officers act within its scope, there is nothing to deter." United States v. Nolan, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Burgess' application of the good-faith exception based on a facially valid warrant is instructive. See 576 F.3d at 1096. In United States v. Burgess, the defendant argues that a warrant officers obtain to search a computer for evidence of drug trafficking lacks particularity and probable cause. United States v. Burgess, 576 F.3d at 2095. The Tenth Circuit holds that, even if the warrant is deficient, the officers' reliance on it is objectively reasonable, because the warrant is not facially invalid and a detailed affidavit supports the warrant. See 576 F.3d at 1096. The Tenth Circuit notes that the affidavit includes extensive facts tying the defendant's computer to the alleged criminal activity, and the Magistrate judge reviews and approves the warrant based on those facts. See 576 F.3d at 1096. Like the officers in United States v. Burgess, here, the officers reasonably rely on a facially valid warrant. See Finding of Fact No. 15, supra, at 5. The iPhone 13 Warrant specifically identifies the item to be searched, gives a model, telephone number, user, and IMEI, and describes a limited scope of information within the cellular telephone to be searched. As the Court describes earlier, it is not so overbroad to become an unconstitutional general warrant, and, therefore, it meets the particularity requirement. See Finding of Fact 14 (describing the iPhone 13 Warrant). The supporting sixty-one-page Jones Aff. describes at least four occasions where Jessen communicates with Linker using Jessen's personal telephone around the same time as R.W.'s illegal activities: (i) November 23, 2021, see Finding of Fact 16; Jones Aff. ¶ 32, at 11 (describing a two-minute-and-thirty-two-second telephone call with Jessen's personal telephone); (ii) December 16, 2021, see Finding of Fact 22-24; Jones Aff. ¶ 45, at 16, and Jones Aff. ¶ 54, at 24 (stating that Jessen communicates with Linker using Jessen's personal telephone, including text messages and several telephone calls); (iii) January 6, 2022, see

Finding of Fact 60; Jones Aff. ¶ 74, at 49 (stating that Jessen uses his personal telephone to speak with Linker for approximately thirteen minutes and forty-seven seconds); and (iv) January 20, 2022, see Finding of Fact 72; Jones Aff. ¶ 78, at 52 (stating that, after the FBI interview with Jessen, Jessen's personal telephone exchanges approximately six text messages with Linker's personal telephone). Like the detailed affidavit in United States v. Burgess, here, the Jones Aff. describes in detail numerous direct communications between Jessen and Linker so as to establish probable cause that Jessen's personal cellular telephone has information that goes to the charged offense. A searching officer reasonably can rely on this particular, justified warrant.

In contrast, in United States v. Leary, the Tenth Circuit declines to apply the good-faith exception and excludes the evidence where the warrant authorizes seizure of "all books, records, documents, and other items" related to a company that allegedly violates trade laws. 846 F.2d at 602. The Tenth Circuit concludes that the warrant is worded so broadly and is so devoid of particularity that it effectively authorizes a general search, and no officer reasonably could believe it was valid. See 846 F.2d at 609-10. Here, the iPhone 13 Warrant bears little resemblance to the deficient warrant in United States v. Leary. It is sufficiently particular, descriptive, and limiting, and therefore the agents conducting the search reasonably can rely on it. Even if the iPhone 13 Warrant describes the wrong iPhone to be searched, which it does not, that misidentification is irrelevant. For the same reasons that the Court explains previously, there is no evidence of misconduct when the Jones Aff. incorrectly identifies the item to be searched as an iPhone 13, because no testimony or other evidence shows that Jones recklessly falsifies the statement about the iPhone model to be searched. The Court, therefore, concludes that the good-faith exception applies and that, even if the warrant is invalid because it lacks probable cause, the searching

officers reasonably rely on the warrant.  The Court does not exclude the evidence obtained from searching Jessen's iPhone 13.

## IV.    THE UNITED STATES INEVITABLY WOULD HAVE DISCOVERED THE IPHONE 13 EVIDENCE.

In the alternative, even if the warrant is invalid, the United States would inevitably discover Jessen's iPhone 13 contents such that the Court would not suppress the evidence.  Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means." United States v. Braxton, 61 F.4th 830, 833 (10th Cir. 2023)(quoting United States v. Neugin, 958 F.3d at 931).  See United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."   United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  For the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986).  "[A] court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means."  United States v. Souza, 223 F.3d at 1205.

The Court concludes even if the challenged iPhone 13 Warrant lacks probable cause, the agents would have obtained a valid warrant to search the iPhone 13.  Here, at the January 20, 2022 FBI interrogation of Jessen, agents observe Jessen's iPhone 11, but state in the Jones Aff. that "[b]ased on the agent's familiarity and experience," Jessen's cellular telephone is "believed" to be an iPhone 13.  Jones Aff. ¶ 78, at 51.  Even Jessen is correct that the iPhone 13 Warrant lacks probable cause because the Jones Aff.'s probable cause is only for the search of the iPhone 11,

agents could resubmit an affidavit describing the probable cause for searching the upgraded iPhone 13.  Given that data transfers are a common process when upgrading phones, and that Jessen likely communicates with Linker after upgrading to an iPhone 13, Magistrate Judge Robbenhaar still would have issued a warrant.  If agents knew that the iPhone 11 they observe at the interrogation is different from the iPhone 13 that they searched, they would have resubmitted the affidavit to include the likelihood of a data transfer and of continued communications with Linker.  This suspected data transfer is enough to establish probable cause to search the iPhone 13.  Ultimately, the same search of the iPhone 13 would result, and the same evidence would be obtained.

    **IT IS ORDERED** that: (i) the Defendant's Motion to Suppress, filed February 18, 2025 (Doc. 18), is denied.

_____
UNITED STATES DISTRICT COURT

Chad E. Meacham
   Acting United States Attorney
Sean M. Long
   Assistant United States Attorney
United States Attorney's Office
Lubbock, Texas

        _Attorneys for the Plaintiff_

Joel R. Meyers
Law Office of Joel R. Meyers
Santa Fe, New Mexico

-- and --

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

        _Attorneys for the Defendant_

- 76 -