# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 24-1346 JB

PAUL JESSEN, JR.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Motions in Limine, filed March 13, 2026 (Doc. 83)("Motion in Limine"). The primary issues are: (i) whether the Court should preclude Defendant Paul Jessen from introducing evidence, making statements, or asking questions, while the jury is present, regarding allegations of Plaintiff United States of America's misconduct, constitutional violations, and other issues that Jessen has raised in his pretrial motions; (ii) whether the Court should preclude Jessen from introducing evidence, making statements, or asking questions regarding the Court's rulings on any pretrial motions; (iii) whether the Court should preclude Jessen from introducing evidence, making statements, or asking questions regarding information or facts which should come to the jury's attention only through Jessen's sworn testimony; (iv) whether the Court should preclude Jessen from engaging in an attempt to impeach any witness with prior administrative disciplinary findings unless the Court has an opportunity to review such evidence to determine its admissibility at the bench; (v) whether the Court should preclude Jessen from mentioning the possible sentencing consequences Jessen faces if convicted of the charges in the indictment; and (vi) whether the Court should preclude Jessen from suggesting or mentioning jury nullification to the jury. The Court concludes that: (i) the Court does not enter a blanket bar precluding Jessen from introducing evidence, making

statements, or asking questions regarding allegations of the United States' misconduct, because such a blanket exclusion is inconsistent with the evidence-by-evidence analysis that the Federal Rules of Evidence requires; Jessen should approach the bench before going into these areas so that the Court can give a fully informed ruling; (ii) the Court precludes Jessen from introducing evidence, making statements, or asking questions regarding the Court's rulings on pretrial motions, because the Court wants the jury to focus on the admitted evidence and not on what the Court does or does not do; (iii) the Court does not preclude Jessen from asking questions regarding information or facts which could only come to the jury's attention through Jessen's sworn testimony, but Jessen must approach the bench before asking these questions for the Court to make an informed decision; (iv) the Court precludes Jessen from attempting to impeach any witness with prior administrative disciplinary findings unless the Court has an opportunity to review such evidence at the bench, and Jessen agrees to this bench approach procedure; (v) the Court precludes Jessen from mentioning the possible sentencing consequences that Jessen faces if convicted, because the jury's role is limited to determining guilt or innocence; and (vi) the Court precludes Jessen from suggesting or mentioning jury nullification to the jury, because under existing controlling law, neither the Court nor counsel should encourage jurors to violate their oath by refusing to apply the law as instructed. The Court therefore grants the Motion in Limine in part and denies the Motion in Limine in part.

## **FACTUAL BACKGROUND**

The Court takes its background facts from the Defendant's Motion to Dismiss Indictment for Outrageous Government Conduct and Violation of Defendant's Fifth and Fourteenth

Amendment Rights of Due Process, filed June 16, 2025 (Doc. 40)("1st MTD").  It recites them solely for context and not as findings of fact.  The Court does not determine the truth of these facts.

On July 8, 2021, members of the Federal Bureau of Investigation's Violent Gang Task Force -- including Bernalillo County Sheriff's Office ("BCSO") Deputies Jessen and Kyle Linker, and FBI Agent Bryan Acee -- execute a search warrant at R.W.'s residence.  1st MTD at 2-3.  During the search, officers recover narcotics.  See 1st MTD at 3.  Following the search, R.W. agrees to cooperate with law enforcement and begins working as a BCSO confidential informant. See 1st MTD at 3.

In the fall of 2021, task force officers and DEA agents begin investigating a suspected drug trafficker, Ada Chouinard.  See 1st MTD at 3.  On November 15, 2021, an undercover DEA task force officer conducts a controlled purchase of narcotics from Chouinard.  See 1st MTD at 3.  DEA agents plan a second controlled buy for November 17, 2021.  See 1st MTD at 3.  Before the transaction, the agents contact Linker to conduct a deconfliction check[1] to ensure no overlapping operations are occurring in the area.  See 1st MTD at 3.  The November 17, 2021, controlled buy proceeds as planned.  See 1st MTD at 2-3.

DEA agents organize a third controlled purchase for November 23, 2021.  See 1st MTD at 3.  Before that buy, the agents again contact Linker for deconfliction.  See 1st MTD at 2-3.  After receiving the call, Linker contacts R.W., and warns him that the DEA is monitoring him and planning another controlled purchase.  See 1st MTD at 2-3.  Acting on this information, R.W. --

---

[1] "*Event deconfliction* is the process of determining when law enforcement personnel are conducting an event in close proximity to one another at the same time. Events include law enforcement actions, such as undercover operations, surveillance, and executing search warrants. When certain elements (e.g., time, date, location) are matched between two or more events, a conflict results. Immediate notification is made to the affected agencies or personnel regarding the identified conflict."  What is Event Deconfliction?, Department of Justice Office of Justice Programs, https://ncirc.bja.ojp.gov/event-deconfliction (last visited November 3, 2025).

who oversees Chouinard's drug distribution -- cancels the transaction that Chouinard has arranged with undercover DEA officers.  See 1st MTD at 3.

Suspecting that Linker has disclosed sensitive information, DEA investigators obtain cellular telephone toll records for both R.W. and Chouinard, which reveal frequent communication between Linker and R.W.  See 1st MTD at 4.  Based on that information, investigators secure a search warrant for R.W.'s residence.  See 1st MTD at 4.  When the DEA agents execute the warrant on December 16, 2021, agents seize methamphetamine and firearms.  See 1st MTD at 4.  During questioning, R.W. admits that Linker warns him about the DEA investigation in November 2021.  See 1st MTD at 4.  R.W. then agrees to serve as a DEA informant in an investigation into Linker's disclosure of confidential information.  See 1st MTD at 4.

At the DEA's direction, R.W. places several recorded calls to Linker.  See 1st MTD at 4.  In these calls, Linker confirms that DEA agents are investigating R.W., advises him to shut down his operations, and tells him to maintain a low profile.  See 1st MTD at 4.  Linker also instructs R.W. not to contact him for a while to avoid detection and tells him to reach out to Jessen instead if he needs assistance.  See 1st MTD at 4.

Between December 27, 2021, and January 5, 2022, acting under DEA supervision, R.W. sends ten text messages and places two telephone calls to Jessen.  See 1st MTD at 4.  On January 4, 2022, at the DEA's direction, R.W. sends Jessen a message, stating: "Hey what's going on I'm being threatened here man they got a hit on me and I don't know what the fuck to do give me a call please."  1st MTD at 4.  Later that day, R.W. sends another message: "Hey what's going on this is Rod, word on the street is that there is a hit on me I don't know what the fuck to do give me

a call please." 1st MTD at 4. Jessen replies: "I'll give you a call tomorrow morning." 1st MTD at 4.

On January 5, 2022, Jessen calls R.W. See 1st MTD at 4. During the call, they agree to meet in person the following day. See 1st MTD at 4. The meeting occurs on January 6, 2022. See 1st MTD at 4.

## PROCEDURAL BACKGROUND

On March 13, 2026, the United States files the Motion in Limine. See Motion in Limine at 1. The Motion in Limine asks the Court to rule on six different issues. See Motion in Limine at 1-5. First, the United States argues that the Court should preclude Jessen from introducing, while the jury is present, any evidence, making any statement, or asking any questions regarding allegations of government misconduct, constitutional violations, and any other issues that Jessen raises in his pretrial motions. See Motion in Limine at 1. Second, the United States argues that the Court should preclude Jessen from introducing, in the jury's presence, any evidence, making any statement, or asking question regarding the contents of, or rulings on, any pretrial motions that either the defense or the United States files. See Motion in Limine at 2. Third, the United States contends that the Court should preclude Jessen, while the jury is present, from introducing any evidence, making any statement, or asking any questions regarding "any information or facts which could only otherwise come to the jury's attention through the sworn testimony of the defendant, unless the defendant will, in fact, testify." Motion in Limine at 2. Fourth, the United States argues that the Court should preclude Jessen "engaging in any attempt to impeach any witness with prior administrative disciplinary findings unless and until the Court has an opportunity to review such evidence to determine its admissibility" at the bench. Motion in Limine at 3. Fifth, the United States contends that the Court should preclude Jessen from mentioning, in any way, the possible sentencing consequences that Jessen faces if convicted. See Motion in

Limine at 4.  Sixth, the United States argues that the Court should preclude Jessen from suggesting or mentioning jury nullification in the jury's presence.  See Motion in Limine at 4.

On March 27, 2026, Jessen files Defendant Paul Jessen's Response to Government's Motion in Limine (Doc. 91)("Response").  Jessen first responds that the Court should not allow the United States to have a blanket order that prohibits Jessen from presenting allegations of the United States' misconduct, because such blanket exclusions are inconsistent with the case-by-case analysis that the Federal Rules of Evidence requires.  See Response at 1-2.  For the same reason, Jessen argues that the United States' request to receive a blanket order excluding all statements regarding the Court's prior rulings is improper.  See Response at 2-3.  Jessen next responds that the Court should not issue a ruling that precludes Jessen from introducing information known only to Jessen, because there are specific circumstances -- such as the rule of completeness -- where Jessen should be able to introduce portions of Jessen's communications to provide necessary context.  See Response at 5.  Jessen also agrees to approach the bench first when attempting to impeach a witness with administrative discipline or prior lawsuits but asks the Court to require the United States to investigate whether each witness has been subject to administrative discipline or prior lawsuits.  See Response at 7.  Jessen further agrees to not mention, before the jury, the possible sentencing consequences that Jessen faces if convicted.  See Response at 8.  Finally, Jessen responds that the United States' request for Jessen not the mention jury nullification "improperly restricts legitimate advocacy," because defense counsel "must be permitted to argue that the government has failed to meet its burden of proof, that the evidence is insufficient, that the law should be applied in a particular manner, and that the defendant's conduct does not warrant conviction."  Response at 9.

## LAW REGARDING RELEVANT EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance.  As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible. See Fed. R. Evid. 402.  The standard for relevance is very liberal.  See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998), partially abrogated on other grounds by Hooks v. Ward, 184 F.3d 1206, 1227 (10th Cir. 1999)).  The evidence need have only "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  See United States v. Leonard, 439 F.3d at 651. "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it need only to have "any tendency" to do so.  United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).  See United States v. Leonard, 439 F.3d at 651.  Although the threshold burden is low, the rules do "not sanction the carte blanche admission of whatever evidence a defendant would like. The trial judge is the gatekeeper under the Rules of Evidence." United States v. Jordan, 485 F.3d at 1218.

## LAW REGARDING THE RULE OF COMPLETENESS

Rule 106 -- otherwise known as the rule of completeness -- states:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part -- or any other writing or recorded statement -- that in fairness ought to be considered at the same time.

Fed. R. Evid. 106.  By allowing the other party to present the remainder of the writing or recorded statement immediately rather than later on cross-examination, this rule avoids the situation where a statement taken out of context "creates such prejudice that it is impossible to repair by a

subsequent presentation of additional material."  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171 n.14 (1988).  Accord United States v. Oseby, 148 F.3d 1016, 1025 (8th Cir. 1998)("The advisory committee notes to Rule 106 state that one of the considerations for this rule is to avoid the misleading impression created by taking matters out of context."); United States v. Rubin, 609 F.2d 51, 63 (2d Cir. 1979)("The notes had been used extensively and quoted from copiously by Rubin's counsel on his cross-examination of Cox, possibly leaving a confusing or misleading impression that the portions quoted out of context were typical of the balance."); United States v. Young, No. CR-09-140-B-W, 2010 WL 1461558, at *3 (D. Me. Apr. 9, 2010)(Woodcock, J.).  The Tenth Circuit states: "The rule of completeness, however, does not necessarily require admission of [an entire statement, writing or recording].  Rather, only those portions which are relevant to an issue in the case and necessary to clarify or explain the portion already received need to be admitted."  United States v. Lopez-Medina, 596 F.3d 716, 735 (10th Cir. 2010)(quoting United States v. Zamudio, 141 F.3d 1186 (10th Cir. 1998).

Courts provide guidance on when the rule of completeness applies.  See, e.g., United States v. Velasco, 953 F.2d 1467, 1475 (7th Cir. 1992); United States v. Castro-Cabrera, 534 F. Supp. 2d 1156, 1160 (C.D. Cal. 2008)(Pregerson, J.).  The United States Court of Appeals for the Seventh Circuit applies a four-part test to determine whether to allow evidence under rule 106: "(1) does [the evidence] explain the admitted evidence, (2) does it place the admitted evidence in context, (3) will admitting it avoid misleading the trier of fact, and (4) will admitting it insure a fair and impartial understanding of all of the evidence."  United States v. Velasco, 953 F.2d at 1475. The United District Court for the Central District of California explains:

> The Rule of Completeness warrants admission of statements in their entirety when the Government introduces only a portion of inextricably intertwined statements.
>
> Statements are inextricably intertwined when the meaning of a statement, if divorced from the context provided by the other statement, is different than the

meaning the statement has when read within the context provided by the other statement. Under those circumstances, a court must take care to avoid distortion or misrepresentation of the speaker's meaning, by requiring that the statements be admitted in their entirety and allowing the jury to determine their meaning.

United States v. Castro-Cabrera, 534 F. Supp. 2d at 1160.  Accord United States v. Coughlin, 821 F. Supp. 2d 8, 30 (D.D.C. 2011)(Lamberth, C.J.)("Coughlin is correct, however, that regardless of whether this evidence is inadmissible hearsay or not, he can introduce it under the rule of completeness."); United States v. Peeples, 2003 WL 57030, No. 01 CR 496, at *3 (N.D. Ill. Jan. 7, 2003)(Guzman, J.).  See also, Walker v. Spina, No. CIV 17-0991 JB\SCY, 2019 WL 538458, at *18 (D.N.M. Feb. 11, 2019)(Browning, J.); Lopez v. Delta Int'l Mach. Corp., 312 F. Supp. 3d 1115, 1143 (D.N.M. 2018)(Browning, J.).

## LAW REGARDING JURY KNOWLEDGE OF SENTENCING RAMIFICATIONS

In criminal cases, the United States and the defendant often work together to keep the jury ignorant of the ramifications of its determination of guilt.  The Supreme Court consistently directs that, "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  Shannon v. United States, 512 U.S. 573, 579 (1994)(footnote omitted)(quoting Rogers v. United States, 422 U.S. 35, 40 (1975)).  This ignorance is not present at the time of the Sixth Amendment's ratification.

### 1.    Jury Knowledge of Sentencing Ramifications at the Founders' Time.

The common-law jury exercises its role as the conscience of the community by nullifying severe sentencing laws; the historical record suggests that the common-law jury not only used its nullification power, but also that jury nullification was a well-known, common jury power to guard against what it saw as unjust laws.  See United States v. Courtney, 960 F. Supp. 2d at 1191.  As discussed above, the historical background also suggests that juries at the Framers' time did not have to be provided instructions about their ability to nullify.  See United States v. Courtney, 960

F. Supp. 2d at 1191.  The frequency with which juries mitigated the verdict or acquitted a guilty defendant, because they saw the law as unjust, suggests that jurors knew about their ability to nullify without any information from the courts about that ability and that this nullification power was essential "to ensure their control in the judiciary."  Blakely v. Washington, 542 U.S. at 305.  Nevertheless, courts at the Founders' time, including the Supreme Court in 1794, instructed juries that it was their right to be the ultimate judge of both the facts and the law.  See United States v. Courtney, 960 F. Supp. 2d at 1191.

Colonial and British jurors at the Founders' time came to the courts from the same vicinity as the defendant, "were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments."  United States v. Polizzi, 549 F. Supp. 2d at 406.  Professor Jeffrey B. Abramson has noted that jurors at the Founders' time did not "come to the jury with minute skill in the laws," but rather the local knowledge jurors would have possessed included knowledge of the laws.  Jeffrey B. Abramson, We, The Jury: The Jury System and the Ideal of Democracy at 32 (1994).  Professor Abramson explains:

> Not only was formal legal training unnecessary, but jurors did not even need to rely on a judge's instructions to know the common law of the land, rooted as it was in fundamental principles of natural justice. . . . Thus, members of a Massachusetts grand jury in 1759 were told that they "need no Explanation" as to most legal matters because "your Good Sence & understanding will Direct ye as to them."

Abramson, supra, at 32.  John Adams similarly noted that "in many cases judges gave the jury no instructions on the law."  1 The Legal Papers of John Adams at 230 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965).

Jurors' knowledge of the law can be seen in a case that the late Professor Julius Goebel, Jr., chronicled, where he notes that, in 1702, a jury verdict was overturned based on the jurors' lack of knowledge about the laws under which the defendant was convicted:

> After being tried in a well-publicized trial and found guilty of treason in 1702, Nicholas Bayard, a former commanding officer of the New York militia and mayor of New York under British rule, appealed to the British Crown based on irregularities in the jury composition -- i.e., the jurors' ignorance of the law:

> In his petition and "appeal" to Queen Anne, Nicholas Bayard stated among other things that he had been "convicted by an illegal petty jury of Aliens and Dutch unduely returned and very ignorant of the English Laws and Language" . . . . Among the affidavits taken by John Bridges and Samson Shelton Broughton, under the Queen's order of reference for the collection of evidence in connection with the Bayard appeal, are statements of some of the petit jurors who had joined in the verdict declaring Bayard guilty of high treason. Thomas Sanders and Isaac Stoutenbergh, two of the trial jurors, made oral statements as follows, confirming the allegations made by Bayard in his petition: ". . . these [depend on] their great Ignorance of the Laws of England at that time not knowing what was High Treason ... the Foreman ... Did assert it was High Treason . . . to disturb the peace good and quiet of this Government and that Colonell Bayard had disturbed the peace by the addresses and eight or nine jurors were for clearing . . . Bayard but were persuaded by the foreman."

Julius Goebel, Jr. & T. Raymond Naughton, Law Enforcement in Colonial New York 604 n.7 (1944).  Professor Goebel notes that New York jurors in revolutionary times often mitigated crimes based on their knowledge of the potential sentences that the defendants faced if the jurors found them guilty of the greater crime:

> We have spoken of the grooves in which the jury might exercise its charity: the verdict in thefts for amounts under the 12d. boundary between grand and petit larceny, and the privilege of finding manslaughter, self-defense or accident upon indictments for murder. These prerogatives the juries in New York did not hesitate to assert, and to these old and established powers of mitigation may be added, perhaps, the avoidance in New York of the incidents of felony judgment by the persistent finding of no goods or tenements. Of considerably greater significance than these possible interferences of the jury, but connected therewith in the case of verdicts for crimes of a less degree when murder, burglary, arson, highway robbery and certain others were charged, is the mitigation obtained by benefit of clergy.

Goebel & Naughton, supra, at 751 (emphasis added)(footnote omitted).  "[T]he benefit of the clergy" was a system of mitigation in which a first-time offender convicted of a lesser crime would be branded on the thumb rather than sentenced to death.  United States v. Polizzi, 549 F. Supp. 2d at 411 (quoting John H. Langbein, The Origins of the Adversary Criminal Trial at 193 (2003)). See 1 Sir William Blackstone, Commentaries on the Laws of England: In Four Books at 1753

(William D. Lewis ed., 2007)(noting that "the benefit of the clergy at present stand[s] . . . considerably different from its original institution . . . [,] what was at first an unreasonable exemption of particular popish ecclesiastics into a merciful mitigation of the general law with respect to capital punishment").

Sir Dudley Ryder, who served as a trial judge for the trial judiciary of the Old Bailey from 1754 to 1756, at least in one case, instructed the jury on the possible ramifications of a guilty verdict at trial and documented his belief that the jury determined the verdict based on availability of the benefit of the clergy:

> Ryder sometimes found time to jot down a little of what he was telling the jury. John Taplin was tried before Ryder in October 1754 on an indictment charging theft from a dwelling house of a watch, valued at forty shillings, and of more than twenty guineas in money. The [Old Bailey] report of the outcome is as curt as possible, "Guilty 39s.," meaning that the jury convicted him but determined the combined value of what was stolen to be thirty-nine shillings (less than two guineas, hence well below the value charged in the indictment). Ryder's notes explain why. "The jury found him guilty to the value of 39s., which they did after I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy. It is by Act of 12 Ann." Ryder thus records his own role in guiding the jury's prerogative of 'valuing' the loot. Because the statute of 1713 to which Ryder refers withdrew so-called benefit of clergy from thefts of forty shillings' value or more when committed in a dwelling house, it foreclosed the primary ground upon which a convict could escape the death penalty for such an offense. The convention of the day, immortalized in Blackstone's phrase as the jury's "pious perjury," was that the jury could "downvalue" the goods, in this instance to thirty-nine shillings, in order to consign the convict to the lesser sanction of transportation for seven years.

John H. Langbein, Shaping the Eighteenth-Century Criminal Trial: A View from the Ryder Sources, 50 U. Chi. L. Rev. 1, 22 (1983)(footnotes omitted)("Ryder Sources").  Professor John H. Langbein concludes from Ryder's notebook chronicling many of his trials during his tenure on the Old Bailey bench that the paramount, if not only, purpose of the jury was to determine the sentence:

> Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In most cases the accused had been caught in the act or otherwise possessed no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings. The main object

of the defense was to present the jury with a view of the circumstances of the crime and the offender that would motivate it to return a verdict within the privilege of clergy, in order to reduce the sanction from death to transportation, or to lower the offense from grand to petty larceny, which ordinarily reduced the sanction from transportation to whipping . . . .

The jury not only decided guilt, but it chose the sanction through its manipulation of the partial verdict. Since guilt was typically although not inevitably a forgone conclusion in many (perhaps most) cases, sentence is what was at stake when these cases were "contested."

Ryder Sources, supra, at 41, 55 (footnotes omitted).  Professor Langbein notes that, in Ryder's two years on the bench at Old Bailey, although he tried over one-hundred and seventy-one cases, there were only sixteen different crimes with which the defendants were charged.  See Langbein, supra, at 42.  Professor Langbein, in addition to reviewing Ryder's notebook, also reviewed a group of reports called the Old Bailey Session Papers ("OBSP") from the 1670s to the 1730s, concluding:

[T]he jury of that time had a large role in what we think of as sentencing, that is, in determining the sanction. In a significant fraction of the cases that went to trial, the real issue was whether the jury would choose to exercise its power to "value" stolen goods in ways that would affect the applicable sanction. It was understood that the value that the jury assigned was fictional, and that the jury was in truth deciding whether to rescue the culprit from the ordinary sanctions of transportation and death by so characterizing the crime that only a lesser sanction could be invoked. If the goods were valued below 12 pence (in practice the Old Bailey juries used the figure of 10 pence), the crime became petty larceny, hence a misdemeanor, and the convict escaped with a whipping or a short jail term. Under certain circumstances the jury could, by valuing goods below other monetary ceilings, bring the culprit under the rubric of benefit-of-clergy, for which the sanction was branding in the thumb. The decision between finding an accused guilty of murder or manslaughter, which also belonged to the jury, can be seen as the choice between capital punishment and branding. It could be argued that in all these situations the jury was in reality discharging a sentencing function, and even today we expect sentencing officers to consult past conviction evidence. But we have seen that the OBSP show that the juries were using past conviction evidence to determine guilt, and with no constraint from the bench.

John H. Langbein, The Criminal Trial Before the Lawyers, 45 U. Chi. L. Rev. 263, 303-04 (1978)(footnotes omitted).

In United States v. Battiste, the case in which Justice Story first intimated that it was the jury's duty pursuant to the Sixth Amendment to follow the law as the judge provides it to the jury,

the judge read to the jury the indictment, which included the mandatory sentence for conviction. See 24 F. Cas. at 1044. The indictment included the statutory language for the law under which the defendant was convicted, providing in relevant part: "[I]f any citizen . . . shall land . . . on any foreign shore, [and] seize any negro or mulatto . . . with intent to make such negro or mulatto a slave ... such citizen or person shall be adjudged a pirate, and on conviction thereof . . . shall suffer death." 24 F. Cas. at 1044.

The caselaw from the Framers' era discussing whether courts should instruct juries about their ability to determine the law in libel cases, on the one hand, does not necessarily lend support to the position that courts should inform juries about the ability to nullify the verdict, because, given the special verdict form provided to juries at this time, libel cases may be seen as unique. See United States v. Courtney, 960 F. Supp. 2d at 1191. Although Mr. Hamilton in People v. Croswell used broad and sweeping language to advocate for the jury's role to decide the law in addition to the facts -- and thus to allow them to nullify even if they believed the defendant had factually committed the crime -- Mr. Hamilton was arguing that it was unconstitutional to take away the jury's power to find that the defendant had the required intent for libel. See United States v. Courtney, 960 F. Supp. 2d at 1191. In essence, he was arguing for the jury's power to reach a verdict, because all that the district court allowed the jury to return in People v. Croswell was a special verdict, limited only to finding whether there was publication and whether the statement's inference was true. See 3 Johns. Cas. at 342. Even though Justice Kent's language in People v. Croswell is, therefore, subject to, and often cited for, a reading that it embraces the jury's role as being able to disregard the law given to them by the court as "the jury are under an indispensable necessity to decide both [the law and the fact]," 3 Johns. Cas. at 366, the court's otherwise unsurprising conclusion is that, in a libel case, "the jury have a right to judge . . . whether it be a libel or not ... in short, ... 'the whole matter put in issue . . . .'" 3 Johns. Cas. at 376-77.

The Founders nevertheless believed it proper for the court to instruct the jury on the law. In People v. Croswell, while Justice Kent writes that the jury should decide the whole of the matter, he still notes that it is the court's duty to instruct the jury about the law: "[A]s in other criminal cases, it is the duty of the court, 'according to their discretion, to give their opinion and direction to the jury on the matter in issue,' and it is the duty of the jury to receive the same with respectful deference and attention . . . ." 3 Johns. Cas. at 377. Justice Kent did not hold that the court had the affirmative obligation to instruct the jury that it was to find the facts as well as the law but held merely that it was error to deny the jury the ability to exercise its power to, at that time, do both in reaching the ultimate conclusion of guilt or innocence. People v. Croswell appears, therefore, to go only as far as to recognize the longstanding proposition that the jury has the power to nullify, or to decide the ultimate issue of guilt, regardless whether the evidence establishes guilt, but does not stand for the proposition that the defendant has the right to demand instruction from the court about the jury's ability to exercise its nullification power. Rather, it falls in line with Justice Harlan's conclusion about the common-law jury's role that he articulated in Sparf v. United States:

> [T]he general common-law rule in criminal cases . . . [is that it is] the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as compounded in the issue submitted to them.

156 U.S. at 98.

Regardless whether libel cases are viewed as unique, however, the historical authority shows that the Founders viewed the jury's role to return a verdict based on its conscience, notwithstanding the court's instructions about the law. See United States v. Courtney, 960 F. Supp. 2d at 1192. To say that libel cases are unique cannot account for Chief Justice Day's charge to the jury in Georgia v. Brailsford -- not a libel case -- "that by the same law, which recognizes th[e] reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to

judge of both, and to determine the law as well as the fact in controversy." 3 U.S. at 4. Rather, dictionaries at the Founders' time included in the definition of jury: "Juries are . . . not finable for giving their verdict contrary to the evidence, or against the direction of the court . . . and they may not only find things of their own knowledge, but they go according to their conscience." Jacob's Law Dictionary (1782)(quoted in C. Conrad, supra, at 46-47).

Changes in juror qualifications have resulted in a situation in which, at the time that the Founders ratified the Sixth Amendment, the common-law juries were vastly different from our contemporary juries. See United States v. Courtney, 960 F. Supp. 2d at 1180. Whereas Professor Goebel notes that New York juries had a "high property qualification . . ., which rested upon the presumed higher responsibility and intelligence of propertied persons," courts today do not require property ownership, let alone a high property value qualification, as a prerequisite for juror qualification. New Mexico state courts do not get their jury pool from property ownership records, but rather from the Department of Motor Vehicles, or, in the United States District Court for the District of New Mexico, from the state of New Mexico's voter registration list. See Misc. No. 08-00004-40, Order Adopting Modified Jury Plan ¶ 4, at 2, filed December 2, 2008. Similarly, whereas Judge Weinstein notes that colonial and British jurors at the Founders' time "were from the vicinage, were well-informed and self-confident property owners, and knew the essentials of the local criminal law and its punishments," United States v. Polizzi, 549 F. Supp. 2d at 406 (citations omitted), the juries today do not have those same requirements and jurors do not often have those same qualities, see J. Goebel & T. Naughton, supra, at 603 (noting that "[t]he [New York] Judicature Act of 1691 and 1692 also contained provisions that no man's rights or property should be determined . . . unless the facts be found by verdict of twelve men of the neighborhood" (emphasis added)). Although the jury pools contain only persons who are registered to vote in a certain New Mexico county, or licensed to drive in the state, especially in a large state like New

Mexico with a smaller population density, jurors may not hail from within what in the eighteenth century would have been considered the defendant's vicinity.

The twenty-first century American jury pool has less knowledge about the law than the common-law jury pool of the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at 1180.  As Professor Langbein notes in looking at Ryder's personal notebook from 1754 to 1756, in two years on the bench at the central criminal court in London, trying over 170 cases, there were only sixteen laws with which a mid-eighteenth-century Londoner may have been charged, and with which the freeholder jury pool would thus likely have been familiar.  See Ryder Sources, supra, at 42. In modern times, however, "[f]or decades, the task of counting the total number of federal criminal laws" has been attempted by "lawyers, academics and government officials," largely without success: a 1982 United States Department of Justice study attempting to count the number of federal criminal laws as part of an effort to persuade Congress to revise it, "produced only an educated estimate: about 3,000 criminal offenses."  Gary Fields & John R. Emshwiller, Many Failed Efforts to Count Nation's Federal Laws, Wall St. J., July 23, 2011.  Thus, while Professor Abramson notes that jurors in the late-eighteenth century American colonies did not "come to the jury with minute skill in the laws," the local knowledge jurors would have possessed included knowledge of the laws.  Abramson, supra at 32.  The same cannot be said for contemporary juries in federal courts.  The extent of colonial juries' knowledge of the law is exemplified by the 1702 trial of Nicholas Bayard, a New York mayor while under British rule, who appealed his conviction on grounds that the trial was improper, because two of the jurors did not have their own independent knowledge of treason's elements, "but were persuaded [sic] by the foreman."  Goebel & Naughton, supra, at 603.

At the time of the Sixth Amendment's ratification, juries knew what the ramifications of a guilty verdict would be, because of the limited sentences available. Importantly, of the sixteen

offenses at issue in the Old Bailey trials, only two of those sixteen laws were misdemeanors, while the rest were felonies.  Ryder Sources, supra, at 42.  At that time, juries knew well the repercussions of a guilty verdict for felonies.  See United States v. Courtney, 960 F. Supp. 2d at 1181.  Punishment for the first offense was the "benefit of the clergy," which meant the judge would choose between seven years' banishment or immediate release with a branding on the thumb.  See United States v. Courtney, 960 F. Supp. 2d at 1181.  Punishment for the second offense was death.  See Ryder Sources, supra, at 39.  For misdemeanors, although the judge had more discretion, it was almost invariably lashings.  See Ryder Sources, supra, at 53.  Juries at the Founders' time likely knew a substantial amount more about the law with which the defendant was charged and almost certainly knew the repercussions of a guilty verdict.

The Supreme Court, in its recent sentencing decisions discussing the Sixth Amendment jury trial right as it existed at the Founders' time, has similarly noted both the vicinity tenet and that offenses were sanction-specific when the Sixth Amendment was ratified in 1791.  See United States v. Courtney, 960 F. Supp. 2d at 1181.  In Blakely v. Washington, the Supreme Court noted that a tenet of the Sixth Amendment jury trial right at the Founders' time was "that the 'truth of every accusation' against a defendant should afterwards be confirmed by unanimous suffrage of twelve of his equals and neighbours . . . ." 542 U.S. at 301 (quoting 4 W. Blackstone, supra, at 343).  The Supreme Court in Apprendi v. New Jersey recognized that, at least with respect to felonious conduct, "the English trial judge of the later eighteenth century had very little explicit discretion in sentencing.  The substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense."  530 U.S. at 479.  Cf. id. 530 U.S. at 481 (noting that there was a "19th-century shift in this country from statutes providing fixed-term sentences to those providing judges discretion within a permissible range").  The Supreme Court has noted the very limited sentences available to American judges at the Founders' time and the nature of mandatory

sentencing in contrast to its recent sentencing opinions: "In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature.  Each crime had its defined punishment."  United States v. Grayson, 438 U.S. 41, 45 (1978).

Even if the Court instructed modern-day juries that the crime with which the defendant in the case is charged is a felony or a misdemeanor, given the multiple crimes with specific statutory minimum and maximum sentences, those juries likely would not know the possible sentences the defendants face if found guilty.  Whereas the Supreme Court noted in Apprendi v. New Jersey that the nineteenth century saw a shift from mandatory, definite sentences to a system in which the court could impose a sentence at the court's discretion, because courts today are not permitted to inform the modern-day jury about the possible sentencing range flowing from the defendants' guilty verdicts, and given the complexity of the United States Sentencing Guidelines, the modern-day jury is likely without knowledge of the possible sentencing ramifications of their guilty verdict. The Court, in its experience on the bench, has found that present-day jurors, beyond lacking knowledge about sentencing ramifications for felonies or misdemeanors, often do not recognize the difference between criminal and civil jury trials.  Numerous times conducting voir dire, when the Court inquired about a potential juror's past experience on a civil or criminal jury trial, the juror's answers show that what the juror believes was a criminal trial was actually civil and vice versa.

Judge Weinstein has similarly noted that the vast difference between late-eighteenth century juries' knowledge about criminal law and sentencing ramifications of guilty verdicts, and contemporary juries' knowledge, is not surprising given the vast difference in criminal law as it then existed compared with the law today: "Criminal law then was much simpler than today, now

requiring tomes of highly abstruse, convoluted definitions and extraordinary combinations of statutory prison maximums and minimums, fines, restitutions, forfeitures, probationary terms, treatment for mental health and other problems in and out of prison, sentencing guidelines, case law and local practice."  United States v. Polizzi, 549 F. Supp. 2d at 407.  Considering the small number of offenses in the late-seventeenth century and eighteenth century, and that there were only two sanctions available for a felony conviction, support for withholding sentencing information from the jury and the jury's resulting lack of knowledge cannot be found in the historical reality of the common-law jury known to the Founders at the time of the Sixth Amendment's ratification.

2.     **Jurors on Common-Law Juries Used Their Knowledge of Their Verdict's Sentencing Ramifications in Reaching Their Verdict.**

Juries at the Founders' time not only knew about the sentencing ramifications of their verdicts, but historical evidence shows that juries weighed heavily the defendant's sentence in reaching their verdicts. In looking at jury verdicts throughout the eighteenth century in colonial New York, Professor Goebel concludes:

> The verdicts . . . are illustrative of one of the most important aspects of the jury's prerogative -- the power to effect a mitigation in the severity of the law by verdicts which would let off an obvious offender with penalties less than the worst of the charges against him would make inevitable. This power was not confined to the selection of a relatively innocuous count on which to return a conviction, but extended, as indicated above, to a finding of an offense less in degree than that charged in the indictment. The importance of this rule in the case of felonies was obvious, since it was possible thus for the defendant to pray clergy and escape the rigor of the otherwise inevitable judgment of life and limb.

J. Goebel & T. Naughton, supra, at 673 (footnotes omitted).  The eighteenth-century jury in England also consistently exercised its power to effect a mitigation of the defendant's sentence. Professor Langbein notes that "only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence . . . . To the extent that trial had a function in

such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction. These trials were sentencing proceedings." Ryder Sources, supra, at 41.

The Supreme Court has twice noted the common-law jury's mitigation power stemming from their knowledge of the repercussion of guilty verdicts. In Jones v. United States, the Supreme Court noted that "competition developed between judge and jury," and provided the jury's mitigation power as an example: "The potential or inevitable severity of sentences was indirectly checked by juries' assertions of a mitigating power when the circumstances of a prosecution pointed to political abuse of the criminal process or endowed a criminal conviction with particularly sanguinary consequences." Jones v. United States, 526 U.S. at 245. In Apprendi v. New Jersey, the Supreme Court again referenced this mitigation power, noting that, at the Founders' time:

> [J]uries devised extralegal ways of avoiding a guilty verdict, at least of the more severe form of the offense alleged, if the punishment associated with the offense seemed to them disproportionate to the seriousness of the conduct of the particular defendant. [Jones v. United States, 526 U.S.] at 245 [119 S.Ct. 1215] ... ("This power to thwart Parliament and Crown took the form not only of flat-out acquittals in the face of guilt but of what today we would call verdicts of guilty to lesser included offenses, manifestations of what Blackstone described as 'pious perjury' on the jurors' part. 4 Blackstone 238-239").

Apprendi v. New Jersey, 530 U.S. at 480 n.5. It is thus clear that the Supreme Court's conception of the common-law jury which the Sixth Amendment protects includes a jury with knowledge of the sentences a guilty defendant faces and a jury that uses this knowledge to reach its verdict.

That there was knowledge germane to common-law jurors does not clearly suggest that withholding knowledge about sentencing ramifications is inconsistent with the Sixth Amendment's jury trial right. If, for instance, a juror at the Founders' time knew the sentence that a guilty defendant faced only because there existed a very limited number of laws and a much more limited class of potential sentences, the courts' refusal today to institute a change to affirmatively provide

to the jury this information does not clearly violate the defendant's Sixth Amendment right.  It seems tenuous to argue that knowledge lost because the jury pool has enlarged since the Sixth Amendment's ratification or that knowledge lost because the jurors in the jury pool are less educated about the criminal law, without any affirmative conduct on the courts' behalf -- and without more -- implicates the Sixth Amendment.  The Supreme Court has recognized that the Sixth Amendment "limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury," Blakely v. Washington, 542 U.S. at 308; a change resulting from the inclusion of a broader base of citizens in the jury pool, or from an evolution of the jurors in the jury pool, without courts' affirmative exertion of power, may not implicate the Sixth Amendment jury trial right.  On the other hand, however, even if the jury's lack of knowledge about the sentence that the defendant faces is diminished, because the modern-day jury is left without information that appears to have been important to the common-law jury's verdict and its power to mitigate the defendant's sentence, the substance of the defendant's Sixth Amendment jury trial right appears to have deteriorated substantially.  See Booker, 543 U.S. at 237 (stating that the Supreme Court's holding that the Sentencing Guidelines are unconstitutional if mandatory "is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance").  To be consistent with what the Framers thought a jury was at the time of the Bill of Rights' adoption, it may no longer be defensible to keep the jury so ignorant of the verdict's sentencing ramifications.

3.    **Jury Knowledge of Sentencing Ramifications in Modern Times.**

"It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'"  Shannon v. United States, 512 U.S. at 579 (quoting Rogers v. United States, 422 U.S. at 40).  The Supreme Court

explains that its reasoning is to avoid confusion and keep separate the jury's factfinding role from the judge's role in determining the sentence the law requires:

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion.

Shannon v. United States, 512 U.S. at 579.  In support of this proposition, the Supreme Court cites Rogers v. United States, in which the Supreme Court held that the district court erred when, without notice to the defendant and out of the defendant's presence, it answered in the affirmative a communication which the jurors sent during their deliberations inquiring whether the court would accept a verdict of guilty as charged "with extreme mercy of the Court." 422 U.S. at 37, 40.  The Supreme Court concluded that the district court's statements to the jurors irreparably prejudiced the defendant, reasoning that the court's statements might have induced a verdict that the jury would not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without reaching a verdict, returned a verdict of "guilty with extreme mercy" within five minutes "after being told unconditionally and unequivocally that it could recommend leniency," strongly suggests that the trial judge's response may have induced unanimity by giving members of the jury who had previously hesitated about reaching a guilty verdict the impression that the recommendation might be an acceptable compromise.

Rogers v. United States, 422 U.S. at 40 (quoting United States v. Glick, 463 F.2d 491, 495 (2d Cir. 1972)).

The Tenth Circuit has stated: "The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial. Breach of this standard has often been grounds for reversal."  United States v. Greer, 620 F.2d at 1384.  The Tenth Circuit has held

specifically that an instruction on possible minimum sentences is not required absent a jury's required participation in sentencing and that a district court has no discretion to instruct the jury on sentencing ramifications. See United States v. Parrish, 925 F.2d 1293, 1299 (10th Cir. 1991)("We hold a jury instruction about mandatory minimum sentences was properly omitted because the offenses do not specifically require jury participation in sentencing."); United States v. Gehringer, 385 F. App'x 830, 834 (10th Cir. 2010)(unpublished)("In light of established Tenth Circuit and Supreme Court authorities, the district court had no discretion to instruct the jury on the sentencing penalties, and therefore did not abuse its discretion in denying the defendant's request.").

**4.      Withholding Knowledge About Sentencing From The Modern-Day Jury Leaves The Jury Without Knowledge That It Would Have Had At The Framers' Time.**

Judicial power as it relates to sentencing in the modern criminal court system appears to infringe on the Sixth Amendment's reservation of jury power in two interrelated areas. The first is that the Sentencing Guidelines have caused, at least in part, the modern-day jury's ignorance of the ramifications of a guilty verdict. Although, at the Framers' time, judges had discretion regarding sentences for misdemeanors -- largely between corporal punishment and banishment -- for felonies, judges until the nineteenth century had no discretion in relation to sentencing. See Apprendi v. New Jersey, 530 U.S. at 481 (noting "the 19th-century shift in this country from statutes providing fixed-term sentences to those providing judges with discretion within a permissible range"); 530 U.S. at 482 (noting "[t]he historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties . . . ."); Ryder Sources, supra, at 41 (noting the mandatory sentences for felonies were either transportation/banishment if the benefit of the clergy was available, or death if not, and, for misdemeanors, was transportation or whipping). While Congress' power to make law includes

"the power to fix the sentence for a federal crime," <u>Mistretta v. United States</u>, 488 U.S. 361, 364 (1989), Congress' creation of over 3,000 federal laws presents significant problems for jurors who may wish to educate themselves about sentencing repercussions for certain criminal offenses, and the federal Sentencing Guidelines have made self-education of potential sentences virtually impossible. Although a juror may be educated about statutory minimums and maximums, a juror likely cannot educate him or herself about a defendant's potential sentence, as the Guidelines take into account the defendant and the crime's circumstances, and, after <u>Booker</u>, allow a judge to depart from a Guidelines sentence. The Sentencing Guidelines, enacted pursuant to Congress' power to make laws and to delegate that power, <u>see</u> <u>Mistretta v. United States</u>, 488 U.S. at 3617, therefore have necessarily eroded the jury's ability to take into consideration the potential sentence that the defendant faces and eroded its ability to use its mitigation power, <u>see</u> <u>Apprendi v. New Jersey</u>, 530 U.S. at 483 (noting "the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion'" (quoting <u>Jones v. United States</u>, 526 U.S. at 247-48)).

Second, even though the Sentencing Guidelines find some support in the judges' discretion at the Framers' time to sentence within a prescribed range -- even if it applied only in the limited situations of misdemeanors -- the prohibition on any mention to the jury of a guilty verdict's sentencing implications does not find the same support. Ryder in the 1750s, at least, was not required to keep information about the jury's verdict's sentencing implications from the jury. <u>Ryder Sources</u>, <u>supra</u>, at 22. Similarly, in <u>United States v. Battiste</u>, Justice Story in 1835 read to the jury the statute pursuant to which the defendant was charged, which included the sentencing ramification: "Death." 24 F. Cas. at 1044. Judges therefore were not precluded from informing juries about the verdict's sentencing implications.

**5.**     <u>**Where the Verdict Does Not Alter the Minimum and/or Maximum Sentence Imposed on the Defendant, the Court is Not Free to Give the Jury Sentencing Information.**</u>

Neither Supreme Court nor Tenth Circuit precedent prohibits, wholesale, any mention of possible sentences.  See United States v. Courtney, 960 F. Supp. 2d at 1185.  Rather, the modern-day principle is limited to those situations in which "a jury has no sentencing function."  Shannon v. United States, 512 U.S. at 579.  The Supreme Court in Apprendi v. New Jersey held that "any fact [other than a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490, and the jury is therefore required to participate in finding a fact that, by changing the mandatory maximum, changes substantially the nature of the sentence. Similarly, in Jones v. United States, the Supreme Court construed 18 U.S.C. § 2119 to constitute three separate offenses, rather than one sentence with three factual considerations for sentencing, because it reasoned that, to leave to a judge factual findings which would mean the difference between a sentence of up to fifteen years, up to twenty-five years, or up to life, implicates the defendant's Sixth Amendment jury trial right.  See United States v. Courtney, 960 F. Supp. 2d at 1185.  On the one hand, the Supreme Court's constitutional requirement that a jury participate in factfinding where the fact is necessary to a sentence with a substantially different punishment is analogous to the factual finding required in the case which Ryder notes, where the jury was to determine whether the total value of stolen goods was forty shillings or more, as a finding of forty shillings makes mandatory a death sentence and precludes the possibility of the benefit of the clergy.  See United States v. Courtney, 960 F. Supp. 2d at 1185.  Similarly, whereas Justice Story in United States v. Battiste instructed the jury by reading them the statute which included the punishment, see United States v. Courtney, 960 F. Supp. 2d at 1185 -- courts instruct contemporary juries if the death sentence is a possible punishment for their potential jury's return of a guilty verdict, see United States v. Courtney, 960 F. Supp. 2d at 1185.  Moreover, it is possible that modern-day juries know whether the return of a guilty verdict in a capital case -- such as first-degree murder -- in their jurisdiction puts at issue a

possible death sentence.  On the other hand, in Ryder's example, he appears not only to have required the jury to find a fact upon which an enhanced sentence depends, but to have gone further and instructed the jury specifically about the implications of finding the particular fact. Ryder notes that "I told them that 40s. was necessary to make him guilty of felony that was without benefit of clergy," Ryder Sources, supra, at 22; by telling the jury that fact, he instructed it specifically that the implications of the factual finding meant an increased maximum sentence, or, rather, the preclusion of anything except for the maximum sentence, see United States v. Courtney, 960 F. Supp. 2d at 1186.

Even when a juror's participation is required to enhance a mandatory minimum sentence, modern-day courts do not instruct the jury on the sentencing implications of the factual findings that they make.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  In the case of drug-trafficking, for example, where the amount of the drugs in which the defendant traffics determines the statutory maximum and minimum, the jury is not told, as Ryder told the jury in another context, the line at which the possible relief from the death sentence becomes impossible or that there is a line at which the statutory maximum and minimum sentence changes.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  Requiring courts to withhold from jury instructions a guilty verdict's ramifications therefore violates the defendant's Sixth Amendment jury trial right as the Founders thought of that right.

Current Supreme Court and Tenth Circuit law makes clear, however, that withholding sentencing information from juries not directly participating in sentencing does not unconstitutionally invade the province of the jury.  See United States v. Courtney, 960 F. Supp. 2d at 1186.  The Supreme Court, in the majority opinion that the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court of the United States, authored in Apprendi v. New Jersey,

recognizes that there are organic changes which take place in trial practices without violating the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost only by gross denial, but by erosion.'" 530 U.S. at 483 (quoting Jones v. United States, 526 U.S. at 247-48). The Supreme Court has thought that the evolution of courts' practice to prohibit instructions about sentencing ramifications where the jury's factfinding does not fundamentally affect the defendant's sentencing ramifications to avoid "distract[ing] them from their factfinding responsibilities, and creat[ing] a strong possibility of confusion," Shannon v. United States, 512 U.S. at 579, is such a constitutional change in trial practice. The Supreme Court's recent sentencing opinions, moreover, are susceptible to a narrow construction of the Sixth Amendment's jury trial right. The Supreme Court in Booker held that the Sentencing Guidelines' mandatory nature is unconstitutional, in part because the Guidelines, in taking into consideration the defendant's relevant conduct, often produced a sentencing range higher than the mandatory maximum allowed based on facts which the jury found. See United States v. Courtney, 960 F. Supp. 2d at 1186. In Apprendi v. New Jersey, the Supreme Court quoted its recognition in Jones v. United States that the Sixth Amendment's substance, as the Founders saw it, is its protection against substituting new methods of trial in place of the jury trial:

> As we stated in Jones: "One contributor to the ratification debates, for example, commenting on the jury trial guarantee in Art. III, § 2, echoed Blackstone in warning of the need 'to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.' A [New Hampshire] Farmer, No. 3, June 6, 1788, quoted in The Complete Bill of Rights 477 (N. Cogan ed. 1997)."

Apprendi v. New Jersey, 530 U.S. at 484 n.11 (emphasis added)(quoting Jones v. United States, 526 U.S. at 248). See Booker, 543 U.S. at 238-39 ("The Framers of the Constitution understood the threat of 'judicial despotism' that could arise from 'arbitrary punishments upon arbitrary

convictions' without the benefit of a jury in criminal cases." (quoting The Federalist No. 83 at 499 (C. Rossiter ed. 1961))).  Whereas the Supreme Court has held that certain facts necessary to impose a greater mandatory maximum statutory sentence require jury participation in finding those facts, substituting a court's finding of those facts, especially where the standard of proof is a preponderance of the evidence rather than beyond a reasonable doubt, would effectively introduce a new method of trial.  The Supreme Court's recent sentencing decisions requiring jury participation in this factfinding and precluding a court's substitution of facts for the jury's, therefore, preserves the jury's factfinding role as it existed at the Founders' times.  Presumably the Supreme Court justifies the contemporary practice to withhold sentencing ramifications from the jury at trial where its factfinding does not substantially affect the sentence imposed -- i.e., does not affect the range in which the judge can exercise discretion -- does not effectively introduce a new arbitrary method of trial as a substitute for a jury trial, but rather continues the practice of allowing the judge to exercise discretion in sentencing.  See Apprendi v. New Jersey, 530 U.S. at 482 n.9 (noting that, "[u]nder the common-law procedure, the court determines in each case what within the limits of the law shall be the punishment -- the question being one of discretion" (emphasis in original)(quoting 1 J. Bishop, Criminal Law §§ 933-34(1) (9th ed. 1923))).  The Supreme Court in Booker noted that, as Mr. Hamilton wrote in The Federalist No. 83, the Framers' intent in ratifying the Sixth Amendment was to protect from judicial despotism by mandating a jury trial in criminal cases; the Supreme Court has apparently concluded that to withhold instruction about sentencing ramifications from a jury whose facts do not affect the defendant's possible mandatory maximum sentence does not change that the criminal jury trial right is exercised, and fully protected and satisfied, when the jury finds as fact whether the defendant committed the crime.  Moreover, the Supreme Court has apparently decided that, in a contemporary society in which Congress has enacted over three thousand federal criminal laws and substituted mandatory criminal sentences

for the Sentencing Guidelines, the requirement to withhold jury instruction about possible

sentences stems from the concern that their knowledge of sentencing ramifications "distracts them

from their factfinding responsibilities, and creates a strong possibility of confusion," Shannon v.

United States, 512 U.S. at 579, and that keeping the jurors ignorant preserves the defendant's

criminal jury trial right.

The Supreme Court's conclusion that withholding sentencing information may help protect

the defendant's Sixth Amendment jury trial right finds support in the Supreme Court's decision in

Rogers v. United States, in which the Supreme Court held that the district court erred when it told

the jury that it would accept a guilty verdict "with extreme mercy of the Court."  422 U.S. at 40.

The Supreme Court reasoned that the district court's statements to the jurors prejudiced the

defendant, reasoning that the court's statements might have induced a verdict that the jury would

not otherwise have reached:

> The fact that the jury, which had been deliberating for almost two hours without
> reaching a verdict, returned a verdict of "guilty with extreme mercy" within five
> minutes "after being told unconditionally and unequivocally that it could
> recommend leniency," strongly suggests that the trial judge's response may have
> induced unanimity by giving members of the jury who had previously hesitated
> about reaching a guilty verdict the impression that the recommendation might be
> an acceptable compromise.

Rogers v. United States, 422 U.S. at 40 (quoting United States v. Glick, 463 F.2d at 495).  Were

district courts to instruct the jury about the defendant's possible sentence, there is then the issue of

what the Court would say.  The Court could likely give only statutory minimum and maximum or

instruct the jury about the Sentencing Guidelines and their advisory nature.  The Sentencing

Guidelines are often difficult for those with legal training to understand, and the Supreme Court's

concern for instructions about sentencing possibilities leading to jury confusion could come to

fruition rather quickly.[6] Moreover, defendants may find that, as the jury in Rogers v. United States

quickly decided to convict after they learned that the court may be lenient toward the defendant,

knowledge about the Sentencing Guidelines range the defendant faces, and the possibility that a court may vary downward from the guidelines sentence, may result in a guilty verdict where a jury might not otherwise reach one.  Even though the discretion to inform the jury about possible sentences would likely be left to the defendant's wishes whether to so instruct the jury, the defendant may learn to be careful about what he or she wishes.

The Court does not minimize, therefore, the difficulties that fully informing juries about the sentencing ramifications that its verdicts would present.  There are good prudential reasons why the modern American court system has decided to tell the jury not to think about sentencing. See United States v. Courtney, 960 F. Supp. 2d at 1188.  The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism. To keep the jury ignorant of sentencing ramifications is not consistent with the concept of a jury trial at the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at 1188.  To fully protect the defendant's right to a jury trial, it appears necessary to allow him or her to advise the jury about the sentencing ramifications of its verdict.

Nevertheless, the Court is obligated to follow controlling Supreme Court and Tenth Circuit precedent.  See, e.g., Zamora v. Wells Fargo Home Mortg., 831 F. Supp. 2d 1284, 1305 (D.N.M. 2011)(Browning, J.)("While the Court realizes that its decision . . . may in some ways be unfair and unduly harsh ..., the Court is bound to follow binding precedent from the Tenth Circuit."). These courts have been very clear about what a trial court should do: the trial court is not to present any information about possible sentencing unless the jury's participation in sentencing is required. See Shannon v. United States, 512 U.S. at 579 ("It is well established that, when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting Rogers v. United States, 422 U.S. at 40)); United States v. Parrish, 925 F.2d at 1299 ("We hold a jury instruction about mandatory minimum sentences was properly

omitted because the offenses do not specifically require jury participation."); United States v. Greer, 620 F.2d at 1384 ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial. Breach of this standard has often been grounds for reversal.").

## LAW REGARDING JURY NULLIFICATION

One of the most precious and treasured rights that United States citizens and residents have is the Sixth Amendment to the Constitution's right to "an impartial jury." U.S. Const. amend. VI. See Pena-Rodriguez v. Colorado, 580 U.S. 206 (2017). This fundamental right is a cornerstone of the American criminal justice system, and the Sixth Amendment has long embodied and protected this means of resolving criminal charges that the government brings. "That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." Blakely v. Washington, 542 U.S. at 305-06. The jury trial right as preserved in the Bill of Rights was passed down from the right that the Magna Carta enshrines. See United States v. Booker, 543 U.S. 220, 239 (2005)("The Founders presumably carried this concern from England, in which the right to a jury trial had been enshrined since the Magna Carta.").

### 1.    The Jury's Role at the Founders' Time.

"The colonial jury played a vital and celebrated role in American resistance to British tyranny leading up to the revolution. American counsel regularly argued the validity of laws directly to juries, which often refused to enforce British laws they felt were unjust." Andrew J. Parmeter, Nullifying the Jury: "The Judicial Oligarchy" Declares War on Jury Nullification, 46 Washburn L.J. 379, 382-83 (2007)(footnotes omitted). The Honorable Jack Weinstein, United States District Judge for the Eastern District of New York, has noted that, in 1791, at the time of

the Sixth Amendment's ratification, "[i]t was then understood that the jury had the power to refuse to convict even if the facts and law indicated guilt. In later years this fundamental power of the jury -- and the right of the accused -- has been termed the power to nullify." United States v. Polizzi, 549 F. Supp. 2d at 405.

The Supreme Court has recognized that the jury trial right that the Sixth Amendment affords to defendants was understood at the Founders' time to provide essential protections against government tyranny and to safeguard liberty:

> [T]he historical foundation for our recognition of these principles extends down centuries into the common law. "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . ." 4 [Sir William Blackstone, Commentaries on the Laws of England: In Four Books 343 (William D. Lewis ed., 2007)](1769).

Apprendi v. New Jersey, 530 U.S. at 477.  As Alexander Hamilton first noted, this belief in the jury trial right as a safeguard to liberty was widely shared during the constitution-framing era:

> The friends and adversaries of the plan of the Convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury. Or if there is any difference between them, it consists in this; the former regard it as a valuable safeguard to liberty, the latter represent it as the very palladium of free government.

The Federalist No. 83, at 456 (Scott ed. 1894)(Hamilton).  The jury trial right was part and parcel of the Framers' belief that the common person should participate in government, and essential to this participation was ensuring that the judiciary was justly and correctly effectuating the laws, whether the laws were written or natural laws.  See Clay S. Conrad, Jury Nullification 45 (1998)(citing Note, The Changing Role of the Jury in the Nineteenth Century, 74 Yale L.J. 170, 172 (1964)); Diary of John Adams, Feb. 12, 1771, in 2 The Works of John Adams 253 (1850)(quoted in Blakely v. Washington, 542 U.S. at 306 ("[T]he common people, should have as complete a control ... in every judgment of a court of judicature [as in the legislature.]")); Letter

from Jefferson to L'Abbe Arnold, July 19, 1789, in 3 Works of Thomas Jefferson, 81, 82 (1854)(quoted in Mark D. Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582, 582 (1939)("Were I called upon to decide, whether the people had best be omitted in the legislative or judiciary department, I would say it is better to leave them out of the legislative. The execution of laws is more important than the making of them.")).

The criminal jury's role at the Founders' time was primarily that of a factfinder, but also included as a secondary role acting as the community's conscience to determine whether the law, or the application of law to the facts, was conscionable. See United States v. Courtney, 960 F. Supp. 2d 1152, 1164 (D.N.M. 2013)(Browning, J.). Professor Irwin A. Horowitz notes: "While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not." Irwin A. Horowitz, Jury Nullification: An Empirical Perspective, 28 N. Ill. U. L. Rev. 425, 427 (2007-2008)(quoting Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 110 (1998)). Similarly, Clay S. Conrad, a trial lawyer in Houston, Texas with the law firm of Looney & Conrad, P.C., asserts that the Sixth Amendment jury trial right implicitly recognizes criminal juries' right to determine the law -- and thus jury nullification if they believe the law wrong -- because, at the Framers' time, the concept of a jury included the idea that the jury not only decided the facts of a case, but also the law:

> The Sixth Amendment itself implicitly recognizes the right of criminal trial jurors to judge the law. Although it does not mention that power explicitly, it can logically be assumed that the definition of a jury used in that document would be consonant with the prevailing definition in the legal dictionaries of the period. The most common legal dictionary in Colonial Virginia was the British Jacob's Law Dictionary [(1782)]; and within the encyclopedic definition given in Jacob's, the word 'jury' is defined as:

> Jury . . . [s]ignifies a certain number of men sworn to inquire and try the matter of fact, and declare the truth upon such evidence as shall be delivered them in a cause: and they are sworn judges upon evidence in matter of fact.... Juries are ... not finable for giving their verdict contrary to the evidence, or against the direction of the court; for the law supposes the jury may have some other evidence than what is given in court, and they may not only find things of their own knowledge, but they go according to their consciences.

> The right of jurors to judge "according to conscience," then, was implicit within the word "jury" as the drafters of the Bill of Rights understood it. This was the trial by jury the founders knew, and this was the trial by jury they intended to pass on to their progeny.

C. Conrad, supra, at 46-47 (footnotes omitted).  The assertion that criminal juries embraced decisions of law as well as fact finds support in precedent caselaw from the Founders' era.

In Georgia v. Brailsford, 3 U.S. (3 Dall.) 1, 1 L.Ed. 483 (1794), a civil case, the Supreme Court noted that the role of the jury is to be the ultimate finder both of the facts and of the law. See 3 U.S. at 4. A jury decided the case even though the Supreme Court had original jurisdiction, because the State of Georgia was a party to the case.  The Honorable John Day, then-Chief Justice of the Supreme Court of the United States, charged the jury:

> It may not be amiss, here, Gentlemen, to remind you of the good old rule, that on questions of fact, it is the province of the jury, on questions of law, it is the province of the court to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this, and on every other occasion, however, we have no doubt, you will pay that respect, which is due to the opinion of the court: For, as on the one hand, it is presumed, that juries are the best judges of facts; it is, on the other hand, presumable, that the court are the best judges of law. But still both objects are lawfully, within your power of decision.

3 U.S. at 4. In People v. Croswell, 3 Johns. Cas. 337 (N.Y. Sup. Ct. 1804), meanwhile, Mr. Hamilton was counsel for the defendant, who was indicted for libel against then-President Thomas Jefferson.  The trial court in the case instructed the jury that they were to enter a special, as opposed to general, verdict limited to finding only two issues: (i) whether the article was published; and (ii) whether the article's innuendos were true or false. See 3 Johns. Cas. at 342. The jury was instructed

that the defendant's intent -- the element requiring that the defendant intended the statements to be libelous -- was a matter of law exclusively for the court. See 3 Johns. Cas. at 341-42. Mr. Hamilton argued:

> The Chief Justice misdirected the jury, in saying they had no right to judge of the intent and of the law. In criminal cases, the defendant does not spread upon the record the merits of the defence, but consolidates the whole in the plea of not guilty. This plea embraces the whole matter of law and fact involved in the charge, and the jury have an undoubted right to give a general verdict, which decides both the law and the fact . . . .  All the cases agree that the jury have the power to decide the law as well as the fact; and if the law gives them the power, it gives them the right also. Power and right are convertible terms, when the law authorizes the doing of an act which shall be final, and for the doing of which the agent is not responsible.

> The intent constitutes crime. To deny, then, to the jury the right to judge of the intent, and yet to require them to find a general verdict of guilty, is requiring them to commit perjury. The particular intent constitutes the crime, in cases of libel, beca[us]e the act is not, of itself, unlawful; and where the particular intent alone constitutes the guilt, the court cannot judge of that intent, and the jury must find it....

> It is admitted to be the duty of the court to direct the jury as to the law, and it is advisable for the jury in most cases, to receive the law from the court; and in all cases, they ought to pay respectful attention to the opinion of the court. But, it is also their duty to exercise their judgments upon the law, as well as the fact; and if they have a clear conviction that the law is different from what it is stated to be by the court, the jury are bound, in such cases, by the superior obligations of conscience, to follow their own convictions. It is essential to the security of personal rights and public liberty, that the jury should have and exercise the power to judge both of the law and of the criminal intent.

3 Johns. Cas. at 345-46 (emphasis omitted).    The prosecution countered that the sound administration of court business requires that juries be permitted to determine the facts only:

> The jury have, undoubtedly, the power, in criminal cases, to decide the law as well as the fact, if they will take upon themselves the exercise of it; but we must distinguish, in this case, between power and right. It is the right of the jury to decide the fact, and only the fact; and it is the exclusive province of the court to decide the law in all cases, criminal as well as civil. A jury is wholly incompetent, and necessarily must be, from the nature of their institution, to decide questions of law; and if they were invested with this right, it would be attended with mischievous and fatal effects. The law, instead of being a fixed rule, would become uncertain and capricious, and there would not remain any stability or uniformity of decision, or certainty of principle, in the administration of justice . . . .

> If the jury were to judge of the law in the case of libels, why not of the effect of writings in civil cases, and of the law in all cases where the plea is the general issue? Surely the counsel on the other side are not prepared to carry their doctrine to this extent.

3 Johns. Cas. at 350-51. Mr. Hamilton replied:

> But it is not only the province of the jury, in all criminal cases, to judge of the intent with which the act was done, as being parcel of the fact; they are also authorized to judge of the law as connected with the fact. In civil cases, the court are the exclusive judges of the law, and this arose from the nature of pleadings in civil suits; for, anciently, matters of law arising in the defence, were required to be spread upon the record, by a special plea, and the jury were liable to an attaint for finding a verdict contrary to law. But in criminal cases, the law and fact are necessarily blended by the general issue, and a general verdict was always final and conclusive, both upon the law and the fact. Nor were the jury ever exposed to an attaint for a verdict in a criminal case; and this is decisive to prove that they had a concurrent jurisdiction with the court on questions of law; for where the law allows an act to be valid and definitive, it presupposes a legal and rightful authority to do it. This is a sure and infallible test of a legal power.

> In England, trial by jury has always been cherished, as the great security of the subject against the oppression of government; but it never could have been a solid refuge and security, unless the jury had the right to judge of the intent and the law.

> **\*315** The jury ought, undoubtedly, to pay every respectful regard to the opinion of the court; but suppose a trial in a capital case, and the jury are satisfied from the arguments of counsel, the law authorities that are read, and their own judgment, upon the application of the law to the facts, (for the criminal law consists in general of plain principles,) that the law arising in the case is different from that which the court advances, are they not bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions? To oblige them, in such a case, to follow implicitly the direction of the court, is to make them commit perjury, and homicide, under the forms of law. Their error is fatal and cannot be corrected. The victim is sacrificed; he is executed; he perishes without redress. Was he a juror, in such a case, he would endure the rack rather than surrender his own convictions on the altar of power, rather than obey the judicial mandate.

People v. Croswell, 3 Johns. Cas. at 355-56.

The Supreme Court of New York was equally split, with two justices agreeing with Mr. Hamilton and two justices siding with the prosecution.  The Honorable James Kent, then-Associate Justice of the Supreme Court of New York, wrote in agreement with Mr. Hamilton that "[t]here is nothing peculiar in the law of libels, to withdraw it from the jurisdiction of the jury" by requiring

a special verdict. 3 Johns. Cas. at 365-66. Justice Kent reasoned that, in all other areas of criminal law, the jury is charged with finding intent:

> The jury are called to try, in the case of a traitor, not only whether he committed the act charged, but whether he did it traitorously; and in the case of a felon, not only whether he killed such a one, or took such a person's property, but whether he killed with malice prepense, or took the property feloniously. So in the case of a public libeller, the jury are to try, not only whether he published such a writing, but whether he published it seditiously. In all these cases, from the nature of the issue, the jury are to try not only the fact, but the crime, and in doing so, they must judge of the intent, in order to determine whether the charge be true, as set forth in the indictment. The law and fact are so involved, that the jury are under an indispensable necessity to decide both, unless they separate them by a special verdict.

3 Johns. Cas. at 366-67 (emphasis omitted). He thus concluded:

> [U]pon every indictment or information for a libel, where the defendant puts himself upon the country, by a plea of not guilty, the jury have a right to judge, not only of the fact of the publication, and the truth of the innuendoes, but of the intent and tendency of the paper, and whether it be a libel or not; and, in short, of "the whole matter put in issue upon such indictment or information." That in this, as in other criminal cases, it is the duty of the court, "according to their discretion, to give their opinion and direction to the jury on the matter in issue;" and it is the duty of the jury to receive the same with respectful deference and attention, and, unless they choose to find a special verdict, they are then to exercise their own judgments on the matter in issue, with discretion and integrity.

3 Johns. Cas. at 376-77.

The Honorable Morgan Lewis, then-Chief Justice of the Supreme Court of New York, disagreed with Mr. Hamilton and Justice Kent, and concluded that the policies behind not constricting a jury to deciding matters of law are not present in the United States as they were in England:

> It has been urged, that to deny a jury the right of deciding on the law and the fact, in all cases of criminal prosecution, is contrary to the spirit and genius of our government. But how, has not been attempted to be shown. In England, where the judges are appointed by the crown, and juries form a substantial barrier between the prerogatives of that crown and the liberties of the people, the reasons for extending the powers of the latter are certainly much stronger than with us, where the judges are, in effect, appointed by the people themselves, and amenable to them for any misconduct.

People v. Croswell, 3 Johns. Cas. at 409.

As Judge Weinstein notes in United States v. Polizzi, the negative connotations surrounding nullification "ignore history and the meaning of the Sixth Amendment."  549 F. Supp. 2d at 405. The history to which Judge Weinstein refers is the dual roles that the common-law jury played at the Founders' time: its primary role was as factfinder, but its secondary role was to also find the law, often by acquitting if the jury found the law unjust.  See I. Horowitz, supra, at 427 ("While the fact-finder role of the jury is the judicially preferred model of jury functioning, a second, less accepted, but nevertheless viable role of the jury is a purveyor of 'commonsense justice,' the application of a rough and ready sense of what is just and what is not.").

The jury's nullification power was well-known and used during the Founders' time, as common-law juries during the seventeenth and eighteenth century saw the development of the jury's power to acquit against the facts, or, as it was referenced in the time, to find the law in addition to the facts.  See United States v. Courtney, 960 F. Supp. 2d at 1189-90.  In the late-seventeenth century, Edward Bushell, who had been imprisoned for his role in acquitting -- against the court's direction to convict -- two Quakers of the offenses of unlawful assembly and breaching the peace resulting from their preaching, petitioned for a writ of habeas corpus.  See United States v. Polizzi, 549 F. Supp 2d at 405; C. Conrad, supra, at 24.  When the judge instructed the jury about the facts which the prosecution needed to prove to convict, the judge instructed the jury that the prosecution had proved those facts and instructed the jury it was their job to find as fact that the defendants had committed the crimes.  See C. Conrad, supra, at 26 (quoting The Tryal of Wm. Penn and Wm. Mead for Causing a Tumult ..., How. St. Tr. at 6:951 (1670)).  When the jury refused to convict, and Bushell was imprisoned for his failure thereafter to pay a fine, the Honorable John Vaughn, then-Chief Justice of the Court of Common Pleas, held that to require a jury to find guilt because the court believed that all elements of the law were proven is to make the use of a jury

- 39 -

superfluous.  See C. Conrad, supra, at 27.  As one scholar notes, Chief Justice Vaughn's decision "ushered in . . . 'the heroic age of the English jury,' during which 'trial by jury emerged as the principle defense of English liberties,'"  C. Conrad, supra, at 28 (quoting J.M. Beattie, London Juries in the 1690's 214, in J. S. Cockburn & Thomas A. Green, eds., Twelve Good Men and True (1988)), and which influenced the common-law jury to the point that, at the Founders' time, "jury [nullification] [w]as an accepted part of the American law for the next several generations," C. Conrad, supra, at 32.

The Supreme Court in its recent sentencing opinions has not only discussed that the Sixth Amendment jury trial right guarantees the "historical foundation" of the jury as "guard[ing] against a spirit of oppression and tyranny on the part of rulers, and as the great bulwark of our civil and political liberties," Booker, 543 U.S. at 239 (quoting Apprendi v. New Jersey, 530 U.S. at 477), but has specifically pointed out the jury's nullification power at common law. The Supreme Court referenced the jury's power to find against the facts that the evidence establishes in both Apprendi v. New Jersey and Jones v. United States, noting that "juries devised extralegal ways of avoiding jury verdicts . . . ." Apprendi v. New Jersey, 530 U.S. at 479 n.5.  In Jones v. United States, the Supreme Court similarly noted that "[t]his power to thwart Parliament and Crown took the form ... of flat-out acquittals in the face of guilt . . . "  526 U.S. at 245 (quoting 4 W. Blackstone, supra, at 238-39).  The authorities suggest that the common-law jury at the Founders' time had the ability to nullify by acquitting the defendant against the facts that the evidence establishes at trial, or -- as it was referred to at the time -- to determine the law.

There is, therefore, a tension between the historical authority about the common-law jury's role and the Supreme Court's finding in Sparf v. United States "that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court."

156 U.S. 51, 90 (1895).  Justice Harlan's inclusion of the word "rightfully" before "refuse" leaves this statement open to interpretation that, although the nullification power was part of the common-law jury's role, it was nevertheless wrongful to exercise it. Such an argument is, however, irreconcilable with the recent Supreme Court decisions' recognition of the crucial importance of the common-law jury's mitigation power to the Sixth Amendment's preservation of the jury trial right.

2.   **The Evolution of the Jury's Role and Sparf v. United States.**

The Honorable Joseph Story, then-Associate Justice of the Supreme Court of the United States, riding circuit in Massachusetts, issued the first American opinion explicitly limiting the role of jurors in United States v. Battiste, 24 F. Cas. 1042 (C.C.D. Mass. 1835).  See United States v. Polouizzi, 687 F. Supp. 2d 133, 190 (E.D.N.Y. 2010)(Weinstein, J.)(noting that the first of "[t]wo major Supreme Court Justices' opinions in the nineteenth century . . . restricting the Sixth Amendment's jury" right to decide the law is "Justice Story's in . . . United States v. Battiste . . ."), vacated, 393 F. App'x 784 (2d Cir. 2010)(Miner, J., joined by Leval and Wesley, JJ.)(unpublished); C. Conrad, supra, at 65 (noting that 160 years had passed since the introduction of jury nullification, or jurors as deciders of the law, "before Supreme Court Justice Joseph Story, riding circuit in Massachusetts, rendered the first major American court opinion limiting the role of juries ...").  In United States v. Battiste, the defendant was on trial for violating a newly enacted law punishing human trafficking in slaves, and Justice Story was concerned that, because Massachusetts was the first state to abolish slavery and was home to much of the abolitionist movement, the jury would convict him based on their beliefs about slavery rather than on the facts. See United States v. Polouizzi, 687 F. Supp. 2d at 190-91 ("Justice Story's statement was made in the context of *preventing a conviction unfounded under the statute as he construed it, not to prevent the jury from refusing to convict a person technically guilty.*" (emphasis in original)); C. Conrad,

- 41 -

supra, at 66.  Justice Story instructed the jury as to his opinion that the jury determining guilt based on the jurors' own beliefs, rather than on the law as the court told them -- jury nullification -- is inconsistent with the notion of a fair trial:

> Before I proceed to the merits of this case, I wish to say a few words upon a point, suggested by the argument of the learned counsel for the prisoner upon which I have had a decided opinion during my whole professional life. It is, that in criminal cases, and especially in capital cases, the jury are the judges of the law, as well as of the fact. My opinion is, that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case, tried upon the general issue. In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily determine the law, as well as the fact. In each, they have the physical power to disregard the law, as laid down to them by the court. But I deny, that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions, or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court. This is the right of every citizen; and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views, which different juries might take of it; but in case of error, there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury. Indeed, it would be almost impracticable to ascertain, what the law, as settled by the jury, actually was. On the contrary, if the court should err, in laying down the law to the jury, there is an adequate remedy for the injured party, by a motion for a new trial, or a writ of error, as the nature of the jurisdiction of the particular court may require. Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or ignorance, or accidental mistake, to interpret it. If I thought, that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial. But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion. It is not, indeed, an occasion, on which there is any reason to doubt, that an intelligent jury can understand the principles of law applicable to the subject, as well as the court; for they are the principles of common sense. And as little reason is there, in my view, to suppose, that they can operate injuriously to the real merits of the case of the prisoner.

24 F. Cas. at 1043.

In Pierce v. State, 13 N.H. 536 (1843), the Supreme Court of New Hampshire cited United States v. Battiste in holding that the right to return a verdict based on a finding that the law is otherwise than the court gives it to the jury is inconsistent with the proposition that the Constitution is the supreme law of the land:

> [T]he result at which we have arrived is that the juries have not the right to decide the law in any case; that this accords with the best authorities in the common law, and with other legal rights which must be surrendered if they may decide the law; and that they are bound by the law, as laid down to them by the court . . . .
>
> The constitution of the United States, and the acts of Congress made in pursuance thereof, are the supreme law of the land, and the judges in every state are bound thereby. If juries are not bound also, the question can never be settled whether a law be in pursuance of the constitution, and the courts must suspend their judgments until a sufficient number of verdicts has been returned, one way or the other, to render it probable that juries generally in future will return their verdicts the same way, -- for no nearer approach to certainty could be made.
>
> We cannot believe that impartial and reflecting men, of whatever profession they may be, can advocate doctrines which may lead to such results as the right of the jury to decide the law may end in. We cannot think that the people or their representatives would be content with an exposition of the constitution which would cause the constitutionality of the license law to remain an open question, until it could be settled by the verdict of a jury; of a body admirably adapted to the decision of questions of fact, but irresponsible, giving no reasons for their decisions, not subject to impeachment or attaint, without access to the sources of the law, and therefore unfitted for the investigation of legal rights. No reflecting man in the jury box would be willing to take upon himself this responsibility. He would feel that the question could not be examined with the deliberation it required; that the law could not be expounded with quite so much facility as it could be made, -- and that there was no such inspiration in the jury box as would enable twelve men to determine, per saltum, grave questions which, elsewhere, require care, and thought, and patient study, and time for undisturbed reflection. And it is the opinion of the court, that it is inconsistent with the spirit of the constitution that questions of law, and still less, questions of constitutional law, should be decided by the verdict of the jury, contrary to the instructions of the court.

Pierce v. State, 13 N.H. at 551-54.  Courts around the country began to follow suit and adhere to the proposition that allowing juries to decide the law in a case, and to decide against the law as the court gave it to them, is inconsistent with the constitutional right for a fair trial.  See, e.g., Commonwealth v. Porter, 51 Mass. 263, 263, 10 Metcalf 263, 263 (1845)("[I]t is the duty of the

court to give instructions to the jury on all questions of law which arise in a cause tried by them; and it is the duty of the jury to receive the law from the court, and to conform their . . . decision to such instructions...."); State v. Burpee, 65 Vt. 1, 25 A. 964, 973 (1892)("The doctrine that jurors are judges of the law in criminal cases is repugnant to . . . the constitution of Vermont, which guaranty to every person within this state 'a certain remedy' for all wrongs, conformably to the laws....")(quoting Vt. Const. art. 4, 10).

Sixty years after United States v. Battiste, the Honorable John Marshall Harlan, then-Associate Justice of the Supreme Court of the United States, writing for the majority in Sparf v. United States, decided whether a district court could find that manslaughter did not apply as a matter of law and the jury had to follow that instruction, or whether it was wholly the jury's determination.  See United States v. Courtney, 960 F. Supp. 2d at 1170.  The defendants in Sparf v. United States, tried jointly for murder, asserted on appeal that the court invaded the jury's province to determine the law and the facts in criminal cases, where the judge instructed the jury on manslaughter and murder, but also instructed the jury:

> I do not consider it necessary, gentlemen, to explain [manslaughter] further, for if a felonious homicide has been committed, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder. In other words, it may be in the power of the jury, under the indictment by which these defendants are accused and tried, of finding them guilty of a less crime than murder, to wit, manslaughter, or an attempt to commit murder; yet, as I have said in this case, if a felonious homicide has been committed at all, of which I repeat you are the judges, there is nothing to reduce it below the grade of murder.

156 U.S. at 60.  The judge additionally instructed the jury: "[A]s one of the tribunals of the country, a jury is expected to be governed by law, and the law it should receive from the court." 156 U.S. at 63.  The Supreme Court held that the district court did not err in giving these instructions:

> We are of opinion that the court below did not err in saying to the jury that they could not, consistently with the law arising from the evidence, find the defendants guilty of manslaughter, or of any offense less than the one charged; that if the defendants were not guilty of the offense charged, the duty of the jury was to return

a verdict of not guilty. No instruction was given that questioned the right of the jury to determine whether the witnesses were to be believed or not, nor whether the defendant was guilty or not guilty of the offense charged. On the contrary, the court was careful to say that the jury were the exclusive judges of the facts, and that they were to determine -- applying to the facts the principles of law announced by the court -- whether the evidence established the guilt or innocence of the defendants of the charge set out in the indictment.

The trial was thus conducted upon the theory that it was the duty of the court to expound the law, and that of the jury to apply the law as thus declared to the facts as ascertained by them. In this separation of the functions of court and jury is found the chief value, as well as safety, of the jury system. Those functions cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights.

156 U.S. at 106.

Justice Harlan notes the varied opinions of jurists and court decisions dating back to Georgia v. Brailsford, which had recognized that juries necessarily have the right to determine matters of law in addition to fact, but concludes: "We are of the opinion that the law in England at the date of our separation from that country . . . falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court." Sparf v. United States, 156 U.S. at 90.  Justice Harlan reasoned that the incorrect belief about the jury's ability to depart from the law which the court gives to it arises from the jury's ultimate ability to decide guilt or innocence in rendering a general verdict: "The contrary view rests, as we think, in large part, upon expressions of certain judges and writers, enforcing the principle that when the question is compounded of law and fact a general verdict, ex necessitate, disposes of the case in hand, both as to law and fact." 156 U.S. at 90.  He determined, therefore, that "the general common-law rule in criminal cases" at the time of the Sixth Amendment's ratification was

the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury, by a general verdict, of necessity determined in the particular case both law and fact, as compounded in the issue submitted to them.

- 45 -

156 U.S. at 98.  Justice Harlan thus rejected the defendants' contention that the district judge's instructing the jury that it was to follow the law that he gave to them was improper, reasoning:

> We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be.

156 U.S. at 102.  Justice Harlan, articulating the policy behind the Supreme Court's holding, noted that requiring juries to adhere to courts' instructions ensures that laws, even if they may be unpopular, are enforced:

> "As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to purposes of injustice. But, on the other hand, I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen. The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men. To enforce popular laws is easy. But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne."

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 1 Curt.C.C. 62, 63, 26 F.Cas. 1323 (C.C.D. Mass. 1851)).

States quickly followed on the heels of the Supreme Court's decision in Sparf v. United States to restrict the role of juries. Pennsylvania, for instance, clarified its opposition to jury nullification in the case of Commonwealth v. Bryson, 276 Pa. 566, 120 A. 552 (1923), where the defendant challenged the district court's instruction, which provided: "[I]n this sort of case you are the judges of the law and the facts, the law as well as the facts, but you are to take the law from the court as the proper source of information."  120 A. at 554.  The Supreme Court of Pennsylvania noted that correctness of the instruction "is now settled in Pennsylvania," holding: "There is

nothing in the instructions of which defendant can justly complain. It is the duty of the jury to take the law from the court, to the same extent in a criminal case as in any other, and a trial judge can properly so instruct." 120 A. at 554. Further, the Supreme Court of Illinois in 1931 held unconstitutional a statute which provided that juries in criminal cases are the judges of both fact and law, reasoning that the statute "abrogates an essential attribute of the trial of a criminal case by a jury as known to the common law, and results in the deprivation of a right which has been uniformly guaranteed by our successive Constitutions." People v. Bruner, 343 Ill. 146, 175 N.E. 400, 404 (1931). The Supreme Court of Illinois cites Sparf v. United States as authority for the proposition that, at common law, it is a jury's duty to take and apply the law as the judge gives it to the jury. See People v. Bruner, 175 N.E. at 403 (noting that the Supreme Court in Sparf v. United States, "following the rule and practice at common law, [held that] it was the duty of the jury in every criminal case ... to take the law from the court and to apply the law so received to the facts as they found them from the evidence"). The Supreme Court has not directly addressed nullification since Sparf v. United States. See Col. Jeremy S. Weber, Court-Martial Nullification: Why Military Courts Needs a "Conscience of the Commander", 80 A.F. L. Rev. 1, 16-17 (2019).

3.      **The Jury's Current Role.**

"It is well-established that the court instructs the jury as to the rules of law and that the jury applies the facts as they find them to those rules." United States v. Grismore, 546 F.2d 844, 849 (10th Cir. 1976)(citing Sparf v. United States, 156 U.S. at 51). "One touchstone of a fair trial is an impartial trier of fact -- 'a jury capable and willing to decide the case solely on the evidence before it.' " McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984)(quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). A juror meets the constitutional standard for impartiality where the juror "can lay aside his opinion and render a verdict based on the evidence presented in court." Patton v. Yount, 467 U.S. 1025, 1037 n.12 (1984). As the Tenth Circuit has explained, a

"defendant's right to an impartial jury does not include a right to a jury composed of persons who will disregard the district court's instructions."  United States v. James, 203 F.3d 836 (10th Cir. 2000)(table opinion).  Cf. United States v. Fredette, 315 F.3d 1235, 1240-41 (10th Cir. 2003)("The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.")(quoting Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 552 (10th Cir. 1999)).

The Tenth Circuit has held that "there is no right to jury nullification." Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999). Jury nullification is defined as a

> jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness.

Jury Nullification, Black's Law Dictionary at 936 (9th ed. 2009).  "While we recognize that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath."  United States v. Gonzalez, 596 F.3d 1228, 1237 (10th Cir. 2010)(internal quotation marks omitted)(quoting United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983)).  "[W]e disapprove of the encouragement of jury nullification." United States v. Gonzalez, 596 F.3d at 1237.  The Tenth Circuit in Crease v. McKune cited with approval the United States Court of Appeals for the Second Circuit's holding in United States v. Thomas, 116 F.3d 606 (2d Cir. 1997), in which the Second Circuit stated that "the powers of juries to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."  116 F.3d at 615.  Moreover, the Tenth Circuit has held that "the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law." United States v. Rith, 164 F.3d 1323, 1337 (10th Cir. 1999).  See United States v. Powell, 955 F.2d

1206, 1213 (9th Cir. 1992)(holding that criminal defendants are "not entitled to jury nullification instructions").

In <u>United States v. James</u>, the Tenth Circuit upheld a district court judge's sua sponte dismissal of a potential juror who stated his belief that the juror had the power to disregard the judge's admonition on the law and acquit if the juror felt it just to do so.  <u>See</u> 2000 WL 136816, at *4.  The district court judge asked the juror, an emeritus professor of law at the University of Denver, whether he was "willing to accept the law from me as I give it in the instructions," to which the juror responded that his "inclination is to follow the judge's instructions."  2000 WL 136816, at *2.  The juror noted, however, that he had one "qualm" and that was the view that "a jury always has the power to acquit.... [n]ot withstanding the evidence." 2000 WL 136816, at *2. The judge then, immediately, sua sponte dismissed the juror and provided the following explanation to the venire:

> Now, we were on the subject of experience with the law.  I just excused the professor because he expressed a view that the jury can disregard the law. I'm surprised to hear that's being taught, if it is being taught. But at any rate, that's not the law. As I have explained patiently and carefully, the jury has to accept the law as it is, and it's up to the jury to decide on the evidence, you know, whether the evidence meets this high standard of proof, and can certainly decide on an acquittal, as he said, if the evidence doesn't persuade or convince you beyond a reasonable doubt. But the jury can't make up the law, and that's the little exchange that we had there, and I'm sure you followed along with that, but I wanted to make it plain why it was that I excused this teacher.

2000 WL 136816, at *2.  When the defendant appealed, asserting that the judge's sua sponte dismissal of the juror and instruction to the venire violated his Sixth Amendment jury trial rights, the Tenth Circuit affirmed, holding:

> In light of his responses to questions during voir dire, the district court did not abuse its discretion or commit plain error in sua sponte dismissing [the] prospective juror.... A person who is either unwilling or unable to follow the court's instructions is not qualified to be a juror. Nor did the district court commit any error when it informed the jurors that it is their obligation to follow the law as it instructs. In short, the defendant was not deprived of his right to a fair trial.

2000 WL 136816, at *4.

The Tenth Circuit and the Supreme Court bind the Court, and the Court may not provide the jury with an instruction inviting nullification. See United States v. Courtney, 960 F. Supp. 2d at 1189. While in United States v. Courtney, the Court stated that the defendant

> perhaps should be afforded the opportunity to have the Court instruct the jury, or his counsel be allowed to tell the jury, that, if it finds "the law arising in the case is different from that which the court advances," the jurors are "bound by their oaths, by their duty to their creators and themselves, to pronounce according to their own convictions," rather than according to the dictates of the law,

960 F. Supp. 2d at 1196, the Court ultimately held that current Supreme Court and Tenth Circuit controlling law required denial of the requested instruction. See United States v. Courtney, 960 F. Supp. 2d at 1196-97.  The defendant appealed the denial of the instruction, and the Tenth Circuit responded:

> In a lengthy exposition, the district court correctly noted that the role of the Sixth Amendment, like many other portions of our Constitution, has changed over time. However, rather than embarking on a winding and uncertain[3] journey into the minds of the framers, we must follow Supreme Court and Tenth Circuit precedent. Therefore, we state once again that "a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law."

United States v. Courtney, 816 F.3d 681, 681 (10th Cir. 2016)(quoting United States v. Rith, 164 F.3d at 1338).  See United States v. Warwick, 16-CR-4572 MCA, 2017 WL 5027295 (D.N.M. Oct. 30, 2017)(Armijo, C.J.)(concluding that the court's role to instruct the jury on the law and the duty of the jury to obey the instructions have been clearly defined since 1895).  See also United States v. Jensen, No. 17-CR-2566 WJ, 2018 WL 878963 (D.N.M. Feb. 13, 2018)(Johnson, J.)(stating that the Tenth Circuit has repeatedly affirmed that a defendant is not entitled to an instruction advising or encouraging the jury to exercise the power of nullification); United States v. Edwards, 266 F. Supp. 3d 1290, 1322 (D.N.M. 2017)(Browning, J.)(concluding the same).

4. **Withholding From the Jury Information About its Mitigation or Nullification Right Has Lessened the Jury's Control in Judicial Proceedings and Eroded the Common-Law Jury's Role.**

The Supreme Court has stated that not all changes to the jury's role implicate the Sixth Amendment: "We do not suggest that trial practices cannot change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury right could be lost not only by gross denial, but by erosion.'" Apprendi v. New Jersey, 530 U.S. at 483(quoting Jones v. United States, 526 U.S. at 247-48). The question for the Court to decide is whether the judicial exertion of power has changed trial practices to the point where the jury trial right has been unconstitutionally eroded or denied. Requiring courts to keep information about the mitigation or nullification power from the jury has not wholly taken away a defendant's jury trial right. Given that: (i) the Founders contemplated the jury's role to include its right to be the ultimate decider of the law; and (ii) the mitigation power played such a large role in the common-law jury's resolution of a case, however, the contemporary judicially created requirement to keep all information from the jury about its "power" to nullify is inconsistent with the Sixth Amendment jury trial right at the Founders' time.

The Supreme Court has noted that "the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury." Blakely v. Washington, 542 U.S. at 308. Even though an organic change leading to the courts' omissions of any information about the jury's nullification would perhaps not be sufficient to find a judicial exertion of power, such a small evolution is not what occurred. Sparf v. United States and its progeny effectively took away, by the exertion of judicial power, any possibility that the jury might be informed about its role including its nullification or mitigation power. The Supreme Court's decision in Sparf v. United States, which established that it is correct for courts to instruct the jury that the law is the court's

determination to make and solely in its province, and that it is the jury's duty to apply the law as given, is inconsistent with the practices of the Supreme Court in Georgia v. Brailsford and of the New York Supreme Court in People v. Croswell.  To stake out the position that the law is solely the court's province and that it is the jury's duty to apply the law as the Court gives it to the jury is in tension with the Supreme Court's direction that it is the jurors' "right to take upon yourselves to judge . . . both . . . the law as well as the fact in controversy," Georgia v. Brailsford, 3 U.S. at 4 (emphasis added), and that, when, in the jurors' eyes, "the law arising in the case is different from that which the court advances," the jurors are "bound by their oaths, by their duty to their creator and themselves, to pronounce according to their own convictions," rather than according to the dictates of the law, People v. Croswell, 3 Johns. Cas. at 355-56.  The question thus becomes whether this judicial power infringes on the jury's province.

Like the modern-day jury's lack of knowledge about sentencing information, it may be that any lack of the jury's knowledge about its nullification power does not implicate the Sixth Amendment's jury trial right, because even if the jurors' knowledge about nullification has receded, the jury's power to nullify still exists to the same extent that it did in the Founders' time.  See United States v. Courtney, 960 F. Supp. 2d at 1193-94.  As the Honorable Judge Learned Hand, United States Circuit Judge for the United States Court of Appeals for the Second Circuit, observed in Steckler v. United States, 7 F.2d 59 (2d Cir. 1925), however inconsistent jury nullification may be with the jury's role as factfinder and duty to apply the law as given to its findings of fact, the jury retains this nullification power and exercises this power when the jury sees fit to do so regardless whether the court informs the jury about the power:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

7 F.2d at 60.

The Supreme Court and especially the Tenth Circuit have also concluded that this change in practice -- affirmatively to instruct the jury to follow the law which the district court gives to it -- has not unconstitutionally eroded the jury's role from the Founders' conception of that role.  This conclusion finds support in the policy considerations which Justice Harlan noted in Sparf v. United States. Justice Harlan noted that many of the concerns present in England and the colonies in the Framers' era about the injustice that stems from judges as arms of the oppressive state dissipated with the requirements in the United States that judges give their opinions publicly, explain the reasoning behind their opinions, and the repercussion of impeachment guaranteed in the United States Constitution:

> As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to the purposes of injustice.

156 U.S. at 107 (quoting United States v. Morris, 1 Curt.C.C. at 63, 26 F.Cas. 1323).  He reasoned, rather, that placing the duty to expound the law in the courts and requiring the citizens to follow them furthers the interests of justice by helping to ensure that laws which the democratic government enacts are enforced regardless of their popularity:

> I do consider that this power and corresponding duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen. The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men. To enforce popular laws is easy. But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, -- there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne.

Sparf v. United States, 156 U.S. at 107 (quoting United States v. Morris, 1 Curt.C.C. at 63, 26 F.Cas. 1323).  As Judge Weinstein notes, Sparf v. United States produces a court system that can

efficiently deal with the realities of the organic evolution of the American legal system and the jury pool:

> Justice Harlan's majority opinion was well designed to produce a more efficient court system calculated to deal with the growing complexity of the law; the much improved training and professionalism of bench and bar; a lay public increasingly out-of-touch with the law's details; and a desire to provide predictable rules protecting our growing national industry and commerce.

United States v. Polizzi, 549 F. Supp. 2d at 421. These courts have, therefore, been very clear about what a trial court should do when asked to inform the jury about its nullification power or to allow the lawyers to do so: "[N]either the court nor counsel should encourage jurors to violate their oath." United States v. Gonzalez, 596 F.3d at 1237 (internal quotation marks omitted)(quoting United States v. Trujillo, 714 F.2d at 106). See United States v. Gonzalez, 596 F.3d at 1237 ("[W]e disapprove of the encouragement of jury nullification.").

The Constitution was not designed, however, to be neat and efficient, but to protect individual liberty against government despotism. See United States v. Courtney, 960 F. Supp. 2d at 1195. That the jurors' lack of knowledge stems at least in part from the judicial exertion of power, and that the jury's nullification power played an important role in criminal jury trials at the Founders' time, counsels in favor of finding this evolution unconstitutional. In Blakely v. Washington, the State of Washington asserted that, although the jury did not find the aggravating fact supporting the enhancement that the sentencing judge applied, and the sentencing range based on the facts submitted to the jury corresponded with a 49 to 53-month range, the 90-month sentence imposed was nevertheless constitutional, because the statutory maximum for the crime was ten years, and the sentence imposed was under that statutory maximum. See 542 U.S. at 303. Justice Scalia, then-Associate Justice of the Supreme Court, noted, however, that "[o]ur precedents make clear that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict," 542 U.S. at 303 (emphasis

- 54 -

omitted), noting that, "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority," 542 U.S. at 304.  Justice Scalia explained that Apprendi v. New Jersey and its progeny are based on commitment to the Framers' intention in providing the Sixth Amendment jury trial right: the people's ultimate control of the judiciary.

> Our commitment to Apprendi in this context reflects not just respect for longstanding precedent, but the need to give intelligible content to the right of jury trial.  That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary.  See Letter XV by the Federal Farmer (Jan. 18, 1788), reprinted in 2 The Complete Anti-Federalist 315, 320 (H. Storing ed. 1981)(describing the jury as "secur[ing] to the people at large, their just and rightful control in the judicial department"); John Adams, Diary Entry (Feb. 12, 1771), reprinted in 2 Works of John Adams 252, 253 (C. Adams ed. 1850)("[T]he common people, should have as complete a control . . . in every judgment of a court of judicature" as in the legislature); Letter from Thomas Jefferson to the Abbe Arnoux (July 19, 1789), reprinted in 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed. 1958)("Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative"); Jones v. United States, 526 U.S. 227, 244-48 [119 S.Ct. 1215, 143 L.Ed.2d 311] . . . (1999).  Apprendi carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict.  Without that restriction, the jury would not exercise the control that the Framers intended.

Blakely v. Washington, 542 U.S. at 305-06.  To take away the defendant's ability to inform the contemporary jury about its nullification power, which was central to the common-law jury's role in ensuring that the people kept "ultimate control ... in the judiciary," 542 U.S. at 306, effectively takes away the modern jury's ability to withhold a guilty verdict where it believes to do so is just. This situation is particularly the case when a court instructs the jury that it must follow the court's instructions on the law and set aside any beliefs it may have about what the law should be. In such a case, because the jury did "not exercise the control that the Framers intended," the sentence that the court subsequently imposes on the defendant does not "derive[ ] wholly from the jury's verdict," as the Framers contemplated "jury," and therefore violates the Framers' intent in

- 55 -

preserving the jury trial right in the Sixth Amendment.  Blakely v. Washington, 542 U.S. at 305-06.

Because the common-law jury at the Founders' time was in control of the judiciary by virtue of rendering the ultimate decision in its verdict, and because the courts at the time of the Founders told the jury that the jury was the master of the law and of the facts, the Supreme Court's and the Tenth Circuit's precedent that the trial court should not instruct the jury about nullification is inconsistent with the Framers' intention in adopting the Sixth Amendment jury trial right. Moreover, the requirement that the court not allow the lawyers to encourage nullification is inconsistent with the practice at the time of the Framers, as Mr. Hamilton's conduct in People v. Croswell exhibits.  Even though it is messy to talk openly to the jury about jury nullification in the modern American judicial system, the Constitution is not structured solely to efficiently convict defendants.

The Court has made clear its belief that the jury has the power to put off the law as the Court gives it and to convict according to the jury's conscience.  This power has been a long-standing bulwark against the threat of judicial despotism and congressional tyranny, yet the Court is left no choice but to deny defendants' motions requesting this right.  Despite the Supreme Court's possible receptiveness to reconsider the issue of jury nullification and the courts' role in educating the jury of its power, the Supreme Court has not directly ruled on the issue. The Court must defer, therefore, to the Supreme Court's guidance to district courts that, where a recent decision casts doubt about Supreme Court caselaw's precedential value, district courts must adhere to the established precedent until the Supreme Court explicitly reconsiders it.  See Hohn v. United States, 524 U.S. 236, 252-53 (1998)("[O]ur decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continued validity."); United States v. Courtney, 960 F. Supp. 2d at 1199 ("Thus, although the recent Supreme

Court case law discussing the Sixth Amendment jury trial right calls into question the language in this instruction, the Court cannot say that the Supreme Court has effectively ruled this instruction unconstitutional.").

## ANALYSIS

The Court grants the Motion in Limine in part and denies the Motion in Limine in part. First, the Court does not enter a blanket bar precluding Jessen from introducing evidence, making statements, or asking questions regarding allegations of the United States' misconduct, because such a blanket exclusion is inconsistent with the evidence-by-evidence analysis that the Federal Rules of Evidence requires; Jessen should approach the bench before going into these areas so that the Court can give a fully informed ruling. Second, the Court precludes Jessen from introducing evidence, making statements, or asking questions regarding the Court's rulings on pretrial motions, because the Court wants the jury to focus on the admitted evidence, and not on what the Court does or does not do. Third, the Court does not preclude Jessen from asking questions regarding information or facts which could only come to the jury's attention through Jessen's sworn testimony, but Jessen must approach the bench before asking these questions for the Court to make an informed decision. Fourth, the Court precludes Jessen from attempting to impeach any witness with prior administrative disciplinary findings unless the Court has an opportunity to review such evidence at the bench, and Jessen agrees to this bench approach procedure. Fifth, the Court precludes Jessen from mentioning the possible sentencing consequences that Jessen faces if convicted, because the jury's role is limited to determining guilt or innocence. Sixth, the Court precludes Jessen from suggesting or mentioning jury nullification to the jury, because under existing controlling law, neither the Court nor counsel should encourage jurors to violate their oath by refusing to apply the law as instructed.

I.      **THE COURT DOES NOT ENTER A BLANKET BAR PRECLUDING JESSEN FROM INTRODUCING EVIDENCE, MAKING STATEMENTS, OR ASKING QUESTIONS REGARDING ALLEGATIONS OF THE UNITED STATES' MISCONDUCT.**

The United States asks the Court to preclude Jessen from "introducing any evidence, making any statement, or asking any questions regarding allegations of government misconduct, constitutional violations, and any other issues that may be, or has been, raised by the defendant in his pretrial motions while the jury is present." Motion in Limine at 1. Jessen argues that the United States' request is an overly broad exclusion that categorically excludes evidence "that may be highly relevant and admissible for proper purposes, including impeachment, establishing bias or motive, challenging the credibility of witnesses, and demonstrating the reliability or unreliability of investigative methods." Response at 1-2. The Court agrees with Jessen that the United States' request is overly broad.

The United States does not assert the grounds on which the Court should exclude evidence of government misconduct. See Motion in Limine at 1. Instead, the United States asserts only that this evidence is unfairly prejudicial and minimally probative. See Motion in Limine at 1. Thus, the United States is invoking rule 403. A motion in limine asks the Court "'to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" Palmieri v. Defaria, 88 F.3d 136, 141 (2nd Cir. 1996)(quoting Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc., 652 F. Supp. 1400, 1401 (D. Md. 1987)(Smalkin, J.)). The Court cannot balance meaningfully, however, the governmental misconduct's probative value against its prejudicial effect without knowing more about the misconduct and the reasons for which Jessen plans to introduce the calls:

> As a procedural matter, the movant should identify the particular evidence at issue and articulate with specificity the arguments supporting the position that the particular evidence is inadmissible on any relevant ground. A court is well within

its discretion to deny a motion in limine that fails to identify the evidence with particularity or to present arguments with specificity.

United States v. Cline, 188 F. Supp. 2d 1287, 1292 (D. Kan. 2002)(Crow, J.), aff'd, 349 F.3d 1276 (10th Cir. 2003)(citing National Union v. L.E. Myers Co. Group, 937 F. Supp. 276, 287 (S.D.N.Y. 1996)(Kram, J.)).  Accordingly, a motion "'seeking to prohibit generic, unspecified prejudicial testimony [is] not useful.'"  United States v. Enns, No. 15-10045-JTM, 2015 WL 8770006, at *1 (D. Kan. Dec. 14, 2015)(Marten, J.)(quoting Hemetek v. United States, No. 3:08-CR-00198, 2012 WL 3870620, at *9 (S.D. W. Va. April 25, 2012)(Eifert, M.J.)).

The Court therefore declines to issue a categorical prohibition against any and all allegations of government misconduct.  The parties have not informed the Court what allegations may come up at trial.  Should Jessen wish to present such evidence, he must bring it to the Court's attention at the bench before introducing it at trial in front of the jury.

## II. THE COURT PRECLUDES JESSEN FROM INTRODUCING EVIDENCE, MAKING STATEMENTS, OR ASKING QUESTIONS REGARDING THE COURT'S RULINGS ON PRETRIAL MOTIONS.

The United States next asks the Court to preclude Jessen from "introducing any evidence, making any statement, or asking any questions regarding the contents of, or rulings on, any pretrial motions filed by either the defense or the government in the jury's presence."  Motion in Limine at 2.  Jessen responds that the United States seeks an overly broad exclusion that categorically excludes evidence that could become "relevant and necessary to the presentation of evidence and of examination of witnesses."  Response at 4.  The Court agrees with the United States that its rulings on pretrial motions are irrelevant to the jury's consideration of the facts of this case.

Rule 402 of the Federal Rules of Evidence provides that only relevant evidence is admissible.  See Fed. R. Evid. 402.  "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Of course,

"[t]he standard is not stringent; it is aimed at each 'brick' of evidence potentially making a wall and not every witness 'mak[ing] a home run.'" United States v. Yazzie, 188 F.3d 1178, 1189 (10th Cir.1999)(quoting Fed. R. Evid. 401 advisory committee's note).   Rule 403 excludes otherwise relevant evidence, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

The Court concludes that its rulings on pretrial motions are irrelevant to the jury's consideration of this case's facts.  Although Jessen argues that those rulings may bear on his defense, the relevant information is the underlying evidence at issue in the motions and not the Court's rulings themselves.  The danger of unfair prejudice and juror confusion substantially outweighs any minimal relevance the rulings may have.  Informing the jury that the Court previously resolves issues in one party's favor risks improperly influencing the jury's evaluation of the evidence.  It also risks confusing the issues before the jury.  To the extent that either party seeks to introduce evidence referenced in a pretrial motion, that party may request permission outside the jury's presence, and the Court will rule once it is informed fully of the context and purpose of the proposed evidence.  See United States v. Enns, 2015 WL 8770006, at *1 ("Seeking to prohibit generic, unspecified prejudicial testimony [is] not useful.").

The Court therefore precludes Jessen from introducing evidence, making statements, or asking questions regarding the Court's rulings on pretrial motions in the jury's presence.  If either party seeks to introduce evidence at issue in a pretrial motion, that party first must approach the bench and obtain the Court's permission before presenting the evidence to the jury.

## III.   THE COURT DOES NOT PRECLUDE JESSEN FROM ASKING QUESTIONS REGARDING INFORMATION OR FACTS WHICH ONLY COULD COME TO THE JURY'S ATTENTION THROUGH JESSEN'S SWORN TESTIMONY.

The United States requests that the Court prohibit Jessen from "introducing any evidence, making any statement, or asking any questions regarding any information or facts which could only otherwise come to the jury's attention through the sworn testimony of the defendant, unless the defendant will, in fact, testify." Motion in Limine at 2. The Court denies the United States' pretrial request, as the Court and two other judges in the District of New Mexico have done when faced with identical requests from the United States. See United States v. Johnson, No. CR 18-2665 JAP, 2020 WL 406370, at *4 (D.N.M. Jan. 24, 2020)(Parker, J.); United States v. Begay, 497 F. Supp. 3d 1025, 1087 (D.N.M. May 15, 2020)(Browning, J.); United States v. Coriz, No. CR 17-1105 JCH, 2019 WL 2076791, at *2 (D.N.M. May 10, 2019)(Herrera, J.). The Court can address better the United States' concerns when the United States can identify more specifically the evidence that it wishes to exclude and the reasons for its exclusion. The Court therefore does not preclude Jessen pretrial from asking questions regarding information or facts which could come only from Jessen, but Jessen must approach the bench before asking questions based only on Jessen's knowledge so that the Court may make a more informed decision.

The United States seeks to prevent Jessen from eliciting his own exculpatory statements from the United States' witnesses and prevent Jessen's counsel from using information to frame a question that states information which could come only from Jessen. See Motion in Limine at 2-3. While party opponent's statements are not hearsay, self-serving statements from the defendant by the defendant are inadmissible. See United States v. Larsen, 175 F. App'x 236, 241 (10th Cir. 2006)("Rule 801(d)(2), which excludes from the definition of hearsay admissions by a party-opponent, does not apply because the rule does not permit self-serving, exculpatory statements made by a party and offered by that same party."); United States v. Cunningham, 194 F.3d 1186, 199 (11th Cir. 1999)("[A] defendant cannot attempt to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination."); United States v. Begay,

497 F. Supp. 3d at 1087 (holding that a defendant is unable to elicit his own exculpatory statements from law enforcement).  Thus, Jessen needs to run these questions by the Court before he asks them so that the Court can decide whether they should be asked.

**IV.    THE COURT PRECLUDES JESSEN FROM ATTEMPTING TO IMPEACH ANY WITNESS WITH PRIOR ADMINISTRATIVE DISCIPLINARY FINDINGS UNLESS THE COURT HAS AN OPPORTUNITY TO REVIEW SUCH EVIDENCE AT THE BENCH.**

The United States requests that the Court preclude Jessen "from engaging in any attempt to impeach any witness with prior administrative disciplinary findings unless and until the Court has an opportunity to review such evidence to determine its admissibility."  Motion in Limine at 3.  Jessen agrees with the United States' request for a bench approach procedure.  See Response at 7.  The Court therefore concludes that, should any party attempt to impeach a witness with prior administrative disciplinary findings, the party first must approach the bench so that the Court can make an informed decision.

Jessen further requests that the Court require the United States to conduct a "thorough examination of all anticipated witnesses regarding any prior administrative discipline, lawsuits, or misconduct allegations."  Response at 7.  Jessen asserts that the United States' "acknowledgement that it is not currently aware of any such instances suggests that it has not yet conducted a thorough inquiry necessary to fulfill its disclosure obligations."  Response at 7.  The Court disagrees with Jessen's assertion.  The United States' representation that it is unaware of any impeachment evidence does not establish that it does not conduct the necessary inquiry, nor does it justify requiring a broader investigation.  The Court nevertheless orders the United States to review each testifying witness' personnel file to determine whether any materials subject to disclose under Brady v. Maryland, 373 U.S. 83 (1963)("Brady") or Giglio v. United States, 405 U.S. 150 (1972)("Giglio"), exist.  See United States v. Hykes, 2016 WL 1730125, at *19 (D.N.M. April 11,

2016)(Browning, J.)(holding that the United States should review administrative reports to determine whether they contain discoverable material).

Similarly, the current United States Attorneys' Manual also requires prosecutors "to seek all exculpatory and impeachment information from . . . federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant."  United States Attorneys' Manual § 9-5-001(B)(2)(2020). The United States must produce Brady and Giglio materials immediately.  The United States must review the administrative records of testifying witnesses to determine whether any materials must be disclosed.

**V.      THE COURT PRECLUDES JESSEN FROM MENTIONING THE POSSIBLE SENTENCING CONSEQUENCES JESSEN FACES IF CONVICTED.**

Whether to permit a defendant to present evidence concerning sentencing ramifications has confronted the Court numerous times. See, e.g., United States v. Woody, 336 F.R.D. 293 (D.N.M. 2020)(Browning, J.); United States v. Young, 403 F. Supp. 3d 1131 (D.N.M. 2019)(Browning, J.); United States v. Baker, 342 F. Supp. 3d 1189 (D.N.M. 2018)(Browning, J.); United States v. Edwards, 266 F. Supp. 3d 1290 (D.N.M. 2017)(Browning, J.); United States v. Folse, No. CR 15-2485 JB, 2015 WL 10383584 (D.N.M. Nov. 9, 2015); United States v. Courtney, 960 F. Supp. 2d 1152; United States v. Jim, 2012 WL 119607 (D.N.M. 2012).  While the Court is sympathetic to defendants' arguments that not permitting juries to hear about the sentencing ramifications of their verdicts is contrary to the juries' role at the country's founding, see, e.g., United States v. Courtney, 960 F. Supp. 2d at 1154, the Court is bound to follow clear precedent from the Tenth Circuit and the Supreme Court, which currently hold that juries may not hear this information.  See Rogers v. United States, 422 U.S. 35, 40 (1975); United States v. Courtney, 816 F.3d 681 (10th Cir. 2016).

Accordingly, the Court precludes Jessen from mentioning the possible sentencing consequences he faces if convicted.

## VI.    THE COURT PRECLUDES JESSEN FROM SUGGESTING OR MENTIONING JURY NULLIFICATION TO THE JURY.

The United States asks the Court to prevent Jessen from discussing jury nullification to the jury. See Motion in Limine at 4. The common-law jury at the Framer's time knows about its ability to nullify -- knows that it has the ability to acquit the defendant or mitigate the verdict regardless whether the evidence proves beyond a reasonable doubt that the defendant is guilty -- and the court informs the jury that its role includes acting as the final arbiter of law. See United States v. Courtney, 960 F.Supp.2d at 1198. At the Framers' time, a jury's exercise of its nullification power was a proper exercise of its duty. See United States v. Courtney, 960 F.Supp.2d at 1198. The Supreme Court in Sparf v. United States considers whether such a position is efficient and announces that "[the jury cannot] rightfully refuse to act upon the principles of law announced by the court." 156 U.S. at 90. The Court concludes that, even though the Court believes that a defendant's Sixth Amendment jury trial right should include both the right to instruct the jury about the nullification power, and to allow his or her counsel to argue for nullification, it must follow the Tenth Circuit's directions not to instruct the jury about this power. See United States v. Rith, 164 F.3d at 1337 ("[T]he law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law."); United States v. Thomas, 116 F.3d at 615 ("[T]he powers of the jury to 'nullify' or exercise a power of lenity is just that -- a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent."). At a minimum, it appears that the Court should not be lying to or misleading the jury -- telling the jurors that they do not have the power to nullify

or mitigate -- when in fact the jury has that power.  Nevertheless, because of controlling precedent, the Court bars Jessen from discussing jury nullification in front of the jury.

**IT IS ORDERED** that: (i) the United States' Motions in Limine, filed March 13, 2026 (Doc. 83), is granted in part and denied in part; (ii) the Court does not enter a blanket bar precluding Defendant Paul Jessen from introducing evidence, making statements, or asking questions regarding allegations of Plaintiff United States of America's misconduct, but Jessen should approach the bench before going into these areas in the jury's presence; (iii) the Court precludes Jessen from introducing evidence, making statements, or asking questions regarding the Court's rulings on pretrial motions; (iv) the Court does not preclude Jessen from asking questions regarding information or facts which could come to the jury's attention only through Jessen's sworn testimony, but Jessen must approach the bench before asking these questions; (v) the Court precludes Jessen from attempting to impeach any witness with prior administrative disciplinary findings unless the Court has an opportunity to review such evidence at the bench; (vii) the Court orders the United States to review the administrative records of testifying witnesses to determine whether any materials must be disclosed under Brady v. Maryland, 373 U.S. 83 (1963)("Brady") or Giglio v. United States, 405 U.S. 150 (1972)("Giglio"); Brady and Giglio materials must be disclosed immediately; (viii) the Court precludes Jessen from mentioning the possible sentencing consequences that Jessen faces if convicted; and (ix) the Court precludes Jessen from suggesting or mentioning jury nullification to the jury.

_____
UNITED STATES DISTRICT JUDGE

- 66 -

*Counsel:*

Chad E. Meacham
  Acting United States Attorney
Sean M. Long
Ryan Redd
  Assistant United States Attorney
United States Attorney's Office
Lubbock, Texas

      *Attorneys for the Plaintiff*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

-- and --

Joel R. Meyers
Law Office of Joel R. Meyers
Santa Fe, New Mexico

      *Attorneys for the Defendant*